UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

RIMU CAPITAL LTD.,

      *Plaintiff,*

   vs.

JASON ADER, SPRINGOWL ASSET
MANAGEMENT LLC, SPRINGOWL
ASSOCIATES LLC, ADER FUND
MANAGEMENT LLC, and 26 CAPITAL
HOLDINGS LLC,

      *Defendants.*

Civil Action No. 1:23-cv-05065-LJL

**Oral Argument Requested**

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**</u>
<u>**MOTION TO DISMISS UNDER RULES 12(B)(1) AND 12(B)(6)**</u>

Samuel J. Lieberman
Frank S. Restagno
Kathleen D. Reilly
SADIS & GOLDBERG LLP
551 Fifth Avenue, 21st Floor
New York, NY 10176

September 1, 2023

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS .........................................................................................2

    A.    Ader Forms 26 Capital Holdings, LLC ("Sponsor"), the Sponsor of 26 Capital Acquisition Corp., a SPAC Formed for a Gaming Industry Merger .......... 2

    B.    Defendants Offer Rimu an Investment in the Sponsor's SPAC Founder Shares and Private Placement Warrants – in an Arm's Length Transaction Where Rimu Disclaimed All Reliance on Any "Information Or Advice" from Defendants .................................................................................................. 4

    C.    The Plain Terms of the Rimu Subscription Agreement and the Sponsor Operating Agreement Show that Rimu Did Not Acquire Any Residual Percentage .............................................................................................................. 6

    D.    Rimu's 2018 SpringOwl Investment Management Agreement Does Not Address the Sponsor Investment Made Over 3 Years Later in 2021 – and Instead Is Expressly Limited to an Entirely Different, Preexisting Investment ...................................................................................................................... 7

    E.    Rimu Knew for Over a Year Before Bringing Suit that its $25 Million Investment Was Distributed to Another Investor – Yet Waited to Bring Suit Until After a Related Delaware Action Disputing Whether the Merger Will Close ...................................................................................................................... 8

LEGAL STANDARD..................................................................................................9

ARGUMENT ...........................................................................................................10

I.    THE COMPLAINT FAILS TO PLEAD A PRIVATE RIGHT OF ACTION UNDER THE INVESTMENT ADVISERS ACT ......................................................10

II.    THE COMPLAINT FAILS TO ESTABLISH AN ADVISORY RELATIONSHIP OR DUTY TO DISCLOSE FOR RIMU'S 26 CAPITAL SPONSOR INVESTMENT .........12

III.    RIMU'S EXTENSIVE DISCLAIMERS OF RELIANCE DEFEAT ITS FRAUD, NEGLIGENT MISREPRESENTATION, AND FIDUCIARY DUTY CLAIMS AS A MATTER OF LAW ................................................................................................15

IV.    THE ALLEGED MISREPRESENTATIONS AND OMISSIONS ARE IMMATERIAL AS A MATTER OF LAW ..................................................................18

V.    RIMU'S CLAIMS BASED ON DISTRIBUTIONS TO ADER SHOULD BE DISMISSED UNDER RULE 23.1 AND RULE 12(B)(6) ................................................21

A.      The Distribution Claims Are Derivative Claims for Which No Demand
        Was Made nor Demand Futility Plead with Particularity to Satisfy Rule
        23.1.................................................................................................................... 21

B.      The Complaint Fails to State a Breach of the Operating Agreement or
        Fiduciary Duty in Paying Out the Distribution...................................................... 22

VI.     THE COMPLAINT FAILS TO PLEAD SCIENTER WITH PARTICULARITY...........24

VII.    THE ENTIRE COMPLAINT SHOULD BE DISMISSED FOR LACK OF SUBJECT
        MATTER JURISDICTION.............................................................................................24

CONCLUSION....................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Airborne Health, Inc. v. Squid Soap*,
  LP, 2010 WL 2836391 (Del. Ch. July 20, 2010) ...................................................19

*Carnegie-Mellon Univ. v. Cohill*,
  484 U.S. 343 (1988) ...................................................................................................24

*Clark v. Davenport*,
  2019 WL 3230928 (Del. Ch. July 18, 2019) .........................................................19

*Dane v. UnitedHealthcare Ins. Co.*,
  974 F.3d 183 (2d Cir. 2020) ......................................................................................9

*Dohmen v. Goodman*,
  234 A.3d 1161 (Del. 2020) .......................................................................................16

*EBC I, Inc. v. Goldman Sachs & Co.*,
  91 A.D.3d 211 (1st Dep't 2011) .............................................................................13

*Frati v. Saltzstein*
  2011 WL 1002417 (S.D.N.Y. Mar. 14, 2011) ......................................................18

*In re Frederick's of Hollywood, Inc.*,
  2000 WL 130630 (Del. Ch. Jan. 31, 2000) ...........................................................21

*Gamm v. Sanderson Farms, Inc.*,
  2018 WL 1319157 (S.D.N.Y. Jan. 19, 2018), *aff'd,* 944 F.3d 455 (2d Cir.
  2019) ...........................................................................................................................10

*Giddings v. U.S.*,
  2023 WL 4492411 (S.D.N.Y. July 12, 2023) ......................................................10

*Grunstein v. Silva*,
  2009 WL 4698541 (Del. Ch. Dec. 8, 2009) ........................................................23

*Harsco Corp. v. Segui*,
  91 F.3d 337 (2d Cir. 1996) ......................................................................................18

*IAC Search, LLC v. Conversant LLC*
  2016 WL 6995363 (Del. Ch. Nov. 30, 2016) ......................................................17

*Infomedia Grp., Inc. v. Orange Health Sols., Inc.*,
  2020 WL 4384087 (Del. Super. Ct. July 31, 2020) ..................................16, 17, 19

iii

*IRA Trust FBO Bobbie Ahmed v. Crane*,
    2017 WL 7053964 (Del. Ch. Dec. 11, 2017) .......................................................................20

*Kassover v. UBS AG*,
    619 F. Supp. 2d 28 (S.D.N.Y. 2008) ...............................................................................11, 14

*KDH Consulting Grp. LLC v. Iterative Cap. Mgmt. L.P.*,
    2020 WL 7251172 (S.D.N.Y. June 29, 2020) ...................................................................2, 11

*Kolari v. N.Y. Presbyterian Hosp.*
    455 F.3d 118 (2d Cir. 2006) ...............................................................................................24

*Lim v. Radish Media Inc.*,
    2023 WL 2440160 (2d Cir. Mar. 10, 2023) .........................................................................24

*Metro Ambulance, Inc. v. E. Med. Billing, Inc.*,
    1995 WL 409015 (Del. Ch. July 5, 1995) ...........................................................................13

*MidCap Funding X Tr. v. Graebel Companies, Inc.*,
    2020 WL 2095899 (Del. Ch. Apr. 30, 2020) .......................................................................17

*Miracle Ventures I, LP v. Spear*,
    2022 WL 16578962 (S.D.N.Y. Nov. 1, 2022) .....................................................................15

*In re Nat'l Collegiate Student Loan Trusts Litig.*,
    251 A.3d 116 (Del. Ch. 2020) .............................................................................................13

*Negrete v. Citibank, N.A.*,
    187 F. Supp. 3d 454, 465 (S.D.N.Y. 2016) .........................................................................24

*Nexpoint Diversified Real Est. Tr. v. Acis Cap. Mgmt., L.P.*,
    620 F. Supp. 3d 36, 43 (S.D.N.Y. 2022) .........................................................................1, 10

*Norton v. Town of Brookhaven*,
    2023 WL 3477123 (2d Cir. May 16, 2023) ...................................................................24, 25

*Omega Overseas Partners, Ltd. v. Griffith*,
    2014 WL 3907082 (S.D.N.Y. Aug. 7, 2014) .......................................................................12

*Osborn ex rel. Osborn v. Kemp*,
    991 A.2d 1153 (Del. 2010) ..................................................................................................23

*Rapillo v. Fingerhut*,
    2016 WL 11705140 (S.D.N.Y. Sept. 14, 2016) ..................................................................11

*Roman y Gordillo, S.C. v. The Bank of New York Mellon Corp.*,
    2015 WL 5786460 (S.D.N.Y. Sept. 29, 2015) ....................................................................25

*San Diego Cnty. Emps. Ret. Ass'n v. Maounis*,
    749 F. Supp. 2d 104 (S.D.N.Y. 2010)....................................................18

*Schiff v. ZM Equity Partners, LLC*,
    2020 WL 5077712 (S.D.N.Y. Aug. 27, 2020) ..............................21, 22

*Sullivan v. Ruvoldt*,
    2017 WL 1157150 (S.D.N.Y. Mar. 27, 2017) ....................................25

*Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*,
    444 U.S. 11 (1979)........................................................................1, 11

*Wu v. Bitfloor, Inc.*,
    460 F. Supp. 3d 418, 423 (S.D.N.Y. 2020).........................................10

*Zirn v. VLI Corp.*,
    681 A.2d 1050 (Del. 1996) ................................................................16

**Statutes**

15 U.S.C. § 80b-6 ("Investment Advisers Act") ............................... *passim*

Fed. R. Civ. P. 9(b) ......................................................................10

Fed. R. Civ. P. 12(b) ...........................................................9, 10, 21

Fed. R. Civ. P. 23.1..........................................................2, 21, 22

Section 29(b) of the Exchange Act ...................................................18

**Other Authorities**

Restatement (Third) of Torts §16 ....................................................14

## PRELIMINARY STATEMENT

The Complaint should be dismissed in its entirety, because (1) it fails to plead a federal private right of action under the Investment Advisers Act of 1940 (the "Advisers Act"); and (2) Plaintiff, a very sophisticated investor, broadly disclaimed reliance on "any information or advice" from Defendants for the disputed 26 Capital Sponsor Investment, which fatally undermines the Complaint's allegations of reasonable reliance and a fiduciary relationship giving rise to a duty to disclose omitted information. (Ex. 1,[1] Rimu Subscription Agmt. Sched I; Compl. ¶¶ 18-23).

*First*, the Complaint alleges a claim "under Section 206 of the Advisers Act" at "15 U.S.C. § 80b-6." (Compl. ¶6.) But "there is no private right of action to bring a claim pursuant" to "Section 206." *Nexpoint Diversified Real Est. Tr. v. Acis Cap. Mgmt., L.P.*, 620 F. Supp. 3d 36, 43 (S.D.N.Y. 2022) (citing *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 19-25 (1979)).

Instead, there is only a limited private right of action under Advisers Act Section 215 to rescind an advisory contract that requires illegal conduct, and for restitution of advisory fees only. But the Complaint does not allege the Subscription Agreement requires illegal conduct, and does not seek restitution of advisory fees. Instead, it seeks a return of Plaintiff's entire $25 million investment – which is improper for an Advisers Act claim. *See TAMA*, 444 U.S. at 24 n.14.

*Second*, the fraud, misrepresentation/omission, and fiduciary duty claims challenging the Rimu Subscription Agreement for the 26 Capital Sponsor Investment should be dismissed, because the Complaint cannot establish an investment adviser or fiduciary relationship for that investment. The Subscription Agreement expressly disclaims reliance on "any information or advice" from 26 Holdings or "any of its affiliates." (Ex. 1, Rimu Subscription Agmt. Sched I.) Similarly, the Investment Management Agreement ("IMA") cited in the Complaint expressly limits its

---

[1] Citations to "Ex.__" refer to exhibits to the September 1, 2023 Declaration of Samuel J. Lieberman filed herewith.

investment adviser relationship to a "Preexisting Investment" that is entirely different from, and which occurred over three years before, the 26 Capital Sponsor Investment.

*Third*, Plaintiff's breach of contract and breach of fiduciary duty claims alleging improper 26 Capital Holdings cash distributions to Ader should be dismissed because (i) they are derivative claims that fail Rule 23.1's strict demand requirements and (ii) the Operating Agreement permitted cash distributions to Mr. Ader for his Residual Percentage Interest. The Rimu Subscription Agreement is clear that Rimu did not acquire any Residual Percentage Interest in 26 Capital Holdings LLC ("26 Holdings") that would give Rimu a right to share in the Ader cash distributions. Rather, Rimu only acquired interests in Founder Shares and Private Placement Warrants – which the Subscription Agreement is clear would be the only basis for a return on its investment.

*Finally*, this Court lacks subject matter jurisdiction over any remaining claims, because the Complaint relies entirely on the bogus Adviser's Act claim for subject matter jurisdiction. (Compl. ¶¶ 6-7.) Further, the Complaint admits there is no complete diversity to save jurisdiction, because Plaintiff is admittedly a member of Defendants 26 Holdings. (*Id.* ¶ 113.)

Accordingly, the Complaint should be dismissed in its entirety.

## STATEMENT OF FACTS

### A. Ader Forms 26 Capital Holdings, LLC as the Sponsor of 26 Capital Acquisition Corp., a SPAC Formed for a Gaming Industry Merger

This case focuses on Rimu's investment in 26 Capital Holdings, LLC ("Sponsor"), the sponsor entity for the Special Purpose Acquisition Company ("SPAC") 26 Capital Acquisition Corp. ("26 Capital"). (Compl. ¶23.)

A typical SPAC is formed by a sponsor entity, which administers the SPAC and provides an initial investment to cover IPO underwriting fees and other expenses. (*Id.* ¶25.) Initially, the SPAC raises capital from public investors in an Initial Public Offering ("IPO"). (*Id.* ¶24.) In

exchange for the sponsor's services, the sponsor is compensated with a "promote," which often takes the form of 20% of the SPAC's post-IPO equity. (*Id.* ¶25.) That equity is issued to members of the sponsor entity through "founder shares," and sometimes warrants, for a nominal price. (*Id.*)

A SPAC's IPO proceeds are intended to be used to complete a merger with a private company ("de-SPAC"), to effectively take the private target company public by virtue of the merger. (*Id.* ¶26.) Until the merger closes, the proceeds of the IPO are held in trust for the SPAC shareholders' benefit. (*Id.* ¶24.) Those shareholders may redeem their shares, after a merger target is identified, if they are unsatisfied with the merger terms. (*Id.*) Moreover, the SPAC's charter will fix a set period to complete a de-SPAC transaction. (*Id.* ¶26.) If the SPAC fails to close a de-SPAC deal within that window, the SPAC must liquidate and distribute its cash to its public shareholders. (*Id.*) If that occurs, the sponsor's founder shares become worthless. (*Id.*)

26 Capital Holdings, LLC ("Sponsor") is the sponsor entity for the 26 Capital SPAC. (*Id.* ¶27.) Sponsor provided the initial funding to 26 Holdings to acquire founder shares and effect 26 Capital's IPO. (*Id.* ¶36.) 26 Capital consummated its IPO on January 2021, and generated proceeds of $275,000,000 for the SPAC. (*Id.* ¶44.) At that time, Defendant Jason Ader was 26 Capital's CEO and 26 Holdings' majority owner. (*Id.* ¶32.)

On October 15, 2021, 26 Capital entered into a de-SPAC merger agreement (the "Merger") with, among other entities, UE Resorts International, Inc., the parent company of Philippine casino-resort Okada Manila Resort & Casino ("Okada Manila"). (*Id.* ¶47.) The Merger values Okada Manila at $2.6 billion,[2] and has caused the shares of 26 Capital to increase to as high as $11.38 per share – well above the $10 per share value at which 26 Capital stockholders could redeem their shares. *See* Ex. 2 at 1 (26 Capital stock price chart for July 16, 2023). Upon closing

---

[2]  *See*  https://www.forbes.com/sites/jonathanburgos/2021/10/18/okada-manila-to-list-on-nasdaq-by-merging-with-jason-aders-spac-in-a-26-billion-deal/?sh=186105eb1f0f.

of the Merger, 26 Capital stockholders would have the option of either redeeming their SPAC shares or becoming stockholders of the new publicly traded casino-resort company. (Compl. ¶47.)

**B.    Rimu Buys an Interest in Sponsor's SPAC Founder Shares and Private Placement Warrants – While Disclaiming "Any Information Or Advice" from Defendants**

As the Rimu Subscription Agreement states, Rimu is a sophisticated "accredited investor" under the securities laws, with sufficient assets "to bear the risk of an entire loss of its" $25 million "investment in a Membership Interest of" 26 Capital. (Ex. 1, Sched. 1 ¶ 1.) Indeed, Rimu is owned and controlled by "Harald McPike" (*id.* p. 5), a sophisticated "Bahamas-based Austrian-born billionaire" professional financial "trader." (Ex. 9 at 1 (May 26, 2019 *Washington Post* Article).) Mr. McPike "founded a quantitative trading business called QuantRes," which traded "in global financial markets using 'proprietary, algorithmic trading strategies.'" (Ex. 10 at 1-3, Mar. 8, 2020 *Financial News* article.) He is the largest investor in leading UK digital bank Starling Bank. (*Id.*)

"[A]lmost immediately" after the Okada Manila deal was announced on October 15, 2021, Ader discussed with Rimu a potential investment in the Sponsor.[3] (Compl. ¶50.) Over the next several weeks, Rimu and Ader negotiated the terms of what would eventually be Rimu's purchase of a membership interest in the Sponsor (the "Sponsor Investment"). Rimu's analysts reviewed draft deal documents, and obtained additional materials as necessary. (*E.g.*, *id.* ¶77.)

Negotiations culminated with Rimu's execution of a Subscription Agreement on November 30, 2021. (*Id.* ¶82; Ex. 1, Subscription Agmt., p. 1.) The Subscription Agreement effectuated the Sponsor Investment, through which Rimu paid $25 million for 26 Holdings Membership Interest of 2,500,000 units, with "each unit consisting of an economic interest in one (1) Founder Share and one (1) Private Placement Warrant." (Ex. 1, pp. 1, 5.) Rimu obtained a

---

[3] 26 Holdings had already attracted several investors, including Zama Capital Master Fund, LP ("Zama"), who purchased a significant stake in July 2021. (Compl. ¶107.)

Membership Interest in 2,500,000 Founder Shares and 2,500,000 Private Placement Warrants.

Importantly, the Rimu Subscription Agreement – which is incorporated into the Complaint (*see* Compl. ¶129) – contains express disclaimers that undermine Plaintiff's claims. Specifically:

- Rimu is a sophisticated investor, as an "accredited investor…" that is "knowledgeable with respect to the business and operations of … the Company." (Ex. 1, Sched. 1 ¶¶1, 3.)

- "***Neither the Company nor any of its affiliates has been requested to or has provided the Investor with any information or advice*** with respect to the Founder Shares and the Private Placement Warrants, ***nor is any such information necessary or desired by Investor.***" (*Id.* Sched. 1 ¶ 3 (emphasis added).)

- Rimu "carefully reviewed the information [in the SPAC public filings and] ***relied exclusively upon [its] own examination*** of the SPAC, the Founder Shares, the Private Placement Warrants and the terms of the offering … offered hereby, including the merits and risks involved, ***in making an investment decision***. (*Id.* (emphasis added).)"

- Rimu "***understands***, based on its experience, ***the disadvantage to which the Investor is subject due to the disparity of information between the Company and the Investor***. Notwithstanding such disparity, the Investor has deemed it appropriate to enter into this Agreement and to make the Capital Contribution." (*Id.*, Sched. 1, ¶4 (emphasis added).)

- "The Investor acknowledges and understands that the Company and its affiliates possess material nonpublic information regarding the SPAC not known to the Investor that may impact the value of the Founder Shares and the Private Placement Warrants.… ***The Investor agrees that none of the Company, [or] its affiliates … shall have any liability to the investor … whatsoever due to or in connection with … the failure of the Company to disclose the Information***." (*Id.* (emphasis added).)

In addition, the Subscription Agreement contains an integration clause that disclaims and superseded other representations that are not stated in the Subscription Agreement. (*Id.* ¶9.) Under the integration clause, the Subscription Agreement, "contains all of the terms agreed upon or made by the parties relating to [the Sponsor Investment], and supersedes all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter." (*Id.*) Additionally, "[i]n the event of any conflict between [the Subscription] Agreement and the Operating Agreement, the terms of [the Subscription] Agreement shall control." (*Id.* ¶3.) Thus, all prior negotiations concerning the

Sponsor Investment integrated into the Subscription Agreement. [4]

**C.    The Plain Terms of the Rimu Subscription Agreement and the Sponsor Operating Agreement Show that Rimu Did Not Acquire Any Residual Percentage Interest**

Notably, Rimu did not acquire any Residual Percentage Interest in 26 Holdings.  To the contrary, the Subscription Agreement contains an express disclaimer that "***the Founder Shares and Private Placement Warrant (the "Underlying Securities") held by the Company provide the entire basis for any return on your investment*** that you might receive, and … may become worthless" if there is no timely de-SPAC transaction. (*Id.*, Sched. 2 (emphasis added).)  Thus, Rimu's Sponsor Investment Subscription Agreement shows that Rimu did not acquire any Residual Percentage Interest in the Sponsor.  (*Id.*)  This is also confirmed by the Operating Agreement, which defines and discusses the "Residual Percentage," yet reflects in Schedule A that Rimu did not obtain any "Residual Percentage" on November 30, 2021.  (*E.g.*, Ex. 5, Operating Agmt., p. 5 (definition of "Residual Percentage"), p. 24 (Schedule A "November 30, 2021").)

Similarly, the Operating Agreement *expressly distinguishes* (i) "distributions" based on a "Residual Percentage" *from* (ii) "Distributions attributable to the Founder Shares" (*id.* § 4.01(i)) and "Distributions attributable to the Private Placement Warrants." (*id.* § 4.01(ii).)  The latter involve the obligation "to distribute to the Members the Private Placement Warrants, … and the Founder Shares."  (*Id.* § 4.01(b).)  In contrast, "Residual Percentage" distributions involve "[a]ll other distributions," including a cash distributions.  (*Id.* § 4.01(iii).)

Indeed, the Operating Agreement repeatedly distinguishes the "Residual Percentage" from "Founders Shares" and "Private Placement Warrants" throughout the Agreement.  For example,

---

[4] At the same time Rimu executed the Subscription Agreement, it executed a "Term Sheet," under which $800,000 worth of fees that Rimu owed to SpringOwl from a prior investment in Playtech stock (the Preexisting Investment) would be rolled into the 26 Capital Investment.  (*See* Compl. ¶82; Ex. 3, Term Sheet, p. 2.)  Rimu has not paid any fees under the Term Sheet or related to the 26 Capital Sponsor Investment.

the agreement defines "Membership Interest" as "any interest of a Member in the Company … attributable to a Member's Founder Shares Percentage, Private Placement Warrants Percentage, Loan Warrants Percentage *or Residual Percentage*." (*Id.*, p. 3 (emphasis added).) The disjunctive "or Residual Percentage" shows that an interest in Founders Shares and Private Placement Warrants did not create a right to a Residual Percentage (as Plaintiff now claims).

Likewise, Schedule A to the Operating Agreement sets forth the "Capital Contribution, Founder Shares Percentage, Private Placement Warrants Percentage, Loan Warrants Percentage *and/or Residual Percentage*" for each Member. (*Id.* §2.05 (emphasis added).) And a Member may "forfeit such Member's Membership Interest (including any right, title or interest in and to his, her or its Founder Shares Percentage, Private Placement Warrants Percentage, Loan Warrants Percentage *and/or Residual Percentage*, as the case may be) …." (*Id.* §3.01 (emphasis added).)

**D.      Rimu's 2018 SpringOwl Investment Management Agreement Does Not Address the Sponsor Investment Made Over 3 Years Later in November 2021 – and Instead Is Expressly Limited to an Entirely Different, Preexisting Investment**

The plain terms of the August 2018 Investment Management Agreement (the "IMA") between Plaintiff and SpringOwl Associates make clear that it does not apply to the 26 Capital Sponsor Investment made in November 2021. The IMA, which is expressly incorporated into the Complaint (¶¶18-23), states plainly that Rimu had only retained SpringOwl "as an investment adviser in connection with making the investment [] on Schedule A hereto" (Ex. 4, p. 1), which is only "securities issued by Playtech plc." (*Id.*, Sched A.) It is beyond dispute that 26 Capital is not Playtech plc. Thus, the IMA does not apply to the 26 Capital Sponsor Investment.

Indeed, the Complaint admits (as it must) that the IMA only applies to a "Preexisting Investment" that occurred years before the 26 Capital Sponsor Investment. (Compl. ¶19.) The Complaint further admits that the IMA applies only to "a designated investment in the securities

of a specified publicly traded corporation." (*Id.*) And the IMA was "***limited to*** 'various types of securities' issued by ***the specified publicly traded company***." (*Id.* ¶20 (emphasis added).) But the 26 Capital Sponsor Investment is not "designated" nor "specified" in the IMA. Instead:

- SpringOwl Associates was "employ[ed] … as an investment adviser in connection with making the investment [set] forth on Schedule A hereto (the 'Investment'; and the account holding such Investment, the 'Account') …." (Ex. 4, p. 1.)

- Schedule A states that "The assets of the Account shall be invested in various types of securities issued by Playtech plc." (*Id.*, Sched. A.)

- "Adviser accepts the appointment as an investment adviser ***for the Account*** and agrees to supervise and direct the investments ***of the Account***." (*Id.* §1 (emphasis added).)

- "***No party shall have the authority to act for or represent any other party, except as expressly provided herein or as authorized in writing by the other relevant party***…. [N]or shall this Agreement be deemed to confer on any of them any express, implied or apparent authority to incur any obligation or liability on behalf of any such other entity. (*Id.* §18 (emphasis added).)

The limitation that SpringOwl shall not "have the authority to act for" Rimu "except as expressly provided herein" expressly limits the investment adviser relationship to the Playtech investment. (*Id.*) And the disclaimer of "implied or apparent authority" for other transactions precludes the IMA from being the basis of an investment adviser relationship for other deals. (*Id.*)

Further, the Subscription Agreement and the Term Sheet do not mention the Investment Management Agreement, and do not purport to extend it to the 26 Capital Sponsor Investment.

**E.**    **Rimu Knew for Over a Year Before Bringing Suit that its $25 Million Investment Was Distributed to Another Investor – Yet Waited to Bring Suit Until After a Related Delaware Action Disputing Whether the Merger Will Close**

Rimu's own conduct reflects that this lawsuit is a cynical business ploy to hedge against the possibility that the de-SPAC Merger transaction does not close. In fact, Rimu admits in the July 5, 2022 books and records demand cited in the Complaint that it has known since "June 3, 2022" that the cash from its $25 million Sponsor Investment was distributed to another investor in the Sponsor. (Ex. 6, July 5, 2022 Books & Records Demand, p. 1; *see* Compl. ¶¶100-01.) Further,

the Complaint relies on a document in which Defendants' counsel further confirmed the distribution on October 19, 2022. (Ex. 7, Oct. 19, 2022 Email.)

Yet Rimu did not bring this lawsuit in June 2022 or even in October 2022 – despite now claiming that the distribution was improper and even fraudulent.[5] Instead, Rimu waited to bring this action until June 15, 2023, when it learned of a related Delaware Action in which the Defendant is trying to avoid closing the de-SPAC Merger with 26 Capital. Rimu realized the Delaware Action could stop the deal, and cause Rimu to lose money on its investment.

Rimu filed this action on June 15, 2023. The only federal cause of action is pled "under Section 206 of the Investment Advisers Act" "15 U.S.C. 80b-6" (Compl. ¶ 6 & p. 41 ("First Cause of Action")), which does not authorize a private right of action. The remaining claims are state law claims pled based on supplemental jurisdiction relying on the sole federal claim.

## LEGAL STANDARD

"To survive a motion to dismiss" for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188-89 (2d Cir. 2020) (quotation marks omitted). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (quotation marks omitted).

"[O]n a motion to dismiss, a court 'may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, … documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.'" *Wu v. Bitfloor, Inc.*, 460 F. Supp. 3d 418, 423 (S.D.N.Y. 2020).

---

[5] Rimu faults Defendants for asserting in June and October 2022 that Confidentiality restrictions prevented Defendants from revealing the identity of the investor to whom the money was paid. But Plaintiff does not – and cannot – dispute that the Sponsor's Operating Agreement required keeping information about other Members confidential, (Ex. 5, Operating Agmt. §2.05), and Plaintiff agreed to that before investing. (Ex. 1, ¶4.)

Allegations of "fraud must be pled with particularity; but the rule is applied assiduously to securities fraud." *Gamm v. Sanderson Farms, Inc.*, 2018 WL 1319157, at *2-3 (S.D.N.Y. Jan. 19, 2018), *aff'd,* 944 F.3d 455 (2d Cir. 2019) (quotation marks omitted). "Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud" *Id.*

"Determining the existence of subject matter jurisdiction is a threshold inquiry[,] and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Giddings v. U.S.*, 2023 WL 4492411, at *2 (S.D.N.Y. July 12, 2023) (quotation marks omitted).

## **ARGUMENT**

### I. **THE COMPLAINT FAILS TO PLEAD A PRIVATE RIGHT OF ACTION UNDER THE INVESTMENT ADVISERS ACT**

The Complaint's only federal claim fails as a matter of law because it fails to allege a private right of action under the Advisers Act. *First*, the "First Cause of Action" expressly pleads an Advisers Act claim under "15 U.S.C. §80b-6," which is Section 206. *See* Compl. p. 41; *id* ¶¶190-92. Similarly, the Complaint's sole basis for federal question jurisdiction is based on "Plaintiff's claim under § 206 of the Investment Advisers Act of 1940." (*Id.* ¶6.)

But it is well-settled that "there is no private right of action to bring a claim pursuant" to "Section 206." *Nexpoint*, 620 F. Supp. 3d at 43 (citing the "express and binding precedent" of *TAMA*, 444 U.S. at 19-25). Instead, the only available private right of action under the Advisers Act is a limited action under Advisers Act Section 215 to rescind an advisory contract that requires illegal conduct, and to obtain *restitution of advisory fees* only. Thus, the Complaint's claim under Section 206 should be dismissed. *See TAMA*, 444 U.S. at 24 n.14.

*Second*, Plaintiff cannot plead a valid Advisers Act claim, because the remedy it seeks is the return of its "$25 million" investment, which is not available under the limited Section 215 private

right of action. (Compl. p. 52 (prayer for relief).) Courts in this Circuit have consistently dismissed Advisers Act claims brought by a plaintiff "in order to demand the return of its investment" as "a backdoor attempt to assert a private claim under Section 206." *KDH Consulting Grp. LLC v. Iterative Cap. Mgmt. L.P.*, 2020 WL 7251172, at *10 (S.D.N.Y. June 29, 2020); *Rapillo v. Fingerhut*, 2016 WL 11705140, at *11 (S.D.N.Y. Sept. 14, 2016) (Advisers Act "plainly does not provide" for recovery where plaintiffs "seek to recover their entire … investment"); *Kassover v. UBS AG*, 619 F. Supp. 2d 28, 34 (S.D.N.Y. 2008) ("only remedy available under the Advisers Act is rescission of the investment advisory contract and restitution of consideration paid for investment advisory services"). As the *TAMA* Court held, Section 215 "*[r]estitution would not … include compensation for any diminution in the value of the rescinding party's investment.*" 444 U.S. at 24 n.14 (emphasis added).

Indeed, Plaintiff's attempt to dress up its allegations as an Advisers Act private right of action falls apart when it gets to the "Damages" section of the Complaint. It admits that the damages it seeks are the return of Plaintiff's entire "$25 million" paid "for a membership interest in 26 Holdings" – which *TAMA* prohibits for a private right of action. (Compl. ¶ 186.)

*Third*, Plaintiff's attempt to apply its pre-26 Capital SpringOwl IMA, to the entirely separate Sponsor Investment made over three years later, fatally undermines its Advisers Act claim. The very limited remedy under Section 215 does not apply where, as here, a plaintiff alleges that it was defrauded by its investment adviser pursuant to Section 206. *See Omega Overseas Partners, Ltd. v. Griffith*, 2014 WL 3907082, at *4 (S.D.N.Y. Aug. 7, 2014) ("[A] contract does not become void under § 215(b) merely because an investment adviser defrauded her or his client – rather, a contract is void only if it was made illegally or requires illegal performance."). In *Omega*, the Court rejected plaintiffs' claim that a "subsequent fraud" committed after executing an advisory

agreement "caused the performance of [the contract] [to] involve[ ] the violation of [the Advisers Act], ... thus triggering § 215." *Id.* (quotation marks omitted). *Omega* is on point and should govern, because Rimu alleges that a fraudulent Sponsor Subscription Agreement transaction in 2021 violated Section 206, three years after the SpringOwl IMA in 2018. Compl. ¶¶18, 82-89; *see Omega*, 2014 WL 3907082, at *2 (rejecting "claim that § 215 is a backdoor to the private right of action that the Supreme Court refused to find under § 206").

## II. THE COMPLAINT FAILS TO ESTABLISH AN ADVISORY RELATIONSHIP OR DUTY TO DISCLOSE FOR RIMU'S 26 CAPITAL SPONSOR INVESTMENT

The Complaint fails to establish any advisory relationship, fiduciary relationship, or duty to disclose that applies to the 26 Capital Sponsor Investment. This is fatal for the Advisors Act and common law claims alleging misrepresentations, omissions and a breach of fiduciary duties in the IMA and Subscription Agreement incorporated into the Complaint.

*First*, the Complaint admits that the IMA between Rimu and SpringOwl Associates, LLC only applied to a different, Preexisting Investment made three years before the 26 Capital Sponsor Investment. (*See* Compl. ¶¶18-23.) Rimu pleads itself out of court by admitting that the "Investment Management Agreement" only provides that "SpringOwl Associates agreed to act as an investment adviserwith [sic] respect to, and managed for Rimu, *a designated investment* in the securities *of a specified publicly traded corporation*." (*Id.* ¶19 (emphasis added).) Further, the Complaint admits that the IMA was "*limited to* 'various types of securities' issued by *the specified publicly traded company*," – not 26 Capital. (*Id.* ¶20 (emphasis added).)

The IMA's plain language – incorporated in the Complaint – confirms this, by stating:

- SpringOwl Associates was "*an investment adviser in connection with making the investment [set] forth on Schedule A* hereto (the 'Investment'; and the account holding such Investment, the 'Account') ...." (Ex. 4, p. 1 (emphasis added).)

- Schedule A states: "The assets of the Account shall be invested in various types of securities *issued by Playtech plc*." (*Id.*, Sched. A (emphasis added).)

- "***No party shall have the authority to act for or represent any other party, except as expressly provided herein or as authorized in writing by the other relevant party***. (*Id.* §18 (emphasis added).)

The final disclaimer makes plain that SpringOwl did not "have the authority to act" as investment adviser for Rimu "except as expressly provided" in the IMA. (*Id.*) The only investment expressly provided is Playtech plc. The IMA does not apply to the 26 Capital Sponsor Investment.

It is well-settled that Courts look to the terms of the parties' "contracts" to determine the existence and scope of "a fiduciary relationship." *Metro Ambulance, Inc. v. E. Med. Billing, Inc.*, 1995 WL 409015, at *3 (Del. Ch. July 5, 1995) (rejecting fiduciary relationship where parties "bargained for and defined their relationship" in a contract, and there was no special knowledge, or dependence of one party on the other); *accord EBC I, Inc. v. Goldman Sachs & Co.*, 91 A.D.3d 211, 213-14 (1st Dep't 2011) (holding that underwriter did not owe fiduciary duty to company based on "the scope of the underwriting agreement"). Here, the plain language of the IMA establishes the scope of the fiduciary relationship between Defendant SpringOwl and Rimu – and expressly limits that relationship to the Playtech investment. Thus, the IMA precludes applying an investment adviser or fiduciary relationship to the 26 Capital Sponsor Investment. *See In re Nat'l Collegiate Student Loan Trusts Litig.*, 251 A.3d 116, 187 (Del. Ch. 2020) ("the scope of the Owner Trustee's contractual fiduciary duties could not extend to matters over which it has no authority, discretion or control …."); Restatement (Third) of Torts §16 (cmt. a) ("A fiduciary duty is, in general, a duty to act for the benefit of another on matters ***within the scope of the parties' relationship***." (emphasis added)).

*Second*, the Subscription Agreement for the Sponsor Investment confirms that there is no investment adviser relationship for this transaction by expressly disclaiming reliance on "any

information or advice" from Defendants.  (Ex. 1, Sched 1 ¶3.)[6]  Specifically, the Subscription

Agreement admits that Rimu is a sophisticated investor (*Id.*, Sched. 1 ¶ 1), and that:

- Rimu "*relied exclusively upon [its] own examination* … in making an investment decision.  (*Id.*, Sched. 1, ¶3 (emphasis added).)"

- Rimu agreed that "*[n]either the Company nor any of its affiliates has been requested to or has provided the Investor with any information or advice* with respect to the Founder Shares and the Private Placement Warrants, *nor is any such information necessary or desired by Investor.*"  (*Id.* (emphasis added).)

- "*The Investor understands, based on its experience, the disadvantage to which the Investor is subject due to the disparity of information between the Company and the Investor*.  Notwithstanding such disparity, the Investor has deemed it appropriate to enter into this Agreement."  (*Id.*, Sched. 1, ¶4 (emphasis added).)

- "The Investor acknowledges and understands … that the Company is unable to disclose the [material non-public] Information to the Investor.…*The Investor agrees that none of the Company … shall have any liability to the investor … whatsoever due to or in connection with… the failure of the Company to disclose the Information*."  (*Id.*, Sched. 1, ¶4 (emphasis added).)

The Subscription Agreement's express disclaimers defeat the argument that Defendants

acted as an investment adviser or fiduciary in connection with Plaintiff's 26 Capital Sponsor

Investment.  Accordingly, the Complaint's investment adviser and fiduciary duties claims should

be dismissed for failing to allege "facts supporting their allegation that they entered into contracts

for [defendant] to provide them with investment advice" as their "financial advisor" for the 26

Capital Sponsor Investment.  *Kassover*, 619 F. Supp. 2d at 33.

Similarly, Plaintiff's express disclaimers of reliance on any advice or information from

Defendants expressly negated any fiduciary duty or other duty to disclose omitted information.[7]

(Ex. 1, Sched. 1, ¶¶3-4).  This Court has held that almost identical disclaimers "expressly

negate[d]" a fiduciary duty or similar duty to disclose omitted information.  *Miracle Ventures I,*

---

[6] The Subscription Agreement is expressly incorporated by reference in the Complaint.  (*See* Compl. ¶129.)
[7] The Subscription Agreement disclaimers refer to Defendants 26 Capital and its "affiliates." (Ex. 1, Sched 1 ¶3.)  The Complaint alleges that all Defendants are affiliated, through Defendant Ader's role with each.  (Compl. ¶¶ 11-15.)

*LP v. Spear*, 2022 WL 16578962, at *4 (S.D.N.Y. Nov. 1, 2022) (applying Delaware law). In *Miracle Ventures*, the plaintiff expressly represented that it "has independently and without reliance on" the Defendants, "made its own analysis and decision" to engage in a transaction "notwithstanding any lack of knowledge of Excluded Information." *Id.* at *3-4. The Court granted a motion to dismiss the plaintiff's fraud and fiduciary duty claims, reasoning that the disclaimers defeated any duty to disclose omitted information. *Id. Miracle Ventures* should govern here.

*Finally,* the Term Sheet cannot give rise to an investment adviser nor fiduciary relationship, because the Term Sheet is "qualified in [its] entirety" by the Subscription Agreement, including its disclaimers. (Ex. 3 p. 1.) Further, the Term Sheet does not even mention – nor purport to expand – the IMA. Thus, all claims alleging an investment adviser relationship, fiduciary relationship, or duty to disclose regarding the 26 Capital Sponsor Investment should be dismissed.

III.  **RIMU'S EXTENSIVE DISCLAIMERS OF RELIANCE DEFEAT ITS FRAUD, NEGLIGENT MISREPRESENTATION, AND FIDUCIARY DUTY CLAIMS**

The Complaint's fraud (Advisers Act and common law), negligent misrepresentation, and fiduciary duties claims (Claims 1-6) should be dismissed, because, as a sophisticated investor, Plaintiff's extensive disclaimers of reliance on extra-contractual representations and advice defeat reasonable reliance as a matter of law. Under Delaware law that governs the subscription agreement (Ex. 1, § 10), a "claim for fraud" (Second and Third Causes of Action) requires allegations of "the plaintiff acting or refraining from acting **in justifiable reliance on the representation**." *Infomedia Grp., Inc. v. Orange Health Sols., Inc.*, 2020 WL 4384087, at *3 (Del. Super. Ct. July 31, 2020) (emphasis added). Similarly, a claim for constructive fraud (Fourth Cause of Action) requires the plaintiff to "satisfy all the elements of common-law fraud" – including reasonable reliance – except for proof of scienter. *Zirn v. VLI Corp.*, 681 A.2d 1050, 1061 (Del. 1996). A Delaware law "claim for negligent misrepresentation is similar," (Fifth Cause

of Action) in also requiring reasonable reliance, except that the plaintiff must establish that the

defendant owed the plaintiff "a duty to provide accurate information." *Infomedia Grp., Inc.*, 2020

WL 4384087, at *3. Similarly, a plaintiff who alleges in a direct transaction a "breach of the

fiduciary duty of disclosure" (Sixth Cause of Action) "must prove reliance" and "causation" to

recover compensatory damages. *Dohmen v. Goodman*, 234 A.3d 1161, 1175 (Del. 2020).

Here, Rimu expressly disclaimed reliance through the following disclaimers:

- It is a sophisticated "accredited investor" that was fully "knowledgeable with respect to the business and operations of the SPAC and [the Sponsor]" (Ex. 1, Sched. 1 p. 6.)

- It "***relied exclusively upon [its] own examination of the SPAC, the Founder's Shares, the Private Placement Warrants and the terms of the offering***… in making an investment decision. (*Id.*, Sched. 1, ¶3 (emphasis added).)"

- ***Defendants did not "provide[] the Investor with any information or advice*** with respect to the Founder Shares and the Private Placement Warrants, ***nor is any such information necessary or desired by Investor.***" (*Id.* (emphasis added).)

- "***The Investor understands, based on its experience, the disadvantage to which the Investor is subject due to the disparity of information between the Company and the Investor***. Notwithstanding such disparity**,** the Investor has deemed it appropriate to enter into this Agreement…." (*Id.*, Sched. 1 ¶4 (emphasis added).)

- That the Subscription Agreement "supersedes all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter." (*Id.*, § 9.)

Such extensive disclaimers that expressly disclaim reliance – and represent that the plaintiff

relied solely on its own examination – defeat reasonable reliance as a matter of Delaware law. For

example, in *IAC Search, LLC v. Conversant LLC*, the Court dismissed a fraudulent inducement

claim where the contract's disclaimers contained "critical language," in which the buyer "expressly

acknowledged that [seller] was not 'making, directly or indirectly, any representation or warranty'

with respect to any information it received … 'unless such information is expressly included' …

in the Agreement." 2016 WL 6995363, at *6 (Del. Ch. Nov. 30, 2016). Similarly, the disclaimer

disclosed that the buyer was "sophisticated," and relied on "its own independent investigation,

review and analysis regarding the … transactions." *Id.* at *5-6. The Court granted a motion to dismiss, holding that the disclaimers "add[ed] up … to a clear anti-reliance clause to bar fraud claims based on extra-contractual statements made during due diligence." *Id.* at *7; *accord Infomedia*, 2020 WL 4384087, at *4 (dismissing claims based on disclaimers that plaintiff was "sophisticated party" that "expressly agreed … to proceed with the transaction" based on "its own investigation" of the deal, and integration clause); *MidCap Funding X Tr. v. Graebel Companies, Inc.*, 2020 WL 2095899, at *21 (Del. Ch. Apr. 30, 2020) (Plaintiff's disclaimers of reliance on extra-contractual statements "precluded their ability to reasonably rely on any oral statements, or omissions, by Broker that were not … in … the [] Agreement.").

*IAC* and *Infomedia* are directly on point, and should govern. Just like in *IAC* and *Infomedia*, here Rimu agreed that it was a sophisticated party that "relied exclusively upon [its] own examination … in making an investment decision." (Ex. 1, Sched 1 ¶3.) Further, Rimu expressly limited the information it relied on by affirmatively representing that it had not "requested" nor had been "provided … with any information or advice" from Defendants regarding the Sponsor investment that it relied on. (*Id.* ¶ 4.) And Rimu represented that it invested despite "the disadvantage to which" it was "subject due to the disparity of information" between Rimu and the Defendants. (*Id.*) Thus, Rimu's claims should be dismissed.

Similarly, the express disclaimers also defeat reasonable reliance under the Advisers Act § 215 claim. In *Frati v. Saltzstein*, the Court granted a motion to dismiss securities fraud claims, including for fraudulent inducement and rescission under Section 29(b) of the Exchange Act – a "comparable provision" to Advisers Act §215(b). 2011 WL 1002417, at *5-6 & n.2 (S.D.N.Y. Mar. 14, 2011). The Court rejected plaintiffs' claims for fraud in oral statements regarding the identity of investors and a lockup period, based on subscription agreement disclaimers "which

attested that each [plaintiff] had … relied only on the information in th[e investment's] PPM in deciding to invest." *Id.* at *3. The Court reasoned that "the disclaimers in the Subscription Agreements" made the plaintiff's "reliance on [defendant's] oral representation" "simply not reasonable" as a matter of law. *Id.* at *4; *accord San Diego Cnty. Emps. Ret. Ass'n v. Maounis,*, 749 F. Supp. 2d 104, 121 (S.D.N.Y. 2010) (dismissing claims based on plaintiff's "sophistication" and "the clear, unambiguous language of the non-reliance provisions at issue" stating that plaintiff "ha[d] relied solely on the information contained in the [PPM]"); *Harsco Corp. v. Segui*, 91 F.3d 337, 342 (2d Cir. 1996) (no reasonable reliance where purchase agreement contained a merger clause and a clause that "specifically disclaims representations that are not in the agreement").

## IV. THE ALLEGED MISREPRESENTATIONS AND OMISSIONS ARE IMMATERIAL AS A MATTER OF LAW

The Complaint should also be dismissed because many of the alleged misrepresentations are so plainly not material that they are immaterial as a matter of law. *First*, Rimu's disclaimers that it "relied exclusively upon [its] own examination" of the investment, and did not rely on "any information or advice" from Defendants (Ex. 1, Sched. 1 ¶¶ 3-4) render all of the alleged misrepresentations immaterial. (Compl. ¶¶ 127-69.) Under Delaware law, Rimu's disclaimers that its "decision to enter into the [transaction was] solely based on the contractual representations and its own independent investigation … unequivocally indicated that other information it received was not material to its decision." *Infomedia*, 2020 WL 4384087, at *9.

*Second*, the alleged misstatements and omissions are immaterial for additional reasons:

**1. Alleged Ader Oral Statements About a Future Closing Date and "Strong Demand" from "Other Investors" (Compl. ¶¶144-52).** The alleged Ader oral misstatements about a future closing date for a 26 Capital Sponsor Investment and about demand being "strong" are immaterial non-concrete statements that constitute inactionable puffery. *See Clark v.*

*Davenport*, 2019 WL 3230928, at *12 (Del. Ch. July 18, 2019) ("statement that Basho was uniquely positioned to achieve a strategic partnership with IBM was puffery."); *Airborne Health, Inc. v. Squid Soap, LP*, 2010 WL 2836391, at *8 (Del. Ch. July 20, 2010) ("vague statements of corporate optimism designed to boost the appeal of [plaintiff] as a potential transaction partner for [defendant]" were inactionable puffery). Further, the Complaint's allegations about another investment by Zama at the same time (Compl. ¶¶ 153-59) admit that, in fact, there was demand.

2. **Alleged Misrepresentations Concerning Ader's Prior Ownership of the Membership Interest Sold to Rimu (Compl. ¶¶127-30):** In the Operating Agreement, Rimu expressly consented that 26 Holdings and its Managing Member "alone shall maintain a confidential Schedule A" containing "[t]he name, Capital Contribution, Founder Shares Percentage, Private Placement Warrants Percentage, Loan Warrants Percentage and/or Residual Percentage (as the case may be) of each Member." (Ex. 5 §2.05.) This meant that "each particular Member … shall be provided with a redacted <u>Schedule A</u>" showing "his, her or its Membership Interest alone, and no Member shall have the right to be provided with the complete Schedule A" showing other Members' holdings. (*Id.*) Having expressly consented that Rimu would invest without knowing any other Member's ownership interests, Rimu cannot credibly argue that information as to the ownership by another Member (Ader) was material to its investment decision.

3. **Alleged Omissions Concerning Zama Subscription Agreement, Zama Distribution Provision, and Zama-UEC Relationship (Compl. ¶¶153-59).** Given Rimu's agreement that the ownership of other Members would be kept confidential, its Zama allegations should fail. (Ex. 5 § 2.05.) Further, the plain terms of the Zama Distribution Provision (Ex. 8, Zama Subscription Agmt. §2b & c) could not be material or cause damages to Rimu, because they benefit Rimu by providing that the first $1 million from Founder Shares sales should be distributed

to Rimu and all investors other than Zama – as if Zama was not an investor.  (*Id.*)  After that, Zama is paid a temporary catch-up payment to be restored to its pro rata share of Sponsor Investments, (*id.* §2.c.).  Once Zama is caught up to its pro rata share, then the rest of the Founder Shares and Private Placement warrants proceeds are paid based on all Members' "relative Founder Shares Percentages and Private Placement Warrant Percentages, respectively" (*id.* §2.d).  Thus, the Zama Distribution Provision causes the same ultimate result as the Operating Agreement's distribution provisions that call for pro rata payments.  (Ex. 5, Operating Agmt. §4.01.)

**4.**     **Alleged Omissions Regarding Transaction Delays (Compl. ¶¶160-65).**  The allegations about transaction delays fail, because the Complaint fails to plead with particularity any evidence of transaction delays that Ader knew about before Rimu's 26 Capital Sponsor Investment on November 30, 2021.  (*Id.* ¶83.)  Instead, Rimu's allegations focus on post-investment transaction delays between December 2021 and "February 23, 2022" (*Id.* ¶160).  Rimu does not – and cannot – allege that there was any material delay at the time of its investment.  *IRA Trust FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *18 (Del. Ch. Dec. 11, 2017) (alleged misstatement "immaterial" where it "would not have … altered the 'total mix' of information").

**5.**     **Alleged Omissions Concerning Liebman (Compl. ¶¶166-69).**  The Complaint's allegations that Mr. Liebman had a 50% involvement in the Sponsor Investment are insufficient to show falsity and materiality, because the Complaint admits Ader clarified that his agreement with Liebman related only to investments other than the Sponsor Investment, for which an investment was made through SpringOwl.  (*Id.* ¶¶ 123, 125.)  Because there was no investment advisory relationship for the Sponsor Investment, and because Liebman did not own economics in 26 Capital (*id.* ¶ 125) there was no material omission.  *See In re Frederick's of Hollywood, Inc.*, 2000 WL 130630, at *9 (Del. Ch. Jan. 31, 2000) ("reasons for resignations … three months earlier [] in

20

the context of an earlier proposal" were immaterial since they "would have had no significance [to] a reasonable stockholder being asked to vote on a different proposal").

## V.    RIMU'S CLAIMS BASED ON DISTRIBUTIONS TO ADER SHOULD BE DISMISSED UNDER RULE 23.1 AND RULE 12(b)(6)

### A.    The Distribution Claims Are Derivative Claims for Which No Demand Was Made Nor Demand Futility Pled with Particularity to Satisfy Rule 23.1

Rimu's claims breach of contract, declaratory judgment under the contract, and breach of fiduciary duty (Counts Seven through Nine) should be dismissed as improperly pled derivative claims, because Rimu alleges that Ader breached the 26 Holdings Operating Agreement by failing to distribute the $25 million "Ader Distribution" "pro rata to each Member." (Compl. ¶231; *accord id.* ¶245 (alleging "fiduciary duties to the Members of 26 Holdings")). This claim impacts all members – not Rimu individually. As such, the Complaint must satisfy Federal Rule 23.1 for derivative actions. *See Schiff v. ZM Equity Partners, LLC*, 2020 WL 5077712, at *9-11 (S.D.N.Y. Aug. 27, 2020) (dismissing derivative claims for failure to satisfy Rule 23.1 demand requirement). Allegations of breach of an LLC Agreement that caused damages to plaintiff "and the other independent investors of" an LLC, for which they "would recover pro rata in proportion with their ownership" are derivative claims that must be pled under Rule 23.1. *Id.* at *9-11.

The Complaint fails to satisfy Rule 23.1 – and does not even attempt to do so. It is not "verified" and does not allege that "the action is not a collusive one to confer jurisdiction that the court would otherwise lack." Fed. R. Civ. P. 23.1(b)(2). And the Complaint does not allege "with particularity" (or at all) that Plaintiff demanded that 26 Capital take action address its claims for breach of the distribution provision – or that demand would be futile. Fed. R. Civ. P. 23.1(b)(3); *accord Schiff*, 2020 WL 5077712 ("[B]ecause [plaintiff] did not make a demand or plead demand futility in his Amended Complaint, his derivative claims for breach of contract are dismissed.").

**B.**     **The Complaint Fails to State a Breach of the Operating Agreement or Fiduciary Duty in Paying Out the Distribution**

The Complaint fails to allege a breach of the Operating Agreement or of fiduciary duties in the Ader Distribution of cash, because the Complaint fails to establish that Rimu purchased any Residual Percentage Interest that would give it a right to part of the Ader Distribution.

*First*, the Subscription Agreement is clear that Rimu only acquired an interest in Founder Shares and Private Placement Warrants – not any Residual Percentage Interest. (Ex. 1, p. 1 ("each unit consist[s] of an economic interest in one (1) Founder Share and one (1) Private Placement Warrant").) The Subscription Agreement disclaimer is clear that "the Founder Shares and Private Placement Warrants ... held by the Company provide the entire basis for any return on your investment that [Rimu] might receive." (*Id.*, Sched. 2.) Because Rimu only purchased Founder Shares and Private Placement Warrants, it did not acquire a Residual Percentage Interest that would give it a right to participate in any distribution of cash.

Under the Operating Agreement, Rimu's ownership of an interest in Founder's Shares and Private Placement Warrants only gave it a right to participate when 26 Capital would "distribute to the Members the Private Placement Warrants, … and the Founder Shares" themselves. (Ex. 5, § 4.01(b).) In contrast, "All other distributions," including cash distributions, are paid to the Residual Percentage Interest holder, which was only Mr. Ader. (*Id.* § 4.01(3) & p.24.)

*Second*, the 26 Capital Operating Agreement confirms that Rimu's acquisition of a Membership Interest in Founder's Shares and Private Placement Warrants would not automatically carry with it a Residual Percentage Interest. The Operating Agreement routinely uses the disjunctive language "or Residual Percentage" when discussing the types of Membership Interests – to confirm that each type of Membership Interest can be acquired separately. For example, "Membership Interest" means "any interest of a Member in the Company … attributable to a

Member's Founder Shares Percentage, Private Placement Warrants Percentage, Loan Warrants Percentage *or Residual Percentage*." (Ex. 5, p. 3 (emphasis added).) The phrase "*or* Residual Percentage" makes clear that a party can acquire a Membership Interest that covers Founder Shares and Private Placement Warrants, without also obtaining any Residual Percentage Interest.

Similarly, Section 2.05 of the Operating Agreement states that Schedule A is to set forth the "Capital Contribution, Founder Shares Percentage, Private Placement Warrants Percentage, Loan Warrants Percentage *and/or Residual Percentage*" for each Member. (*Id.* §2.05 (emphasis added).) And a Member may "forfeit such Member's Membership Interest (including any right, title or interest in and to his, her or its Founder Shares Percentage, Private Placement Warrants Percentage, Loan Warrants Percentage *and/or Residual Percentage*, as the case may be) …." (*Id.* §3.01 (emphasis added).) The disjunctive "or" shows that a Residual Percentage Interest is not automatically acquired by buying an interest in Founder's Shares and Private Placement Warrants. This reading is necessary, to avoid rendering the "term" 'or' to be "meaningless." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

*Third*, Rimu's breach of fiduciary duty claim based on 26 Holdings' distributions is duplicative of its breach of contract claim, and should therefore be dismissed. *See Grunstein v. Silva*, 2009 WL 4698541, at \*7 (Del. Ch. Dec. 8, 2009) (dismissing fiduciary duty claim that was "substantially identical" to breach of contract claim with "remedies … likely to be equivalent").

*Finally*, the Complaint's claim for declaratory judgment should be dismissed as "impermissibly duplicative of [its] claim of breach of contract." *Lim v. Radish Media Inc.*, 2023 WL 2440160, at \*2 (2d Cir. Mar. 10, 2023). The Complaint's declaratory judgment allegations (Compl. ¶¶250-52) are virtually identical to the allegations for breach of the Operating Agreement. (*See* Compl. ¶¶237-40.) There is no useful purpose for declaratory judgment here.

## VI.     THE COMPLAINT FAILS TO PLEAD SCIENTER WITH PARTICULARITY

The Complaint fails to plead with scienter with particularity that any of the defendants knew their statements were false when made.  In particular, the Subscription Agreement's extensive disclaimers show that Defendants sought to warn Plaintiff of the risks of investing – and thus were not acting with intent to deceive. (*See* Ex. 1, Sched. 2.) Lacking "concrete factual allegations of motive or conscious misbehavior, the Complaint fails to state a claim under Rules 9(b) and 12(b)(6)." *Negrete v. Citibank, N.A.*, 187 F. Supp. 3d 454, 465 (S.D.N.Y. 2016).

## VII.    THE ENTIRE COMPLAINT SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION

The Complaint's failure to plead a private right of action under the Advisers Act deprives this Court of subject matter jurisdiction – because the Complaint relies entirely on that claim for federal question and supplemental jurisdiction.  (Compl. ¶¶6-7.)  "The Supreme Court has instructed that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of [these] factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims.'"  *Norton v. Town of Brookhaven*, 2023 WL 3477123, at *4 (2d Cir. May 16, 2023) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988)).

In *Kolari v. N.Y. Presbyterian Hosp.*, the Court vacated the district court's retention of jurisdiction over state-law claims, after "[p]laintiffs' federal-law claims were eliminated on a motion to dismiss, prior to the investment of significant judicial resources."  455 F.3d 118, 123 (2d Cir. 2006) (quotation marks omitted); *Norton*, 2023 WL 3477123, at *4 (vacating district court's retention of jurisdiction over state-law claims after federal claims were dismissed, and before the filing of an answer or significant discovery).  Similarly, "the better course" is "to dismiss those claims" based on state law after dismissing the federal claim.  *Roman y Gordillo, S.C. v. The Bank of N.Y. Mellon Corp.*, 2015 WL 5786460, at *20 (S.D.N.Y. Sept. 29, 2015).

Further, Rimu cannot cure this jurisdictional defect by pleading diversity of citizenship, because the Complaint admits that Rimu is a member of Defendant 26 Holdings. (Compl. ¶113 ("including Rimu" as a "member[]" of 26 Capital Holdings LLC).) As a "member of'" this Defendant, "there is no complete diversity among the parties." *Sullivan v. Ruvoldt*, 2017 WL 1157150, at *6 (S.D.N.Y. Mar. 27, 2017).

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in its entirety.

Dated:   New York, NY
         September 1, 2023

SADIS & GOLDBERG LLP

s/ Samuel J. Lieberman

By:   Samuel J. Lieberman
      Frank S. Restagno
      Kathleen D. Reilly
      551 Fifth Avenue, 21st Floor
      New York, New York 10176
      (212) 573-8164

      *Counsel for Defendants Jason Ader,
      SpringOwl Asset Management LLC,
      SpringOwl Associates LLC, Ader Fund
      Management LLC, and 26 Capital
      Holdings LLC*