**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ZAMA CAPITAL MASTER FUND, LP,<br><br>     Plaintiff,<br><br>   v.<br><br>JASON ADER, 26 CAPITAL HOLDINGS LLC, SPRINGOWL ASSET MANAGEMENT LLC, SPRINGOWL SPECIAL OPPORTUNITIES FUND LP, 826 CAPITAL HOLDINGS, LLC, and RIMU CAPITAL LTD.,<br><br>     Defendants. | No. 1:23-CV-05065 (LJL) |

**MEMORANDUM OF LAW IN SUPPORT OF ZAMA CAPITAL MASTER FUND, L.P.'s**
**MOTION TO INTERVENE AND FOR A TEMPORARY RESTRAINING ORDER**

HERRICK, FEINSTEIN LLP
John H. Chun
Rodger T. Quigley
2 Park Avenue
New York, New York 10016
(212) 592-1400
*Attorneys for Proposed Intervenor Plaintiff*
*Zama Capital Master Fund, LP*

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................... iii

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF FACTS ....................................................................... 6

    A.    Zama Invested in Sponsor in July 2021 and Amended the
           Distribution Provisions in the Operating Agreement ........................... 6

    B.    Zama Learns of Ader's Fraud During the SPAC Action ..................... 7

    C.    Rimu Advances an Incorrect Interpretation of the Sponsor
           Governing Documents in This Action ................................................. 8

ARGUMENT ......................................................................................... 9

I.     ZAMA SHOULD BE PERMITTED TO INTERVENE AS OF RIGHT ....................... 9

    A.    The Application Is Timely .................................................................. 10

    B.    Zama Has a Significant Protectable Interest Relating to the Same
           Transactions at Issue in This Case ..................................................... 11

    C.    The Disposition of the Rimu Action Would Practically Impair Zama's
           Ability to Protect Its Interest ............................................................. 13

    D.    The Existing Parties to the Rimu Action Will Not Adequately
           Represent Zama's Interest .................................................................. 14

II.    A TEMPORARY RESTRAINING ORDER SHOULD BE GRANTED
      AGAINST SPONSOR AND RIMU ......................................................... 14

    A.    Zama Is Likely to Succeed on the Merits ........................................... 14

           Breach of Contract ........................................................................... 15

           Breach of Fiduciary Duty .................................................................. 16

    B.    Unless Rimu and The Already Insolvent Sponsor Are Enjoined,
           Zama Will Suffer Irreparable Harm .................................................. 18

    C.    The Balance of Hardship Tips Strongly in Zama's Favor ................... 20

    D.    The Public Interest Will Not Be Disserved by An Injunction ............ 21

    E.    This Court Should Not Require Zama to Post a Bond ........................ 21

i

CONCLUSION..................................................................................................................... 22

# TABLE OF AUTHORITIES

**Page**

## Federal Cases

*AFA Dispensing Grp. B.V. v. Anheuser-Busch, Inc.*,
740 F. Supp. 2d 465 (S.D.N.Y. 2010) ........................................................14

*Balestriere PLLC v. CMA Trading, Inc.*,
2014 WL 929813 (S.D.N.Y. Mar. 7, 2014) ................................................12

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
784 F.3d 887 (2d Cir. 2015) ......................................................................14

*Broker Genius, Inc. v. Zalta*,
280 F. Supp. 3d 495 (S.D.N.Y. 2017) ........................................................15

*Citibank, NA v. Aralpa Holdings Ltd. P'ship*,
2023 WL 8810142 (S.D.N.Y. Dec. 19, 2023) .............................................21

*Clarkson Co., Ltd. v. Shaheen*,
544 F.2d 624 (2d Cir. 1976) ......................................................................21

*Del. Tr. Co. v. Wilmington Tr., N.A.*,
534 B.R. 500 (S.D.N.Y. 2015) ...................................................................12

*Eng v. Smith*,
849 F.2d 80 (2d Cir. 1988) ........................................................................15

*Exxon Mobil Corp v. Allapattah Servs., Inc.*,
545 U.S. 546 (2005) ...................................................................................12

*Golden Krust Patties, Inc. v. Bullock*,
957 F. Supp. 2d 186 (E.D.N.Y. 2013) ........................................................22

*Intertek Testing Servs., N.A., Inc. v. Pennisi*,
443 F. Supp. 3d 303 (E.D.N.Y. 2020) ........................................................18

*John v. Sotheby's, Inc.*,
141 F.R.D. 29 (S.D.N.Y. 1992) ............................................................11, 13

*Kamdem-Ouaffo v. Pepsico, Inc.*,
314 F.R.D. 130 (S.D.N.Y. 2016) ................................................................10

*Laroe Eatates, Inc. v. Town of Chester*,
828 F.3d 60 (2d Cir. 2016) ........................................................................10

*MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*,
471 F.3d 377 (2d Cir. 2006) ......................................................................10

*McNeill v. N.Y.C. Hous. Auth.*,
719 F. Supp. 233 (S.D.N.Y. 1989) ....................................................................12

*Mut. Fire, Marine & Inland Ins. V. Adler*,
726 F. Supp. 478 (S.D.N.Y. 1989) ....................................................................13

*NAACP v. N.Y.*,
413 U.S. 345 (1973) ..........................................................................................10

*Pan Am. World Airways, Inc. v. Flight Eng'rs Int'l Ass'n*,
306 F.2d 840 (2d Cir. 1962) ..............................................................................14

*Pierre v. City of N.Y.*,
844 F. App'x 411 (2d Cir. 2021) .......................................................................12

*Restor–A–Dent Dental Lab'ys, Inc. v. Certified Alloy Prods. Inc.*,
725 F.2d 871 (2d Cir. 1984) ..............................................................................11

*Sherman v. Town of Chester*,
339 F. Supp. 3d 346 (S.D.N.Y. 2018) ..........................................................10, 11

*Treglia v. Town of Manlius*,
313 F.3d 713 (2d Cir. 2002) ..............................................................................12

*Warner Bros. Inc. v. Dae Rim Trading, Inc.*,
877 F.2d 1120 (2d Cir. 1989) ............................................................................14

*Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd.*,
782 F. Supp. 870 (S.D.N.Y. 1991) ....................................................................10

*York Rsch. V. Landgarten*,
1992 WL 373268 (S.D.N.Y. Dec. 3, 1992) ......................................................13

## State Cases

*Am. Healthcare Admin. Servs., Inc. v. Aizen*,
285 A.3d 461 (Del. Ch. 2022)............................................................................18

*Brinatti v. TeleSTAR, Inc.*,
1985 WL 44688 (Del. Ch. Sept. 3, 1985) ..........................................................18

*Destra Targeted Income Unit Inv. Tr. v. Parmar*,
2017 WL 373207 (Del. Ch. Jan. 25, 2017)...................................................18, 20

*Dong v. Miller*,
2018 WL 1445573 (Mar. 23, 2018) ...................................................................21

*Kansas City S. v. Grupo TMM, S.A.*,
2003 WL 22659332 (Del. Ch. Nov. 4, 2003) ....................................................18

*Mitsubishi Power Sys. Ams., Inc. v. Babcock & Brown Infrastructure Grp. US, LLC,*
    2009 WL 1199588 (Del. Ch. Apr. 24, 2009) ........................................................18

## **<u>Statutes</u>**

8 Del. C. § 271 .................................................................................................................5

28 U.S.C. § 1367(a) .......................................................................................................12

Fed. R. Civ. P. 24 .......................................................................................................1, 22

Fed. R. Civ. P. 24(a) .................................................................................................11, 13

Fed. R. Civ. P. 24(a)(2) ........................................................................................9, 10, 13

Fed. R. Civ. P. 65(c) ......................................................................................................21

Proposed Intervenor Plaintiff, Zama Capital Master Fund, LP ("Zama"), respectfully submits this memorandum of law in support of its Order to Show Cause seeking (a) to intervene as of right in the above-captioned action and file its proposed complaint pursuant to Fed. R. Civ. P. 24, (b) a temporary restraining order ("TRO") and preliminary injunction against 26 Capital Holdings LLC ("Sponsor") and Rimu Capital Ltd. ("Rimu") from, *inter alia*, making distributions of certain settlement proceeds which will inflict irreparable injury on Zama and other Sponsor members because Sponsor is insolvent, and (c) such other relief as the Court deems just and proper.

## PRELIMINARY STATEMENT

In this action, Rimu seeks redress against Defendant Jason Ader ("Ader") and his companies for their alleged fraudulent inducement of Rimu's $25 million investment in 26 Capital Holdings LLC, the sponsor of a special purpose acquisition company called 26 Capital Acquisition Corp. ("SPAC"). Rimu asserts that, under the false premise that Ader owned 100% of Sponsor's "Residual Percentage," Ader looted the company to the tune of tens of millions of dollars through secret distributions to himself and his family members, including the totality of Rimu's investment. *See* Ex. 6, proposed Rimu Second Amended Complaint ("RSAC"), ¶385 ("Having falsely and fraudulently fixed his own Residual Percentage at 100%, and the Residual Percentage of all other Members at 0%, Ader breached the Operating Agreement by granting 100% of the Ader Distributions to himself.").[1] Rimu seeks recovery of these amounts based upon its "Residual Percentage," which is defined in the Sponsor's Operating Agreement as a percentage derived from each member's capital contribution.

Zama has also been victimized by Ader. Ader looted Zama's $4.5 million investment, and also fraudulently induced Zama to lend the Sponsor an additional $4.5 million.

---

[1] "Ex. __" refers to the exhibits attached to the accompanying Declaration of John H. Chun, Esq.

But although Zama has common cause with Rimu against Ader, it differs sharply from Rimu as to its position that "Residual Percentage" supplies the proper calculation of recovery against Ader. Contrary to Rimu's reliance on "Residual Percentage," Zama believes that the governing recovery methodology is found in Zama's Subscription Agreement (Ex. 2), which Zama entered into in July 2021—months prior to Rimu's December 2021 investment in Sponsor—and which amended the Sponsor Operating Agreement, to which Rimu agreed to be bound.

The relevant terms of that amendment—found in Section 3(g)(ii) of Zama's Subscription Agreement—clearly provide that "any . . . distribution with respect to the capital accounts of the Sponsor" will be "distributed pro rata to all holders of Membership Interests, based on their relative Founder Shares Percentages, Private Placement Warrant Percentages and Loan Warrant Percentages." Ex. 2. In other words, Section 3(g)(ii) of the Zama Subscription Agreement—which supersedes all contrary provisions in the Operating Agreement or Rimu subscription agreement—provides that any recoveries from Ader and his entities for his improper distributions should be calculated based upon the members' relative ownership of Sponsor's Founder Shares and warrants. It makes no mention of "Residual Percentage."

Zama accordingly seeks to intervene in this action to ensure that Rimu's wrongful interpretation of the governing Sponsor documents does not result in an award that deprives Zama of recoveries to which it is entitled. While Rimu's capital contribution is larger than Zama's ($25 million to $4.5 million), Zama's percentage of Founder Shares (58% v. 36%) and warrants (60% to 33%) is larger than Rimu's. Ex. 6 (RSAC) ¶¶94, 116. Accordingly, the determination of whether "Residual Percentage" or Section 3(g)(ii) controls—and how much of any such interest each party holds—will substantially impact the amount of recovery that either party will receive.

Zama's need to intervene has become more urgent in recent days. That is because Zama recently learned that Rimu has purported to replace Ader as the Sponsor's managing member. That appointment arose in connection with the settlement of a control dispute after Rimu and Zama joined forces to notify Ader on October 29, 2023 of his removal as managing member ("Removal Notice," Ex. 7). When Ader refused to step down and instead continued to purport to represent the Sponsor and SPAC in settlement negotiations of a Delaware litigation against the SPAC's merger partners at Universal Entertainment Corp. (with affiliates, "Universal"), Rimu sued in the Delaware Court of Chancery to declare that Ader had been validly removed, *see Rimu Capital Ltd. v. Ader*, Case No. 2023-1190 ("Rimu Delaware Action").

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ Ex. 3 §2. In other words, despite previously accusing Ader of "falsely and fraudulently fix[ing] his own Residual Percentage at 100%" (Ex. 6 ¶385), Rimu has turned around and is doing the exact same thing to Zama based on a transfer of that fictional interest. And this is entirely inconsistent with Rimu's prior representations to this and the Delaware courts that "Residual Percentage means the percentage interest attributable to a Member's residual interest in the Company as set forth on Schedule A, as amended from time to time, *representing such Member's proportionate Capital Contribution*," Ex. 6 ¶370. In other words, each Sponsor investor who made a capital contribution—including Zama and, on information and belief, members of the Sponsor's board of directors—has a Residual Percentage.

Rimu's actions indicate that it does not intend to manage the Sponsor consistent with its fiduciary duties. Indeed, Rimu has already sold-out Zama and the Sponsor. ███████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ██████████████████████████████ *See 26 Capital Acquisition Corp. et al. v. Tiger Resort Asia Ltd. et al.*, C.A. No. 2023-0128-JTL (the "SPAC Action"); Ex. 4 (SPAC Action settlement agreement).

Prior to attempting to ratify that unauthorized settlement, Rimu had previously told the Delaware court in a pleading verified under oath that Ader need to be stopped from representing the Sponsor and SPAC in the negotiations with Universal due to "extraordinary levels of self-dealing" and "gross[] neglect" that "prejudice[ed] the [Sponsor's] (and the SPAC's) ability to successfully prosecute" the SPAC Action. Ex. 8 (Rimu Delaware Complaint) ¶30. And, as it appeared that Ader's primary intent in the Universal negotiations was to secure the broadest possible releases for himself, rather than maximizing the value of the Sponsor and SPAC's claims (believed to be worth hundreds of millions of dollars), Rimu also told the Delaware court that "Ader and [Sponsor] have different incentives with respect to the SPAC Action and his mismanagement of the Company is directly affecting the Company's ability to participate in and control the pending litigation." Ex. 9 (Rimu Delaware Status Quo Motion) ¶34.

Rimu's and Zama's concerns proved entirely correct. ████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ Ex.

4 (SPAC Action settlement) ¶1. ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████ Ex. 3 §2 & Ex. A (Consent).[2]

It appears that Rimu is not so much replacing Ader as managing member as stepping into

his shoes, where Rimu is now poised to continue Ader's legacy of self-dealing and corruption.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████ Ex. 3 at Ex. B. This too is entirely inconsistent with

Rimu's statements to Zama and the Delaware court, in which Rimu sought to clean house and

replace Ader with "a new independent manager." Ex. 8 (Rimu Complaint) ¶36; *see* Ex. 9 (SQO

Motion) ¶41 (representing to Court that "Rimu needs to time to put an independent third-party

manager in place, needs to be able to reassure such manager that he, she or it will have the authority

of a manager and needs a *status quo* order to protect [the Sponsor] from its former manager").

Rimu has done the opposite, to the severe, ongoing detriment of Zama and other Sponsor members.

Zama accordingly respectfully seeks a TRO to prevent further harm to the Sponsor,

including enjoining Rimu and Sponsor from making any distributions from any proceeds of the

---

[2] Zama has moved to intervene in the SPAC Action to challenge the settlement agreement with Universal as void given the absence of notice or a stockholder vote as required by 8 Del. C. §271. Ex. 10 (Intervention Motion). That motion is unopposed by Universal. Ex. 11 (Letter from Defendants dated January 26, 2024). And although Zama has asked Sponsor and Rimu to support the Motion, Zama has yet to receive a response. Ex. 12 (Zama January 26 letter to counsel for Rimu and Sponsor). Zama has further requested that Rimu refrain from making distributions of the SPAC Action settlement payment until the parties' conflicting interpretation of the Sponsor governing documents is resolved. Ex. 13 (email from Zama counsel to Rimu counsel, dated Jan. 19, 2024). Although Rimu's counsel initially stated that Rimu did not "intend to make any distributions before Zama has had an opportunity to review the [settlement] agreements," Ex. 13, during a subsequent phone call on January 25, 2024, Rimu's counsel declined to make any commitment that Sponsor or Rimu would refrain from future distributions.

SPAC Action settlement pay that are wired to the escrow account of its counsel. On information and belief, Sponsor has no other assets and no operating business and is insolvent. If Rimu is permitted to divert such settlement payment proceeds to itself, as it appears likely to do in derogation of the Sponsor's governing documents, including Section 3(g)(ii) of Zama's Subscription Agreement, Zama and Sponsor's other members and investors will be irreparably injured.

## STATEMENT OF FACTS

The Court is respectfully referred to the Proposed Intervenor Complaint (Ex. 1) for a complete statement of the facts and circumstances relevant to this motion. A brief statement of the facts is set forth below for the Court's convenience.

**A.      Zama Invested in Sponsor in July 2021 and Amended the Distribution Provisions in the Operating Agreement.**

In a Subscription Agreement dated July 12, 2021, Zama, Sponsor and Ader agreed that in return for a capital contribution in the amount of $4.5 million, Zama would purchase interests in 4 million Founder Shares of the Sponsor and 4.5 million private placement warrants, which comprised more than 58% of the SPAC's Class B shares and 60% of the warrants. Ex. 1 ¶ 26; Ex. 2 (Subscription Agreement) §1. The parties agreed that Zama's interest in the Sponsor was a "Membership Interest in the Sponsor, and that on the Effective Date . . . [Zama] shall be admitted as a Member of the Sponsor." *Id.* In connection with Zama's admission as a member, the Sponsor's Operating Agreement was amended, and attached to the Subscription Agreement as Exhibit A (the "Operating Agreement"). *Id.*

Despite acquiring a majority economic interest in the Sponsor, Zama did not seek control of the entity. Thus, during the course of negotiations, Zama bargained intensely to protect its investment through the Subscription Agreement. As a result, in Section 3(g) of its Subscription

Agreement, the Sponsor agreed "not to create, or authorize the creation of, or issue, or authorize the issuance of any debt security or create any lien or security interest or incur other indebtedness . . . which ranks senior to the Investor Membership Interest with respect to the allocation or distribution of Founder Shares or Private Placement Warrants." Zama further required the Sponsor to agree in Section 3(g)(ii) that it would not "declare, set aside or pay any dividend or make any other distribution with respect to the capital accounts of the Sponsor that does not get distributed pro rata to all holders of Membership Interests, based on their relative Founder Shares Percentages, Private Placement Warrant Percentages and Loan Warrant Percentages." *Id.* ¶¶28, 62.

By including within Section 3(g)(ii)'s broad scope "***any*** . . . distribution with respect to the capital accounts" without qualification (emphasis added), Zama made clear that any and all distributions that the Sponsor might make needed to be made in accordance with Section 3(g)(ii)'s terms. That is because all membership interests are held through capital accounts.

Moreover, by requiring that "any . . . distributions" be made "pro rata to all holders of Membership Interests, based on their relative Founder Shares Percentages, Private Placement Warrant Percentages and Loan Warrant Percentages," the parties prescribed the exclusive means for allocating all distributions among the holders of Membership Interests. *Id.* ¶30. Accordingly, Rimu is wrong that Sponsor distributions should be allocated according to Residual Percentages.

**B.**   **Zama Learns of Ader's Fraud During the SPAC Action.**

On October 15, 2021, the SPAC entered into an Agreement and Plan of Merger and Share Acquisition ("Merger Agreement") with a gaming company affiliate of Universal's ("CasinoCo") under which CasinoCo, upon closing, would become a publicly-traded entity through a de-SPAC transaction with the SPAC. *Id.* ¶36. When, however, Universal breached the Merger Agreement

and refused to close the deal, the SPAC was forced to initiate the SPAC Action on February 2, 2023. The Sponsor also asserted a claim for damages. Ex. 1 ¶37.

In the weeks leading up to the SPAC Action, Ader approached Zama for funding, first asserting that the Sponsor and SPAC needed funds to extend the SPAC and then later asserting that the Sponsor and SPAC needed additional funds to pursue the SPAC Action. *Id.* ¶38. Recognizing that the SPAC Action constituted substantially all the assets of the SPAC, and certainly the only assets that could generate a meaningful return to the Sponsor (and therefore indirectly to Zama), Zama obliged.

During the course of the SPAC Action, Zama came to gradually learn for the first time of Ader's fraud. For example, contrary to representations in the Subscription Agreement that the Sponsor had no "outstanding debt securities, notes, credit agreements, credit facilities or other agreements, documents or instruments evidencing indebtedness," in truth, the Sponsor was heavily indebted for loans Ader used to initially fund the Sponsor at the time of Zama's investment. Furthermore, Ader's representations that the Sponsor needed money to fund the SPAC Action concealed that the Sponsor lacked funds only because Ader had looted the Sponsor for his personal benefit. *Id.* ¶¶43-44.

**C.    Rimu Advances an Incorrect Interpretation of the Sponsor Governing Documents in This Action.**

According to Rimu's allegations in this action, Ader and Sponsor breached the Operating Agreement by distributing Rimu and Zama's capital contributions entirely to Ader. Ex. 6 (RSAC) ¶385. Ader is apparently attempting to justify those distributions in breach of his contractual and fiduciary obligations under an erroneous theory that he holds 100% of the Residual Percentage. *Id.*

Rimu argues that such theory ignores the definition of "Residual Percentage" in the Operating Agreement, which is derived from the capital contributions of each member, including Rimu and Zama. *Id.*; Ex. 2 (Operating Agreement) at 5 (defining "Residual Percentage" as "the percentage interest . . . representing such Member's proportionate Capital Contribution"). In other words, Rimu and Zama, both of which are members who made capital contributions to Sponsor, by definition, have a Residual Percentage. ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████

While Rimu's argument in this action is correct that Zama does have a Residual Percentage, that is also irrelevant to the proper allocation of distributions among Sponsor's members. That is because the provision that Rimu relies upon—the distribution methodology set forth in Section 4.01 of the Operating Agreement—has been superseded by Section 3(g)(ii) of the Zama Subscription Agreement. That section provides that distributions are a function of each members' relative Founder Shares Percentages, Private Placement Warrant Percentages and Loan Warrant Percentages—not Residual Percentage. Ex. 1 ¶59. And Rimu's claim to distributions is governed by the Zama Subscription Agreement, not the Operating Agreement, because the Zama Subscription Agreement amended the Sponsor's Operating Agreement, to which Rimu agreed at the time of its investment. *Id.*

## **ARGUMENT**

## **I.      ZAMA SHOULD BE PERMITTED TO INTERVENE AS OF RIGHT.**

Under FRCP 24(a)(2), "[o]n timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action,

and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." FRCP 24(a)(2).

"For intervention as of right under Rule 24(a)(2), the moving party must show: (1) the application is timely; (2) the applicant has a significant protectable interest relating to the property or transaction that is the subject of the action; (3) the disposition of the action may practically impair the applicant's ability to protect its interest; and (4) the existing parties may not adequately represent the applicant's interest." *Sherman v. Town of Chester*, 339 F. Supp. 3d 346, 358 (S.D.N.Y. 2018) (quoting *Kamdem-Ouaffo v. Pepsico, Inc.*, 314 F.R.D. 130, 134 (S.D.N.Y. 2016)); *see MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 389 (2d Cir. 2006). As shown below, Zama meets all of the requirements for intervention.

### A.     <u>The Application Is Timely.</u>

"Whether a motion to intervene is timely is an issue within the sound discretion of the trial court and should be determined in light of all the circumstances of the case." *Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd.*, 782 F. Supp. 870, 874 (S.D.N.Y. 1991) (citing *NAACP v. N.Y.*, 413 U.S. 345, 365-66 (1973)).

> In determining whether a motion to intervene is timely, courts consider (1) how long the applicant had notice of the interest before it made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances militating for or against a finding of timeliness.

*Sherman*, 399 F. Supp. 3d at 358 (citing *Laroe Eatates, Inc. v. Town of Chester*, 828 F.3d 60, 66-67 (2d Cir. 2016)). The instant motion to intervene is timely.

Rimu commenced its action on June 15, 2023, about seven months ago. Dkt. No. 1. Defendants served a motion to dismiss, after which the first Rimu amended complaint was filed on September 21, 2023. Dkt. No. 43. Rimu then moved to file its second amended complaint on

October 12, 2013. Dkt. No. 52. On November 27, 2023, prior to the submission of further briefing on either motion, this Court stayed this case in its entirety in light of the control dispute between Ader and Rimu in Delaware. Dkt. No. 65. That stay has yet to be lifted and to Zama's knowledge, any discovery that has occurred remains in its early stages.

In sum, although the case was filed a little over seven months ago, the case has not progressed to an advanced stage. There should, therefore, be no material prejudice to any of the parties in this action from Zama's intervention. *See Sherman*, 339 F. Supp. 3d at 359 (intervention timely where litigation was still at an early stage and parties had not begun discovery); *John v. Sotheby's, Inc.*, 141 F.R.D. 29, 34-35 (S.D.N.Y. 1992) (intervention timely where made nine months after original action commenced, six of which were on the suspense calendar).

Zama, on the other hand will be substantially prejudiced if it is not permitted to intervene and Rimu is awarded recoveries in accordance with its preferred (and erroneous) interpretation of the Operating Agreement.

### B.    Zama Has a Significant Protectable Interest Relating to the Same Transactions at Issue in This Case.

Under Rule 24(a), the "interest" of the intervenor-applicant must be significantly protectable such that it will be directly and immediately affected by the litigation. *Restor–A–Dent Dental Lab'ys, Inc. v. Certified Alloy Prods. Inc.*, 725 F.2d 871, 874 (2d Cir. 1984). Zama, like Rimu, was defrauded by Ader in connection with investments in the same Sponsor and SPAC. And, as with Rimu, Ader distributed all of Zama's capital contributions to himself, in violation of Zama and Rimu's rights under the governing Sponsor documents. The determination of whether "Residual Percentage" or Section 3(g)(ii) controls—and how much of any such interest each party holds—will substantially impact the amount of recovery that either party may receive. It is a

question that must be resolved under the terms of the Sponsor Operating Agreement, as amended by the Zama Subscription Agreement.

Zama's interests are, therefore, directly and immediately affected by Rimu's litigation. *See Del. Tr. Co. v. Wilmington Tr., N.A.*, 534 B.R. 500, 510 (S.D.N.Y. 2015) (in dispute as to proper allocation of Chapter 11 debtors' cash collateral payments, parties that represented secured swap holders were entitled to intervene as of right where they had significant interest in how cash collateral payments were allocated, based on competing claimants' share of debtors' total first lien indebtedness); *Balestriere PLLC v. CMA Trading, Inc.*, 2014 WL 929813, at *20 (S.D.N.Y. Mar. 7, 2014) (because the intervenor asserted claims premised on the loss of funds placed by the plaintiffs in the hands of the Balestriere firm for investment, and because that firm asserted claims that are premised in major part on the same assertedly fraudulent scheme by the investment entity, the intervention claims "are so related to claims in the action . . . that they form part of the same case or controversy under Article III"); *McNeill v. N.Y.C. Hous. Auth.*, 719 F. Supp. 233, 250 (S.D.N.Y. 1989) (intervention rule is satisfied where single common question of law or fact is involved, despite factual differences between parties).

Moreover, courts generally have supplemental jurisdiction over claims "that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). "The last sentence of § 1367(a) makes it clear that the grant of supplemental jurisdiction extends to claims involving joinder or intervention of additional parties." *Exxon Mobil Corp v. Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005). Claims form part of the same case or controversy under Article III when they derive from a "common nucleus of operative fact." *Pierre v. City of N.Y.*, 844 F. App'x 411, 413 (2d Cir. 2021); *Treglia v. Town of Manlius*, 313 F.3d 713, 723 (2d Cir.

2002) (supplemental jurisdiction extends to claims that "arise[] out of approximately the same set of events"). A court has supplemental jurisdiction over would-be intervenors that meet the requirements for intervention of right. *Mut. Fire, Marine & Inland Ins. V. Adler*, 726 F. Supp. 478, 481 (S.D.N.Y. 1989) ("[W]hen the court's jurisdictional requirements are met with regard to the original parties, a party who subsequently intervenes 'as of right' pursuant to Rule 24(a)(2) . . . need not have an independent ground of federal jurisdiction, and will not destroy diversity regardless of its citizenship."); *York Rsch. V. Landgarten*, 1992 WL 373268, at *1 (S.D.N.Y. Dec. 3, 1992) (noting "[i]ntervention as of right under Rule 24(a) normally suffices to demonstrate ancillary jurisdiction"). Thus, this Court has jurisdiction over Zama's claims.

### C. The Disposition of the Rimu Action Would Practically Impair Zama's Ability to Protect Its Interest.

Because Rimu asks this Court to find that Rimu is entitled to distributions based upon each member's respective "Residual Percentage," as defined in the Sponsor Operating Agreement, rather than apply Section 3(g)(ii) of Zama's Subscription Agreement, allowing the Rimu action to proceed without Zama would potentially deprive Zama of its rights to enforce Section 3(g)(ii) of its Subscription Agreement.

This is especially true now that Rimu has become the managing member of the Sponsor. Without Zama's intervention, Rimu will inevitably make Sponsor distributions in accordance with its preferred and wrongful interpretation of the Sponsor governing documents. Zama should therefore be permitted to intervene. *See John*, 141 F.R.D. at 34 (noting that "[p]rohibiting intervention will probably result in awarding the painting to plaintiff, because plaintiff will offer unrefuted proof of ownership" and will otherwise ignore the claims of the proposed intervenor).

    **D.**    **The Existing Parties to the Rimu Action Will Not Adequately Represent**
            **Zama's Interests.**

None of the parties to the existing Rimu action would adequately represents Zama's interests. Ader and his entities certainly will not. And Rimu cannot represent Zama's interests, especially where acceptance of Zama's distribution methodology would reduce the distributions to which Rimu believes it is entitled. Thus, there is a direct conflict between Rimu and Zama.

**II.**    **A TEMPORARY RESTRAINING ORDER SHOULD BE GRANTED AGAINST SPONSOR AND RIMU.**

"[T]he standard for an entry of a temporary restraining order is the same as for a preliminary injunction." *AFA Dispensing Grp. B.V. v. Anheuser-Busch, Inc.*, 740 F. Supp. 2d 465, 471 (S.D.N.Y. 2010). In order to obtain injunctive relief, the movant must show (1) a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (citation omitted).

The purpose of a temporary restraining order is to maintain the status quo of an existing situation "until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." *Warner Bros. Inc. v. Dae Rim Trading, Inc.*, 877 F.2d 1120, 1125 (2d Cir. 1989); *Pan Am. World Airways, Inc. v. Flight Eng'rs Int'l Ass'n*, 306 F.2d 840, 842-43 (2d Cir. 1962). As shown below, Zama satisfies the prerequisites for a temporary restraining order.

    **A.**    **Zama Is Likely to Succeed on the Merits.**

To establish a likelihood of success on the merits, a plaintiff "need not show that success is an absolute certainty. He need only make a showing that the probability of his prevailing is

14

better than fifty percent." *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 510 (S.D.N.Y. 2017) (quoting *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)). Here, Zama is likely to succeed as to Rimu's breaches of its contractual and fiduciary obligations as managing member, including by deeming itself holder of "100% of the Residual Percentage of the Sponsor," and repudiating Zama's Residual Percentage. Ex. 1 ¶83 *et seq.* (Breach of Contract); ¶112 *et seq.* (Breach of Fiduciary Duty).

**Breach of Contract**. As noted above, Rimu filed this action, in part, to redress injuries allegedly inflicted by Ader's refusal to recognize Rimu's Residual Percentage in the Sponsor. Rimu has repeatedly asserted in this action that Ader's claim to own 100% of the Residual Percentage violated the Operating Agreement. According to Rimu, "[p]ursuant to the terms of the Operating Agreement, 'Residual Percentage' means the percentage interest attributable to a Member's residual interest in the Company . . . *representing such Member's proportionate Capital Contribution*." Ex. 6 (RSAC) ¶370. And Ader's attempt to "secretly retain[] 100% of the 'Residual Percentage' in 26 Holdings" violated Sponsor's Operating Agreement, "which required that the 'Residual Percentage' be proportionate to each member's Capital Contribution." *Id.* ¶4; Ex. 7 (Removal Notice) (removing Ader for cause as managing member due, in part, to "wrongfully attributing 100% of the Residual Percentage to yourself in violation of the express terms of the Operating Agreement").

Given such admissions, Rimu cannot claim now that it owns 100% of the Residual Percentage and neither Zama, nor any other Sponsor investor, owns any percentage.[3] Indeed, in the Rimu Delaware Action, Rimu expressly plead that Zama has a Residual Percentage. Ex. 9 (SQO Motion) ¶14 ("As a result of Rimu's investment in the Company, it, together with Zama,

---

[3] On information and belief, several others, including Sponsor's directors Randall Waterfield and Rafi Ashkenai, have purported to make capital contributions to the Sponsor, which would potentially entitle them to a Residual Percentage.

contributed more than 80% of the Company's capital and, under the Company's Operating Agreement, and thus control more than 80% of the Company's Residual Percentage—the proportionate amount of Rimu's and Zama's collective Capital Contributions.").

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████ is

a clear breach of the Operating Agreement. Ex. 9 (SQO Motion) ¶28 (Ader (and now Rimu's) position that "he, and only he, owns 100% of the Residual Percentage in the [Sponsor] . . . is a position profoundly at odds with the Operating Agreement and plainly not true"). Zama is likely to succeed on its claim against Rimu.

**Breach of Fiduciary Duty**. Rimu's actions also constitute clear breaches of fiduciary duties and recent discussions suggest it intends to breach further by intentionally and erroneously distributing any proceeds from the settlement agreement. Ex. 1 (Zama Complaint) ¶112 *et seq*. Indeed, as Rimu has alleged in this action, "Ader breached his fiduciary duties to Rimu by, among other things: (i) falsely and fraudulently setting Rimu's Residual Percentage at 0% . . . ." Ex. 5 (Rimu First Amended Complaint) ¶301. That is exactly what Rimu is doing to Zama.

Rimu has made similar assertions in its Second Amended Complaint. According to Rimu, by wrongfully claiming 100% of the Residual Percentage, "Ader breached the Operating Agreement by falsely and fraudulently setting the Member's Residual Percentage such that it does not represent[] such Member's proportionate Capital Contribution." Ex. 6 (RSAC) ¶384. As Rimu

is engaged in the exact same "false[] and fraudulent[]" conduct, it is in clear breach of its fiduciary duties to Zama and other Sponsor investors.

But that is not all. ████████████████████████████████████████

████████████████████████████████████████████████████████ As Rimu well knew, the SPAC Action was "important to the [Sponsor] for several reasons, including that the [Sponsor's] assets include shares issued by the SPAC whose primary asset is the value of the claims pending in the SPAC Action. While the SPAC sought specific performance and, alternatively, damages for breach, the [Sponsor] also has a counterclaim for damages." Ex. 9 (SQO Motion) ¶22.

And like Zama, Rimu was well-aware that Ader was entirely unsuitable to represent the Sponsor and SPAC's interests in the settlement negotiations with Universal due to his "extraordinary levels of self-dealing" and "differ[ing] incentives." *Id*. ¶¶25, 34. That is why Rimu and Zama removed Ader as managing member on October 29, 2023. Ex. 7 (Removal Notice) (removing Ader for, *inter alia*, "grossly neglecting your duties as Managing Member, and . . . subordinating the interests of Sponsor and its Members to your own personal interests and those of your related entities and family members.").

Yet, Ader ignored that Removal Notice and on November 9, 2023, entered into the SPAC Action settlement agreement which confirmed Rimu and Zama's fears. Ex. 4 ¶1 █████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

17

████████████████████████████

Such self-dealing actions were in clear breach of Rimu's fiduciary duties.

This Court should accordingly find that Zama has established a strong likelihood of success on the merits of its claims. At the very least, Zama has shown serious questions going to the merits and balance of hardships that tips in its favor (*see infra*, Section C).

**B.      Unless Rimu and The Already Insolvent Sponsor Are Enjoined, Zama Will Suffer Irreparable Harm**.

"Irreparable harm is defined as certain and imminent harm for which a monetary award does not adequately compensate." *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 328-29 (E.D.N.Y. 2020) (noting irreparable harm occurs "where the loss is difficult to replace or measure, or where plaintiffs should not be expected to suffer the loss."). Courts have held that the potential for irreparable injury arises where there is "a meaningful threat that a defendant may render relief meaningless by dissipating assets or removing them from the court's jurisdiction." *Destra Targeted Income Unit Inv. Tr. v. Parmar*, 2017 WL 373207, at *2 (Del. Ch. Jan. 25, 2017); *Mitsubishi Power Sys. Ams., Inc. v. Babcock & Brown Infrastructure Grp. US, LLC*, 2009 WL 1199588, at *4 (Del. Ch. Apr. 24, 2009) (finding irreparable harm where plaintiff stated a colorable claim for fraudulent transfer).

Moreover, irreparable harm also arises where a defendant's "precarious financial situation" suggested it "may be unable to satisfy a money judgement." *Kansas City S. v. Grupo TMM, S.A.*, 2003 WL 22659332, at *5 (Del. Ch. Nov. 4, 2003); *Brinatti v. TeleSTAR, Inc.*, 1985 WL 44688, at *4 (Del. Ch. Sept. 3, 1985) ("Injunctive relief is appropriate where the evidence, as here, raises serious questions about defendants' ability to pay a damage award."); *Am. Healthcare Admin.*

*Servs., Inc. v. Aizen*, 285 A.3d 461, 483 (Del. Ch. 2022) (finding threat of irreparable harm where there was "a concrete threat the defendant intends to render itself insolvent and judgment-proof").

That is exactly the case here. ███████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████

If Rimu, an offshore BVI company, is not restrained from doing so, Zama and other Sponsor investors will suffer irreparable injury because Sponsor has no other meaningful assets. The Sponsor is clearly an insolvent entity and will remain so even after the $11 million payment, which is a payment to the SPAC as well. In fact, the Sponsor's debt to just Zama and SpringOwl alone totals $10.3 million, and that is not even taking into consideration millions in debt owed to other creditors of the Sponsor and SPAC. Exs. 15-20 (loan documentation evidencing loans from Zama and SpringOwl of $9 million); Ex. 21 (SPAC Form 8-K dated Aug. 2, 2023, disclosing loan of $1.3 million from SpringOwl). Indeed, as Rimu recognized in the Removal Notice, the Sponsor has "insufficient funds to pay its debts and reasonably expected expenses as they" come due. Ex. 7. And as Rimu conceded in its Delaware action, the prospect of managing member "divert[ing] assets to his own personal uses and, from there, to move them beyond recovery" is irreparable injury. Ex. 9 (SQO Motion) ¶4.

Moreover, the prospect of such injury is imminent. According to a recent letter filed with the Delaware Court of Chancery in the SPAC Action, Universal has already initiated the wire for such funds and they are expected to reach Rimu's lawyers imminently, if they are not there already.

Ex. 11 (Universal letter to Delaware Court of Chancery dated Jan. 26, 2024) (asserting that "Defendants are contractually required to fund the settlement by January 30, 2024" and that because "Defendants are located in Asia, they will have to initiate the funding of the settlement by 11 p.m. Eastern Standard Time on Sunday January 28, 2024"). And it appears that Rimu and Sponsor have already begun to dissipate their assets, including seemingly committing to use proceeds from the settlement payment to resolve a lawsuit by the SPAC's former law firm for unpaid legal fees of nearly $2 million. *See* Ex. 22 (Cole Schotz Jan. 25, 2024 letter to Delaware Court of Chancery, notifying court of settlement in principle of action for unpaid legal fees).

Zama accordingly seeks the expedited relief, in the form of the requested TRO, to prevent the infliction of this imminent, irreparable injury.

### C.       The Balance of Hardship Tips Strongly in Zama's Favor.

In light of this potential for imminent and irreparable injury, the harm to Zama of denying its request for injunctive relief firmly outweighs any alleged harm to Rimu and Sponsor. *See Destra*, 2017 WL 373207, at *3 (finding the balance of the equities favored granting interim relief where "[a]bsent equitable relief the plaintiffs face the prospect of litigating seemingly strong claims only to have their ability to obtain relief rendered a nullity").

Indeed, a TRO in this case would simply continue a state of affairs that has existed since last year pursuant to a status quo order that Rimu obtained in its Delaware action. Under that Order, Rimu restrained Sponsor from engaging "in any material transactions, including but not limited to, executing any binding agreements, or dismissing any litigation," without order of court.[4] Ex. 23 (SQO). As Rimu argued to the Delaware Court of Chancery, a "status quo order is appropriate where the order will prevent imminent irreparable harm, the party seeking to preserve the status

---

[4] Zama received notice that the status quo order was recently lifted as a result of the settlement agreement in the Rimu Delaware Action. Ex. 24 (Jan. 24, 2024 Stipulation and [Proposed] Order Vacating Status Quo Order).

quo has a reasonable likelihood of success on the merits, and the equities favor entering a status quo order." *See* Ex. 9 (SQO Motion) ¶30. And in that same motion, Rimu admitted that Ader, which then claimed to be the managing member, "will face no hardship from having restricted authority during the pendency of this action." Ex. 9 (SQO Motion) ¶43.

The same is true here. The TRO Zama seeks, to preclude the dissipation of the SPAC Action settlement proceeds until the parties' competing claims are resolved, would inflict no injury on Sponsor or Rimu.

### D.    The Public Interest Will Not Be Disserved by An Injunction

Because this matter concerns a private business dispute, this factor is not substantially implicated. *Citibank, NA v. Aralpa Holdings Ltd. P'ship*, 2023 WL 8810142, at *2 n.3 (S.D.N.Y. Dec. 19, 2023) ("the public interest would not be disserved" by a TRO's extension in a private dispute). In any event, protecting the Sponsor's members, investors and its creditors through the TRO serves the public's interest. *Dong v. Miller*, 2018 WL 1445573, at *13 (Mar. 23, 2018) ("This case is a dispute among private parties and does not meaningfully implicate the public interest. If anything, the preliminary injunction would aid the public interest. There is hardly a conceivable public interest in enabling Defendants to evade their creditors." (citation omitted)).

### E.    This Court Should Not Require Zama to Post a Bond

Ordinarily, a temporary restraining order may issue "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). However, because the "amount of any bond to be given upon the issuance of a preliminary injunction rests within the sound discretion of the trial court, the district court may dispense with the filing of a bond." *Clarkson Co., Ltd. v. Shaheen*, 544 F.2d 624, 633 (2d Cir. 1976) (citations omitted). That is

particularly the case where, as here, "[t]here is little likelihood of harm to the parties enjoined." *Id*; *Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 202 (E.D.N.Y. 2013).

As explained, neither Sponsor nor Rimu will suffer harm from this Court temporarily restraining the dissipation of the SPAC Action settlement payment until the proper allocation method is resolved. Indeed, the relief sought would merely continue an injunction that Rimu itself imposed against the Sponsor during the Delaware control dispute, where no bond was required. Because there exists little likelihood of harm to the parties sought to be enjoined, this Court should dispense with the filing of a bond.

## <u>CONCLUSION</u>

For all of the forgoing reasons Zama respectfully requests that the Court grant its motion seeking (a) to intervene as of right in the above-captioned action and file its proposed complaint pursuant to Fed. R. Civ. P. 24, (b) a TRO and preliminary injunction against the insolvent Sponsor and Rimu precluding distributions of the SPAC Action settlement payment, and (c) such other relief as the Court deems just and proper.

Dated:  New York, New York
      January 29, 2024

              HERRICK, FEINSTEIN LLP


              By: *  /s/ John H. Chun*
                  John H. Chun
                  Rodger T. Quigley
              2 Park Avenue
              New York, New York 10016
              (212) 592-1400
              *Attorneys for Proposed Intervenor Plaintiff*
              *Zama Capital Master Fund, LP*