UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

RIMU CAPITAL LTD,

        *Plaintiff*,

   and

26 CAPITAL HOLDINGS, LLC

        *Nominal Plaintiff*,

     v.

JASON ADER, SPRINGOWL ASSET MANAGEMENT
LLC, SPRINGOWL ASSOCIATES LLC, ADER FUND
MANAGEMENT LLC, SPRINGOWL SPECIAL
OPPORTUNITIES FUND, LP 826 CAPITAL HOLDINGS
LLC, SADIS & GOLDBERG, LLP, ROBERT D.
CROMWELL, RON S. GEFFNER, and PAMELA ADER.

       *Defendants*.

------------------------------------------------------------------X

JASON ADER, SPRINGOWL ASSET MANAGEMENT
LLC, SPRINGOWL ASSOCIATES LLC, ADER FUND
MANAGEMENT LLC, SPRINGOWL SPECIAL
OPPORTUNITIES FUND, LP 826 CAPITAL HOLDINGS
LLC

       *Crossclaim Plaintiffs*,

     v.

SADIS & GOLDBERG, LLP, ROBERT D. CROMWELL,
RON S. GEFFNER, and PAMELA ADER.

       *Crossclaim Defendants*.

------------------------------------------------------------------X

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

23-cv-05065 (LJL)

<u>OPINION & ORDER</u>

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___5/1/2025___

LEWIS J. LIMAN, United States District Judge:

Defendants Sadis & Goldberg, LLP, Robert D. Cromwell ("Cromwell"), and Ron S. Geffner ("Geffner," and collectively, the "Attorney Defendants") move, pursuant to Federal Rule of Civil Procedure 9(b) and 12(b)(6), to dismiss the Second Amended and Supplemental Complaint ("SASC"), Dkt. No. 117, of Plaintiff Rimu Capital Ltd. ("Plaintiff" or "Rimu") against them for failure to plead fraud with particularity and failure to state a claim for relief, Dkt. No. 163. The Attorney Defendants also move, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the crossclaim of Defendants/Crossclaim-Plaintiffs Jason Ader ("Jason"), SpringOwl Asset Management LLC ("SpringOwl AM"), SpringOwl Associates LLC ("SpringOwl Associates" and, collectively with SpringOwl AM, "SpringOwl"), Ader Fund Management LLC ("AFM"), SpringOwl Special Opportunities Fund, LP ("SSOF"), and 826 Capital Holdings LLC f/k/a Hospitality Acquisition Corp. LLC ("HAC," and collectively with Jason, SpringOwl AM, SpringOwl Associates, AFM, and SSOF, the "Ader Defendants"), Dkt. No. 148, for failure to state a claim for relief, Dkt. No. 195.

Pamela Ader ("Pamela") moves, pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), to dismiss Rimu's claims against her. Dkt. No. 160. She also moves, pursuant to Federal Rules of Civil Procedure 8 and 12(b)(6), to dismiss the Ader Defendants' crossclaim against her. Dkt. No. 192.

For the following reasons, Pamela Ader's and the Attorney Defendants' motions are granted.

## BACKGROUND

For purposes of this motion, the Court accepts as true the well-pleaded allegations of the SASC as supplemented by the documents incorporated by reference or that are integral to the complaint.[1]

## I.    The Relevant Parties

Rimu is a British Virgin Islands company with its principal place of business in Nassau, Bahamas.  SASC ¶ 12.  Its investments are managed by a family office, MGFO, which is based in the Bahamas.  *Id.* ¶ 12.

Jason Ader is an individual who resides in Florida.  *Id.* ¶ 14.  Jason is the Managing Member of SpringOwl AM, a Delaware limited liability company.  *Id.* ¶ 16.  SpringOwl AM, in turn, is the sole member of SpringOwl Associates.  *Id.* ¶¶ 14, 16.  SpringOwl Associates and SpringOwl AM are registered investment advisors.  *Id.* ¶¶ 16, 56, 294.[2]

Jason also controls a number of other entities, including AFM, *id.* ¶ 17, SSOF, *id.* ¶ 18, and HAC, *id.* ¶ 19.

Pamela is Jason's mother.  *Id.* ¶ 3.

Cromwell and Geffner are attorneys licensed to practice law in New York.  *Id.* ¶¶ 22–23. They are partners in the law firm Sadis & Goldberg, LLP.  *Id.*

---

[1] Plaintiff makes a number of allegations "upon information and belief."  *See, e.g.*, SASC ¶¶ 10, 11, 14, 20, 88, 89, 90, 93, 142, 200, 201, 209.  Such allegations cannot support a claim of fraud in the absence of a statement of the facts upon which the belief was formed.  *See, e.g.*, *Green Star Energy Sols., LLC v. Edison Props.*, 2022 WL 16540835, at *10 & n.7; (S.D.N.Y. Oct. 28, 2022); *Caldwell v. Archdiocese of New York*, 2021 WL 1999421, at *7 (S.D.N.Y. May 19, 2021).

[2] The SASC sometimes distinguishes SpringOwl AM and SpringOwl Associates, but in other instances, treats both as "SpringOwl."  *See, e.g.,* SASC ¶¶ 1, 7, 55, 57.  Both are alleged to be under Jason's control.  *See id.* ¶ 20.  This opinion thus follows the convention of the SASC and refers to SpringOwl AM and SpringOwl Associates as "SpringOwl" except where the SASC or a document incorporated by reference distinguishes between the two.  In any event, the difference is immaterial for purposes of this opinion.

## II.    The Playtech Investment Management Agreement

SpringOwl Associates is an investment advisor to Rimu pursuant to an Investment Management Agreement signed in August 2018.  *See* Dkt. No. 165-7 (the "IMA"); SASC ¶ 26. Under the IMA, SpringOwl Associates agreed to act as an investment adviser with respect to an investment in the securities of Playtech plc, a publicly traded company in the United Kingdom ("the Account"), and to manage that investment for Rimu.  SASC ¶ 27; *see generally*, IMA. Rimu granted to SpringOwl Associates "the sole authority and responsibility for managing the Investment in the Account, on a discretionary basis, in accordance with the Adviser's best judgment," IMA § 2(a), limited by the requirements that "the assets in the Account shall be invested in various types of securities issued by Playtech plc" and that "[a]ll investments in the Account shall, at all times, conform to, and be in accordance with, any requirements imposed by applicable law," IMA sch. A.

In exchange for investment advisory services in connection with Playtech, Rimu agreed to pay AFM, as an affiliate of SpringOwl Associates, an incentive fee equal to 10% of the realized and unrealized net capital appreciation in the Account from the date of inception to the date of termination of the Account.  *Id.* ¶ 29.

SpringOwl Associates and AFM had limited authority and limited duties under the IMA. Section 18 of the IMA provided as follows:

> Each of the Adviser Entities [SpringOwl Associates and AFM] shall, for all purposes herein, be deemed to be independent contractors. No party shall have the authority to act for or represent any other party, except as expressly provided herein or as authorized in writing by the other relevant party. Nothing contained herein shall create or constitute the Adviser Entities and [Rimu] as members of any partnership, joint venture, association, syndicate, unincorporated business or other separate entity, nor shall this Agreement be deemed to confer on any of them any express , implied or apparent authority to incur any obligation or liability on behalf of any such other entity.

IMA § 18.  The IMA also contained a choice-of-law provision stating that:

Except to the extent governed by U.S. federal securities laws, the parties acknowledge and agree that any claim, controversy, dispute or action relating in any way to this Agreement or the subject matter of this Agreement shall be governed solely by the laws of the State of Delaware, without regard to any conflict of laws doctrines that would or may permit or require the application of the laws of a different jurisdiction.

IMA § 11.

## III.    Jason Sponsors a SPAC

A SPAC, or "special purpose acquisition company," is a company that raises capital in an initial public offering ("IPO") to be used in connection with a merger with a company desiring to become public.  *Id.* ¶ 31.  The IPO proceeds are held in trust for the benefit of the SPAC's public stockholders, who have a right (but not an obligation) to redeem their shares after a merger target is identified.  *Id.* ¶ 31.  In the typical scenario, the SPAC's charter sets a fixed period to complete a transaction ("De-SPAC" or "Initial Business Combination") with a yet-to-be-identified private company.  *Id.* ¶ 33.  If the SPAC fails to engage in a transaction within that window, it must liquidate, distributing the cash in its trust to the SPAC's public stockholders.  *Id.*

A SPAC sponsor administers the SPAC.  In exchange for its services, the SPAC sponsor is paid a "promote" that usually takes the form of founder shares for 20% of the SPAC's post-IPO equity, sold to the sponsor for a nominal price.  *Id.* ¶ 32.  The sponsor will also make an investment concurrently with the IPO to cover the SPAC's underwriting fees and other expenses, since those expenses cannot be paid using cash in the trust.  *Id.* ¶ 32.  The founder shares obtained by the sponsor do not have a right to any of the proceeds in the trust upon a liquidation.  *Id.*

Beginning in August 2020, 26 Capital Holdings Corp. ("26 Capital Holdings Corp." or "SPAC"), was sponsored by nominal plaintiff 26 Capital Holdings LLC ("Sponsor").  Jason was

the Managing Member of Sponsor.  *Id.* ¶¶ 1, 13.  Sponsor is under common control with SpringOwl AM.  *Id.* ¶ 37.

Sponsor invested $25,000 in SPAC in August 2020, shortly after the SPAC was incorporated, in exchange for 5,750,000 Founder Shares, amounting to approximately 20% of SPAC's post-IPO equity.  *Id.* ¶ 40.  The Founder Shares acquired by Sponsor take the form of Class B common stock automatically convertible to shares of SPAC's Class A common stock at the time of an Initial Business Combination, on a one-for-one basis, subject to adjustment pursuant to certain anti-dilution rights and subject to substantial transfer restrictions or lock-up provisions.  *Id.* ¶ 43.  In addition, Sponsor and its officers waived a number of rights, including redemption rights with respect to the completion of an Initial Business Combination and to liquidating distributions from the trust account with respect to the Founder Shares if the SPAC failed to complete an Initial Business Combination within 24 months of the offering.  *Id.* ¶ 45.

The SPAC conducted its IPO on January 20, 2021.  *Id.* ¶ 49.  It sold a total of 27,500,000 units at a price of $10 per unit, generating gross proceeds of $275 million, which were placed in a trust account.  *Id.* ¶ 49.[3]  Each unit consisted of: (a) one share of Class A common stock (under the ticker "ADER") and (b) one-half of one redeemable warrant (under the ticker "ADERW").  *Id.* ¶ 38; Prospectus at ECF 1.  Each warrant had an exercise price of $11.50 per share, subject to adjustment.  SASC ¶ 38.  The proceeds of the sale of the units of Class A common stock and the redeemable warrants were placed in a trust account.  *Id.* ¶ 49.  At the same time, the SPAC also sold 7,500,000 Private Placement Warrants to Sponsor at a price of $1 per warrant, generating

---

[3] Pursuant to the prospectus, the SPAC offered a total of 24,000,000 units for sale with an option for the underwriters to purchase an additional 3,600,000 units to cover overallotments.  *See* SASC ¶ 38; Dkt. No. 165-3 (the 26 Capital Acquisition Corp. Prospectus, hereafter the "Prospectus") at ECF 2.

total gross proceeds of $7,500,000 to be used for operating expenses and in connection with a merger transaction.  *Id.* ¶ 50.

In January 2021, the SPAC distributed a stock dividend of 0.2 Founder Shares for each Founder Share outstanding, bringing Sponsor's aggregate share ownership to 6,900,000 Founder Shares.  *Id.* ¶ 42.

As further discussed below, *infra* p.19, Sponsor borrowed the funds it used to purchase the Founder Shares and the Private Placement Warrants from SSOF.  *Id.* ¶¶ 41, 51.

**IV.    The Proposed De-SPAC**

On October 15, 2021, SPAC entered into an Agreement and Plan of Merger and Share Acquisition with companies owning and controlling the Okada Manila Resort & Casino, a casino-resort in the Philippines.  *Id.* ¶¶ 52–53.  The merger counterparties included UE Resorts International, Inc. ("UERI"), the parent of the entity that owned the Philippines casino-resort, as well as Tiger Resort Asia Ltd., Tiger Resort, Leisure and Entertainment Inc., and Project Tiger Merger Sub, Inc., a Delaware corporation and wholly-owned subsidiary of UERI (collectively, the Universal Entertainment Corporation or "UEC Parties").  *Id.* ¶ 52.  Pursuant to the Merger Agreement, UERI was to have acquired SPAC, and, through the merger, would have become a publicly traded company listed on the NASDAQ.  *Id.* ¶ 53.  Upon closing, the stockholders of SPAC would have had the option of either redeeming their shares or, if they took no action to redeem, becoming stockholders of UERI.  *Id.*

**V.    Rimu's Purchase of an Interest in Sponsor's Class B Shares Through a Membership Interest in Sponsor**

Jason and SpringOwl introduced Rimu to SPAC after the SPAC announced its plan of merger with the Okada Manila Resort & Casino but before the closing date for that transaction. On October 22, 2021, Melissa Gannon ("Gannon") sent an email to Drew Colaiezzi

("Colaiezzi"), the Investment Analyst for Rimu's family office, MGFO, with a non-disclosure agreement for a potential investment by Rimu in the SPAC. *Id.* ¶¶ 58–60. The email read: "Please see attached NDA for your review for our potential PIPE investors." *Id.* ¶ 58.[4] The email copied Jason and MGFO's outside advisor, Alan Leibman ("Leibman"). *Id.* The email refers to a potential financing transaction with Okada Manila International, Inc., Tiger Resort, Leisure and Entertainment, Inc., or SPAC, making no mention of a potential financing transaction directly with Sponsor, or with Jason or SpringOwl. *Id.* ¶¶ 60–62. The attached non-disclosure agreement referenced the Agreement and Plan of Merger and Share Acquisition for the Okada Manila Resort & Casino and a transaction involving Rimu and one or more of Okada Manila International, Inc., Tiger Resort, Leisure and Entertainment, Inc., and the SPAC. *Id.* ¶ 62.

Several days later, on November 6, 2021, Jason sent an email to MGFO with the subject "26 Capital," attaching an "Okada Manila Investor Presentation Deck." *Id.* ¶ 64. The body of the email referenced "the deal we are proposing for [MGFO] as part of 26 Capital's merger/IPO with Okada Manila," and contained the proposal that MGFO "make an immediate investment of up to $25,000,000 of common/warrant units @ $10 per unit," with the units representing one share of common stock and one warrant. *Id.* It also mentioned that the shares and warrants would be subject to a one-year lock up and that Jason was "targeting a 11/30 closing for the units and have strong demand from our investors." *Id.* Jason stated: "We view this as a very attractive post pandemic investment in the Asian gaming market" and "[w]e see 300%+ upside in the units

---

[4] PIPE stands for private investment in public equity, referring to selling shares in a public company in a private arrangement with a select investor or group of investors. SASC ¶ 32. A SPAC may seek to raise capital through a PIPE investment to consummate a merger transaction with a target company.

and 200%+ upside in the common, before any growth initiatives." *Id.* He mentioned the possibility of Leibman sitting on the board of the company if MGFO made an investment consistent in size with the investments it had made in earlier transactions. *Id.*

On November 8, 2021, MGFO responded to Jason, copying Leibman and others, inquiring whether Jason would complete the legal and financial due diligence on the transaction "as the GP of 26 Capital." *Id.* ¶ 69. Jason replied: "We will open up a data room for you asap to review the materials. I would call your attention the KPMG Innovation Group and the Schulte Roth due diligence which cover financial, casino/gaming and legal matters." *Id.* ¶ 70.

Jason conducted a phone call with MGFO on November 18, 2021, to discuss the investment in SPAC. *Id.* ¶ 71. Later that day, he sent an email to Colaiezzi, with the subject "Recap," summarizing the call. The email referenced a co-investment by AFM with the funds owed it by Rimu:

> Just to recap.
>
> Ccing Bob Cromwell, who is working on papering this transaction for us.'[MGFO] is committing to a $25mm investment in 26 Capital units, shares/warrants.
>
> There will be a 1 year lock up from closing of the business combination with Okada Manila, and then the shares/warrants will be distributed to you directly. After two years, either party can trigger crystallization of fees. Both Alan [Leibman] and I agree to roll our fees from Playtech, currently estimated at around $800,000, into this new deal. Planned funding and closing is 11/30.
>
> What will the entity be that [MGFO] will be making the investment so we can send you the documents.

*Id.* ¶ 72. Attorney Defendant Cromwell, a partner at Defendant Sadis & Goldberg LLP, was Jason's lawyer alongside his partner, Attorney Defendant Geffner. *Id.* ¶¶ 4, 22–23, 82.

After correspondence between Jason and Colaiezzi on November 24, 2021, regarding deal terms that apparently were mistakenly sent to Rimu and MGFO, *id.* ¶¶ 87, 91, Jason wrote to Colaiezzi, copying Leibman, on November 26, 2021, stating that he was offering MGFO

"$25m in investment units, priced at $10, that contain 1 warrant and 1 common share," that there was "a pool of other investors who [were] buying, the less valuable $100 units with 10/1 shares/units," that counsel was drafting a term sheet for the transaction, and that Jason planned to co-invest with Rimu by rolling over $800,000 in fees Rimu owed AFM into the investment in Sponsor. *Id.* ¶ 92.

On November 26, 2021, Jason sent MGFO and Rimu a term sheet and fee agreement, a subscription agreement, a redline of the subscription agreement against an earlier version, and the Amended and Restated Operating Agreement for Sponsor. *Id.* ¶ 97. He explained that the documents reflected "our agreement for [MGFO] to purchase $25mm of $10 units. Each unit, as we discussed, and I as originally promised will be made up of 1 common share and 1 warrant." *Id.*

After receiving the documents, Plaintiff alleges that Colaiezzi expressed concerns to Jason and to his counsel that Jason and SpringOwl would profit from the proposed investment in ways that were not disclosed in the transaction documents. *Id.* ¶ 98.

On November 28, 2021, Colaiezzi emailed Jason with a list of questions concerning the proposed investment, one of which was directed specifically to "Risk Factors" section of the draft subscription agreement: "If a business combination is not completed within 24 months of the IPO, the underlying securities will become worthless and all investors will lose their entire investments. Why would the capital not be returned to investors in a liquidation process?" *Id.* ¶ 99. The same day, Cromwell emailed Jason, copying his partner, Geffner, with answers to Colaiezzi's questions. *Id.* ¶ 100. He wrote in response to Colaiezzi's question about return of capital that: "Any remaining capital would be returned in a liquidation process. The risk disclosure text was perhaps overstating the risk in order to make the point that the entire

investment may be lost in that event. We have revised the risk disclosure language by inserting 'may' in place of 'will.'" *Id.* ¶ 100; *see also* Dkt. No. 117-2 (executed subscription agreement, hereafter the "Subscription Agreement") (final version containing "may" instead of "will").

Jason forwarded Cromwell's responses to Colaiezzi, saying: "Good morning and thank you for your thoughtful questions. I hope we have done our best to answer all of them for you in the email below." *Id.* ¶ 102. He attached a revised term sheet and fee agreement and noted that "I believe the changes in language on the attached term sheet and agreement should assuage your concerns on fees." *Id.* ¶ 103. The following day, November 29, 2021, Cromwell emailed Jason, copying Geffner, providing revised transaction documents based on Colaiezzi's comments. *Id.* ¶ 105. Jason then forwarded Cromwell's email to Colaiezzi, and Colaiezzi emailed Jason an executed term sheet and fee agreement, Dkt. No. 117-1 (hereafter, the "Term Sheet & Fee Agreement"), as well as the executed Subscription Agreement. *Id.* ¶ 105–106.

On December 3, 2021, Rimu wired $25 million to an account for Sponsor at Bank of America. *Id.* ¶ 115.[5]

Prior to the Rimu transaction, Jason sold an economic interest in 4 million of the Founder Shares held by Sponsor and 4.5 million of the Private Placement Warrants held by Sponsor to another investor, Zama Capital Master Fund, L.P. ("Zama"), for $4.5 million. *Id.* ¶ 141. The terms under which Zama acquired its interests were more favorable than the terms under which Rimu acquired its interests. *Id.* ¶¶ 141, 146. Zama affiliates advised the UEC Parties regarding the proposed de-SPAC transaction, and, unbeknownst to the UEC Parties, had also purchased an

---

[5] The complaint states that the wire was sent on December 3, 2023. *Id.* ¶ 115. It is obvious from the context that the date is a typo.

interest in Sponsor and were working closely with Jason to close the de-SPAC transaction. *Id.* ¶¶ 144–45.

After the Rimu transaction closed, Jason retained only 875,000 Founder Shares in Sponsor and 1.5 million Private Placement Warrants, having sold six million of Sponsor's Founder Shares and six million of the Private Placement Warrants. *Id.* ¶¶ 138, 261.

## VI.    The Operative Documents

The terms of Rimu's investment in Sponsor are governed by three related documents signed and agreed to by Rimu: the Subscription Agreement dated November 30, 2021; the undated Term Sheet & Fee Agreement, and the Amended and Restated Limited Liability Company Operating Agreement of Sponsor, dated July 12, 2021, Dkt. No. 165-6 (the "Operating Agreement"). The Subscription Agreement and Term Sheet & Fee Agreement are attached to the SASC, while the Operating Agreement is referred to in the SASC and incorporated by reference. The Prospectus, though not a governing document, is also incorporated by reference as it is referred to in the SASC and, in executing the Subscription Agreement, Rimu represented and warranted that it had "carefully reviewed" the Prospectus. See SASC ¶¶ 35–38; Subscription Agreement sch. 1, 2.

### A.    The Subscription Agreement

Pursuant to the Subscription Agreement, Rimu agreed to purchase, and Sponsor agreed to transfer to Rimu, a membership interest in Sponsor comprised of 2,500,000 units, each consisting of an economic interest in one Founder Share and one Private Placement Warrant, for an aggregate purchase price of $25,000,000. *See* Subscription Agreement at 2.[6] The investment

---

[6] Plaintiff asserts that Jason's communications with Rimu obscured the nature of the proposed investment and whether it involved the purchase directly of Founder Shares or indirectly through a membership in Sponsor. SASC ¶ 67. The alleged facts, however, including that the

was subject to the terms of the Operating Agreement, and the transfer was to "be effected in accordance with the provisions of Section 8.04 of the Operating Agreement." *Id.* Rimu represented and warranted that it was (1) "an 'accredited investor' as defined under Regulation D of the Securities Act of 1933, as amended," that it could "afford the loss of the entire amount of its Capital Contribution," (3) that it "acknowledge[d] and underst[ood] that [Sponsor] [had] material nonpublic information with regarding the SPAC and its announced business combination transaction not known to [Rimu] that may impact the value of the Founder Shares and the Private Placement Warrants," (4) that it had "read carefully and underst[ood] fully the Risk Factors" set forth in Schedule 2 to the Subscription Agreement, and (5) that it had "carefully reviewed and underst[ood] the terms of the Operating Agreement, including the restrictions on transfer of the Membership Interests." *Id.*

Rimu also affirmatively made the following representations set forth in Schedule 1 to the Agreement:

1. The Investor is an 'accredited investor' within the meaning of Regulation D under the Securities Act of 1933, as amended, and is **able to bear the risk of an entire loss of its investment in a Membership Interest** of the [Sponsor].

2. The Investor is **knowledgeable with respect to the business and operations** of the SPAC and the [Sponsor].

3. The Investor has **carefully reviewed the information contained in the SPAC's registration statement on Form S-1 and the SPAC's other public filings with the SEC**, has **relied exclusively upon his or her own examination** of the SPAC, the Founder Shares, the Private Placement Warrants and the terms of the offering of the Founder Shares, the Private Placement Warrants and the Membership Interest offered hereby, including the merits and risks involved, in making an investment decision.

4. **Neither the** [Sponsor] **nor any of its affiliates has been requested to or has provided the Investor with any information or advice** with respect to the Founder Shares and the Private Placement Warrants, **nor is any such**

_____

investment was conducted through a PIPE and the contents of the communications and the operative documents, do not support Plaintiff's conclusory claim.

**information necessary or desired by Investor.  The** [Sponsor] **and its affiliates have made no representation to the Investor as to the likelihood of the completion or the success of the SPAC's announced business combination transaction.**

5. The Investor **acknowledges and understands that the** [Sponsor] **and its affiliates possess material nonpublic information regarding the SPAC not known to the Investor that may impact the value** of the Founder Shares and the Private Placement Warrants and that the [Sponsor] is unable to disclose the Information to Investor.  The Investor **understands, based on its experience, the disadvantage** to which the Investor is subject due to the disparity of information between the Company and the Investor.  Notwithstanding such disparity, the Investor has deemed it appropriate to enter into this Agreement and to make the Capital Contribution.  The **Investor agrees that none of the** [Sponsor]**, its affiliates, principals, managers, members, employees and agents shall have any liability to the Investor, its affiliates, principals, managers, members, employees, agents, grantors or beneficiaries whatsoever due to or in connection with the** [Sponsor's] **use or non-disclosure of the Information or otherwise as a result of the Investor's Capital Contribution, and the Investor hereby irrevocably waives any claim that it might have based on the failure of the** [Sponsor] **to disclose the Information**.

*Id.* sch. 1 (emphasis added); *see id.* § 4.

Schedule 2 contains the Risk Factors that Rimu represented it had read carefully and fully

understood.  They include:

> **An investment in the Membership Interest offered hereby and in the Founder Shares and Private Placement Warrants involves a high degree of risk. You should consider carefully all of the risks described below before making a decision to Invest in the Membership Interest. If any of the following events occur, you could lose all or a part of your Investment.**

> You should review carefully the entire SPAC Prospectus and in particular the 'Risk Factors' section in the SPAC Prospectus, which 'Risk Factors' section is incorporated herein by this reference to the same extent as if set forth in full herein.

> In particular, the Founder Shares and Private Placement warrants (the 'Underlying Securities') held by the Company provide the entire basis for any return on your investment that you might receive, and (i) the Underlying Securities are subject to the Lock-Up Periods (as defined in the Investor Letter) and (ii) if a business combination is not completed within 24 months following the closing of the SPAC's initial public offering, the Underlying Securities may become worthless, and you may lose your entire investment.

14

The Company is a newly formed entity with no operating history of its own. Although its operations are expected to be limited to holding its investments in securities of the SPAC and lending money to the SPAC, no assurance can be given that the Company will not encounter risk and loss arising from its own operations that will have a negative effect on the Membership Interests, and these risks as well could result in a loss of all or a substantial part of your investment.

The success of the SPAC and of the Company will depend on the management of the Managing Member. If the Managing Member should become incapacitated or otherwise cease to be substantially involved in the business of the SPAC and the Company, this would have a material adverse effect on the business prospects of the SPAC and likely would have a material adverse effect on the value of the Underlying Securities, thereby negatively affecting your investment.

*Id.* sch. 2 (emphasis in the original).

The Subscription Agreement has an integration clause:

6.  Entire Agreement.  Other than as set forth in the Operating Agreement, this Agreement contains all of the terms agreed upon or made by the parties relating to the subject matter of this Agreement, and supersedes all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such matter.

*Id.* at 4.

The Subscription Agreement contained a Delaware choice-of-law provision. *Id.* § 10 ("THIS AGREEMENT SHALL BE GOVERNED SOLELY AND EXCLUSIVELY BY THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ANY CONFLICT OF LAWS DOCTRINES.").

The Subscription Agreement was signed by Jason on behalf of Sponsor and by an individual named Harald McPike on behalf of Rimu.  *Id.* at 6.

## B.    The Operating Agreement

The Operating Agreement set forth the terms pursuant to which Sponsor would operate and the rights of the members of Sponsor.  Jason was designated the "Managing Member" of Sponsor and was permitted to hold a pecuniary interest in Sponsor as a member.  *See* Operating Agreement §§ 2.07, 2.08.  He was vested with the management and control of Sponsor, including

"full, exclusive and complete discretion to manage the business and affairs of the [Sponsor], to make all decisions affecting the business and affairs of the [Sponsor] and to take such actions as [he] deems necessary or appropriate to accomplish the purposes of the [Sponsor]." *Id.* § 6.01(a). The stated purpose of Sponsor was to take actions in connection with the IPO of SPAC and to purchase and hold SPAC securities, including the Founder Shares, Private Placement Warrants, and loans made to SPAC to be utilized by SPAC in connection with its intended Initial Business Combination. *Id.* § 2.04.

Section 8.04 addresses the transfer of the Founder Shares and Private Placement Warrants that comprise the units which Rimu purchased. *See* Operating Agreement § 8.04. Under that section, Jason as Managing Member had the authority to "allocate up to 100% of the number of Founder Shares, up to 100% of the Private Placement Warrants, and up to 100% of the Loan Warrants held by the Company," either to service providers to the SPAC or the Company or to any "Member without the consent of any Member, whether as Profit Interests or otherwise." *Id.* The Operating Agreement provided that if a transfer of one of those securities was made by Jason, it was deemed transferred from all applicable holders of that same security pro rata, except that Jason in his "sole discretion" could determine that the transfer was not made by any particular member, *i.e.*, Jason could determine whose securities were deemed transferred. *Id.* According to Plaintiff, Jason invoked this provision to determine that the transfer of interests to Rimu would be deemed to have been made exclusively from his shares and not from those of any other investors in Sponsor. SASC ¶ 175.

Members of Sponsor were entitled to distributions on a pro rata basis attributable to their economic interest in the Founder Shares, the Private Placement Warrants, any Loan Warrants, and any residual amounts left in the company. *Id.* § 4.01(a). In the event of a de-SPAC

transaction, the Managing Member was required to distribute to the Members the Founder

Shares, Private Placement Warrants, and any Loan Warrants.  *Id.* § 4.01(b).  In the event of a

dissolution, after satisfaction of any liabilities to creditors, Members were entitled to the

distribution of the Founder Shares, Private Placement Warrants, and Loan Warrants.  *Id.* §

9.02(b).

The Operating Agreement also provided that "[n]o interest shall accrue on any Capital

Contribution to the Company, and no Member shall have the right to withdraw or to be repaid

any Capital Contribution made by him, her or it or to receive any other payment in respect of his,

her or its Membership Interest in the Company, . . . except as specifically provided in this

Agreement."  *Id.* § 3.02.

The Operating Agreement contained strict confidentiality provisions.  The Managing

Member was entitled to know the identities of other Members and their respective capital

contributions and interests in the securities of the SPAC.  *Id.* § 2.05(a).  However, the Members

were entitled to know only their own capital contributions and interests in the securities of the

SPAC and not that of any other Member.  *Id.*

The Operating Agreement contained an integration clause.  *Id.* § 10.01.  It was governed

by Delaware law.  *Id.* § 10.04.

### C.    The Term Sheet & Fee Agreement

The Term Sheet & Fee Agreement summarized Rimu's investment in the units offered by

Sponsor and contained the agreement between Rimu and SpringOwl AM regarding the rollover

of SpringOwl AM's investment management fees into Sponsor and the SPAC.  *See* Term Sheet

& Fee Agreement at 1.  It reflected that Sponsor was offering to Rimu a membership interest in

Sponsor comprised of 2,500,000 units, each consisting of one Founder Share and one Private

Placement Unit, for a price of $10.00 per unit or $25,000,000 in total.  *Id.* at 2.  It also reflected

that Sponsor acquired the Founder Shares and the Private Placement Warrants from the SPAC in return for providing to the SPAC the initial at-risk capital utilized to form the SPAC, finance its initial public offering, and finance its operations while the SPAC pursued a de-SPAC transaction. *Id.* It disclosed that Jason was the Managing Member of Sponsor and also the principal of SpringOwl AM. *Id.* at 3.

The Term Sheet & Fee Agreement contained the agreement pursuant to which SpringOwl AM, as a condition of Rimu's purchase of its membership interest, would roll over $800,000 it was owed by Rimu for advice regarding the Playtech investment into Rimu's $25,000,000 purchase of the membership interest. Under that agreement, SpringOwl AM placed the entire $800,000 at risk. If the valuation of the Founder Shares and Private Placement Warrants at the time of distribution equaled or was greater than the price Rimu paid for the securities, the fee owed by Rimu to SpringOwl AM would increase in proportion to the amount of the difference between the two values. If the valuation of the securities at distribution was less than the price Rimu paid, the $800,000 accrued management fee would be reduced in proportionately, putting SpringOwl AM at risk for any decrease in the value of the securities. SpringOwl AM agreed that it would not charge any fees under the agreement, directly or indirectly.[7]

The Term Sheet & Fee Agreement refers Rimu to the public filings made by the SPAC in connection with its initial public offering and subsequent operations for detailed information with respect to the SPAC, the Founder Shares, and the Private Placement Warrants, and contains a hyperlink to that information. *Id.* at 2.

---

[7] *Id.* ("In addition, SpringOwl AM agrees that SpringOwl AM and its Affiliates shall not directly or indirectly charge any fees to either the Company or the SPAC that shall directly or indirectly (e.g., as a Member of the Company or as a shareholder of the SPAC or any successor entity of the SPAC) be payable by or affect the equity ownership or Capital Account of the Investor.").

### D.    The Prospectus

The Prospectus, which Rimu represented and warranted that it had "carefully reviewed" pursuant to Schedules 1 and 2 of the Subscription Agreement, reflected that SPAC had 6,900,000 Founder Shares outstanding, held in the name of Sponsor, that would convert into shares of Class A common stock at the time of the SPAC's Initial Business Combination.  *See* Prospectus at ECF 2, 5.  It also disclosed that Sponsor had agreed to purchase an aggregate of 6,800,000 warrants (or 7,520,000 Private Placement Warrants if the underwriters' over-allotment option were exercised in full).  *Id.*  It warned in bold print that "[i]nvesting in our securities involves a high degree of risk."  *Id.* at ECF 2.  It reflected that $240 million from the offering would be deposited into a trust account and $2 million would be available to pay fees and expenses in connection with the closing of the offering and for working capital following the closing of the offering.  *Id.* at ECF 3.

The Prospectus noted that Sponsor was the record holder of the 6,900,000 Founder Shares and Jason was the beneficial owner.  *Id.* at 5.  It specifically stated that by virtue of his "voting and investment discretion with respect to the common stock held of record by . . . sponsor," Jason "may be deemed to have sole beneficial ownership of the common stock held directly by [Sponsor]."  *Id.*

## VII.    SSOF and Pamela Ader

As previously referenced, Sponsor borrowed the funds it used to purchase the SPAC's Founder Shares and Private Placement Warrants from another Ader entity, SSOF.  SASC ¶¶ 41, 51.  As of the summer of 2021, Pamela was a member of SSOF.  *Id.* ¶ 212.

As of summer 2021, Pamela's account reflected a capital balance of $16,473,917.  *Id.* ¶ 213.  That balance included SSOF's interest in a note receivable from HAC (the "HAC Note"), another entity controlled by Jason, *id.* ¶ 19–20, that SSOF had obtained in February 2021 from

HAC in exchange for two loans in the aggregate amount of $5.2 million that SSOF had made to HAC, *id.* ¶¶ 214, 216.  HAC did not have the ability to satisfy that note.  *Id.* ¶ 218.  SSOF also had a note receivable from SPAC that SSOF valued at $5,828,190 as of July 31, 2021 (the "SPAC Note").  *Id.* ¶ 219.

In the summer of 2021, Pamela, through counsel, demanded that SSOF redeem her interest in SSOF.  *Id.* ¶¶ 3, 90, 134, 212.  This created what the SASC, channeling language used by Vice Chancellor Laster of the Delaware Chancery Court in his decision regarding the failed Initial Business Combination, characterizes as "a personal problem" for Jason.  *Id.* ¶ 221.  HAC did not have the ability to pay the HAC Note and SPAC lacked the funds to repay the SPAC Note.  *Id.* ¶ 220.

Rimu alleges that, in order to solve that personal problem, Jason engaged in a series of transactions that effectively diluted his equity interest in Sponsor in order to repay SSOF.  *Id.* ¶ 221.  The transactions had the effect of discharging HAC's obligations to SSOF under the HAC Note and converting the obligation under the SPAC Note to one that could be satisfied with SPAC equity.

The transactions that discharged HAC's obligations to SSOF proceeded in several steps.  First, Jason entered into an agreement with Sponsor pursuant to which he acquired an option (the "SPAC Shares Option"), to purchase 522,600 Founder Shares for an exercise price of one-tenth of one penny per share, with the understanding that Jason would assign the option to HAC and HAC would in turn assign it to SSOF.  *Id.* ¶¶ 223, 225.  The SPAC Shares Option was entered with respect to the shares in which Jason held a beneficial interest; in effect, he diluted his own interest in Founder Shares.  *Id.* ¶ 224.  Jason then assigned the SPAC Shares Option to HAC, giving up his rights to the option, and HAC assigned the SPAC Shares Option to SSOF in

satisfaction of HAC's obligations to SSOF under the HAC Note. *Id.* ¶¶ 231–33, 236. All of these transactions took place on September 5, 2021, well before Jason approached Rimu regarding the possibility of an investment in Sponsor in late October 2021. *Id.* ¶¶ 55, 231–33. By mid-September, the swap of the HAC Note for the SPAC Shares Option in the SPAC was complete. *Id.* ¶ 239. In effect, SSOF's debt interest in HAC was converted or restructured into a contingent equity interest in the SPAC. *Id.* ¶ 227. The interest in the SPAC Shares Option was allocated to a special memorandum account for Pamela. *Id.* ¶ 235. As of September 15, 2021, Pamela's account no longer showed an interest in the HAC Note but instead reflected options to purchase the Preferred Stock of SPAC with a fair market value of $5,226,000. *Id.* ¶ 241.

On the same day that Jason acquired the SPAC Shares Option and transferred it to HAC in exchange for relief on the HAC Note, Sponsor also exchanged the SPAC Note for an Amended and Restated Promissory Note from Sponsor giving SSOF the right, under specified conditions, to receive payment of the outstanding principal balance and all interest in Founder Shares instead of in cash. *Id.* ¶ 245. Like the SPAC Shares Option, the SSOF Convertible Note was only exercisable against and would only dilute the Founder Shares then beneficially owned by Jason. *Id.* ¶ 247.

Jason entered into an agreement with SSOF to cancel the SPAC Shares Option, effective November 1, 2021. *Id.* ¶ 249.[8] Sponsor agreed to pay SSOF the aggregate amount of $9,966,669.39 to pay off the SSOF Convertible Note worth $5,847,535.69 and terminate the SPAC Shares Option which previously had been valued at $5,226,000. *Id.* ¶ 254. The agreement was payable by December 31, 2021. *Id.* ¶ 256. If the payoff amount was not paid in

---

[8] The SASC does not explicitly indicate whether Jason entered into the agreement in his individual capacity or on behalf of Sponsor.

fully by December 31, 2021, the cancellation and termination would become null and void at the end of the day on December 31, 2021. *Id.* ¶ 257.  Plaintiff hints that $9,966,669.39 of the $25 million from the Rimu transaction was used to retire this debt to SSOF, thereby cancelling the option, because it alleges that the intent to use the funds for such purpose was not disclosed to Rimu and that the investment was used to solve Jason's "personal problem." *Id.* ¶ 149, 278.  In any event, Plaintiff does not allege that the SPAC Shares Option was still outstanding after Rimu made its investment in Sponsor or that the shares in which Rimu purchased an interest were encumbered by the SPAC Shares Option.

## VIII.   The Activities of the Attorney Defendants

The Attorney Defendants represented Jason and Sponsor beginning no later than January 2021. *Id.* ¶ 408(a).  They were involved in the preparation of transaction documents in connection with Rimu's purchase of the membership interests in Sponsor. *Id.* ¶ 82.  They billed time for work documenting loans to Sponsor. *Id.* ¶ 408(b), (c), (d), (e).  They also provided advice and representation to Jason and SSOF in connection with Pamela's demands through Proskauer LLP to redeem her interest in SSOF, including advising and assisting Jason with respect to the conversion of the HAC Note into the SPAC Shares Option and the allocation of the SPAC Share Option to Pamela's "special memorandum account." *Id.*  ¶¶ 408(f), (g), 235–36.

Cromwell prepared documents for, and Cromwell and Geffner advised Jason with respect to, the cancellation of SSOF's loans. *Id.* ¶ 408(h).

In mid- to late-November 2021, Cromwell billed time for work on Rimu's subscription agreement, *id.* ¶¶ 78, 84–85, and on the term sheet and transaction documents, *id.* ¶¶ 85, 96–97, 105, 409.  He also billed time on matters related to the redemption of interests in SSOF. *Id.* ¶ 83.

As detailed above, on November 28, 2021, in response to the question from Colaiezzi of MGFO whether capital would be returned in a liquidation process, Cromwell wrote to Jason,

copying Geffner, about the possibility and likelihood that capital would be returned to members in a liquidation process.  *Id.* ¶ 100–102.

In January 2022, in response to a request from Colaiezzi for the final Schedule A to Sponsor's Operating Agreement, Cromwell sent Jason a redacted Schedule A showing only Rimu's capital contribution, Founder Shares, and Private Placement Warrants, but not the same information for any other member.  *Id.* ¶¶ 117–19, 409.  The redacted Schedule A also did not show Rimu's Residual Percentage.  *Id.* ¶ 120.

Finally, Plaintiffs allege that Cromwell and Geffner had actual knowledge that Jason sold an interest in Sponsor to another investor at a substantially lower valuation than that for which Jason was selling his interest to Rimu.  *Id.* ¶ 410.

## IX.    Delisting the SPAC

The consummation of the proposed de-SPAC did not occur on its closing date.  *Id.* ¶ 133. As a result of the delays in consummating the transaction, SPAC commenced an action on February 2, 2023, against the UEC Parties by filing a complaint in the Delaware Court of Chancery asserting a claim for breach of contract.  *Id.* ¶ 131.[9]  SPAC sought a grant of specific performance ordering the UEC Parties to perform their obligations under the Merger Agreement, including using reasonable best efforts to consummate the proposed de-SPAC in accordance with the terms of the Merger Agreement.  *Id.*

---

[9] The Court takes judicial notice of the decision of the Delaware Chancery Court, but not for the truth of the statements contained in that decision.  *See Bamba v. U.S. Dep't of Homeland Sec.-FPS*, 2021 WL 4478677, at *5 (S.D.N.Y. Sept. 30, 2021) ("The court may take judicial notice of the fact of public records, such as prior adjudications."); *cf. Johnson v. Pugh*, 2013 WL 3013661, at *2 (E.D.N.Y. June 18, 2013) ("A court may take judicial notice of matters of public record, including pleadings, testimony, and decisions in prior state court adjudications, on a motion pursuant to Rule 12(b)(6)."); *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." (internal quotation marks omitted)).

On September 7, 2023, the Delaware Chancery Court, per Vice Chancellor Laster, issued a decision denying specific performance.  *Id.* ¶ 134.  The court reasoned that specific performance is an atypical remedy for breach of contract, particularly unsuitable where, as here, the court would be ill-suited to surveilling and coercing parties through the execution of a complex multi-national merger.  *See 26 Cap. Acquisition Corp. v. Tiger Resort Asia Ltd.*, 309 A.3d 434, 465, 467 (Del. Ch. 2023).  Moreover, the balance of the equities weighed against SPAC in granting that equitable remedy because SPAC did not "come into court with clean hands," but rather had "leverage[d] [a] position of trust with [UEC Parties] to enrich themselves," "gain[ing] and exploit[ing] their inequitable advantage."  *Id.* at 471.  The court found that Zama was on both sides of the proposed de-SPAC transaction, advising the UEC parties while also holding an interest in Sponsor and working with Jason to close the de-SPAC transaction.  SASC ¶ 145.  Vice Chancellor Laster left open the possibility that if SPAC were able to prove breach of contract, it might still recover money damages from the UEC Parties.  *See 26 Cap. Acquisition Corp.*, 309 A.3d at 440.

On September 21, 2023, SPAC issued a press release and filed a Form 8-K with the United States Securities and Exchange Commission ("SEC") announcing that, due to the decision of the Delaware Chancery Court denying the request for an order of specific performance, it would be unable to complete an Initial Business Combination within the Combination Period.  *Id.* ¶ 161.  SPAC announced that it would liquidate the Trust Account and redeem all of the outstanding shares of Class A common stock at a per-share redemption price of approximately $10.95.  *Id.* ¶¶ 161–62.  It also announced that Sponsor had waived its redemption rights with respect to the Founder Shares and that there would be no redemption rights or liquidating distributions with respect to the Company's warrants, which would expire.  *Id.* ¶ 163.

On September 25, 2023, NASDAQ filed a Form 25 delisting SPAC's securities.  *Id.* ¶ 164.

On November 1, 2023, Rimu commenced an action in Delaware Chancery Court seeking a declaration that Jason was removed as Sponsor's Manager Member and was not authorized to act on Sponsor's behalf.  *Id.* ¶ 167.  On January 12, 2024, Rimu and Jason entered into a Settlement Agreement pursuant to which Jason resigned as a Manager Member as of January 12, 2024, and Jason acknowledged that Rimu was authorized to appoint a replacement Managing Member.  *Id.* ¶ 168.  Rimu appointed itself Managing Member.  *Id.*

## X.    Alleged Misstatements

Rimu alleges that it was induced to purchase the interest in the Founder Shares and the Private Placement Warrants by misstatements and actionable omissions made by Jason and SpringOwl.  It claims that Jason and SpringOwl made the following misstatements:

- Jason's representations on November 6, 18, and 24 of 2021 that Sponsor was "targeting" a closing date of 11/30 [November 30, 2021], *see id.* ¶¶ 64, 72, 87, whereas Plaintiff alleges on information and belief that there was no intent or ability to close an "Okada transaction" on that date, nor any legitimate business purpose or deadline that required anyone to close funding Sponsor by that date, but rather Jason fabricated the deadline to rush Rimu's investment, *see id.* ¶¶ 88–90.

- Jason's November 6, 2021, statement that there was "strong demand from our investors," *id.* ¶ 64, and his November 26, 2021, statement that "[w]e have a pool of other investors who are buying, the less valuable $100 units with 10/1 shares/units," *id.* ¶ 92, whereas, upon information and belief, at the time the statement was made, there was no "pool of investors" buying "less valuable $100 units with 10/1 shares/units," *id.* ¶¶ 93, 199.

- Jason's November 28, 2021, email to Rimu's Investment Analyst, Drew Colaiezzi. Colaiezzi had emailed Jason a question regarding Schedule 2 of the Subscription Agreement: "If a business combination is not completed within 24 months of the IPO, the underlying securities will become worthless and all investors will lose their entire investments. Why would the capital not be returned to investors in a liquidation process?" *Id.* ¶ 99. Jason responded by forwarding back to Colaiezzi an email from Attorney Defendant Cromwell in which Cromwell had responded in-line to Colaiezzi's question to the effect that "[a]ny remaining capital would be returned in a liquidation process. The risk disclosure text was perhaps overstating the risk in order to make the point that the entire investment may be lost in that event. We have revised the risk disclosure language by inserting 'may' in place of 'will.'" *Id.* ¶ 100. Jason's forwarding email thanked Colaiezzi for his "thoughtful questions," noting that "we have done our best to answer all of them for you in the email below." *Id.* ¶ 102.

Rimu alleges that Jason and SpringOwl omitted to disclose to it the following material

information:

- Omission of the fact that the membership interests purchased by Rimu in Sponsor were sold by Jason and resulted in Jason divesting himself of most of his then-remaining economic interests in Founder Shares and Private Placement Warrants. *Id.* ¶¶ 136–37, 169–79.

- Omission of the fact that Rimu's investment would not be used by Sponsor for its own business purposes but would go to SpringOwl, leaving Sponsor without capital. *Id.* ¶¶ 176–77, 196, 298(b).

- Omission of the fact that before Rimu executed the transaction, Zama purchased a majority of Jason's interest in Founder Shares and Private Placement Warrants at a more favorable price than Jason and SpringOwl recommended to Rimu, and on which the Rimu Transaction ultimately closed. *Id.* ¶¶141, 148, 204–06.

- Omission of the fact that, with respect to the SPAC transaction, Alan Leibman was entitled to 50% of Jason's returns on any Rimu investment, in a context in which Rimu understood Leibman to be a neutral outside advisor to Rimu. *Id.* ¶¶ 58, 63–64, 69, 152–160, 209.

- Omission of the existence and nature of the SPAC Shares Option as an encumbrance on the Founder Shares, and the potential dilution that would occur if the SPAC Shares Option was not cancelled. *Id.* ¶¶ 260, 264, 277.

## PROCEDURAL HISTORY

This case was initiated on June 15, 2023, by complaint filed by Rimu. Dkt. No. 1. On

September 21, 2023, Rimu filed a First Amended Complaint. Dkt. No. 43.

Rimu filed its Second Amended and Supplemental Complaint on August 6, 2024.  *See* SASC.  Rimu alleges 16 claims for relief: (1) investment advisor fraud under Section 215 of the Investment Advisers Act against Jason, SpringOwl, and AFM, *id.* ¶¶ 304–327; (2) trading for own account in violation of Section 215 of the Investment Advisers Act against Jason, SpringOwl, and AFM, *id.* ¶¶ 328–337; (3) investment adviser fraud under Section 215 of the Investment Advisers Act against Jason, *id.* ¶¶ 338–352; (4) trading for own account in violation of Section 215 of the Investment Adviser Act against Jason, *id.* ¶¶ 353–361; (5) fraudulent inducement against Jason, SpringOwl, and AFM, *id.* ¶¶ 362–367; (6) common law fraud and fraudulent inducement against Jason and SpringOwl, *id.* ¶¶ 368–374; (7) constructive fraud against Jason and SpringOwl, *id.* ¶¶ 375–380; (8) aiding and abetting fraud against HAC and SSOF, *id.* ¶¶ 381–86; (9) negligent misrepresentation against Jason and SpringOwl, *id.* ¶¶ 387–392; (10) breach of fiduciary duty against Jason and SpringOwl, *id.* ¶¶ 393–404; (11) aiding and abetting fraud against the Attorney Defendants, *id.* ¶¶ 405–421; (12) aiding and abetting breach of fiduciary duty against the Attorney Defendants, *id.* ¶¶ 422–430; (13) fraudulent transfer against HAC, *id.* ¶¶ 431–444; (14) fraudulent transfer without reasonably equivalent value against HAC, *id.* ¶¶ 445–453; (15) fraudulent transfers against Jason, SpringOwl AM, and SSOF, *id.* ¶¶ 454–484; (16) fraudulent transfer with actual intent to hinder or defraud against SSOF and Pamela Ader, *id.* ¶¶ 485–495.

The Attorney Defendants filed this motion to dismiss on October 28, 2024.  Dkt. No. 163. The Attorney Defendants filed a memorandum of law and a declaration of counsel in support of the motion.  Dkt. Nos. 164–65.  On December 6, 2024, Plaintiffs filed a memorandum in opposition to the motion.  Dkt. No. 191.  On December 30, 2024, the Attorney Defendants filed a reply memorandum of law in further support of the motion.  Dkt. No. 202.

On October 28, 2024, Pamela filed her motion to dismiss the SASC.  Dkt. No. 160.  She filed a memorandum of law and declaration in support of that motion.  Dkt. No. 161–62.  On December 6, 2024, Plaintiffs filed a memorandum in opposition to the motion.  Dkt. No. 191. On December 30, 2024, Pamela filed a reply memorandum of law in further support of her motion to dismiss.  Dkt. No. 206.

On December 6, 2024, the Attorney Defendants and Pamela each filed motions to dismiss the crossclaims of the Ader defendants, supported by memoranda of law in support of the motions.  Dkt. No. 192–93, 195–96.

## STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement."  *Twombly*, 550 U.S. at 555, 557.  The ultimate question is whether "[a] claim has facial plausibility, [*i.e.*,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]."  *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

Where documents are incorporated by reference into a complaint, "the underlying documents rather than the Plaintiff's description of them govern on a motion to dismiss under Rule 12(b)(6)." *Wolet Cap. Corp. v. Walmart Inc*., 2021 WL 242297, at *12 (S.D.N.Y. Jan. 25, 2021); *see also Gray v. Wesco Aircraft Holdings, Inc*., 454 F. Supp. 3d 366, 383 (S.D.N.Y. 2020) ("If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true." (citation omitted)); *In re Bristol-Myers Squibb Sec. Litig*., 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004) ("The court need not accept as true an allegation that is contradicted by the documents on which the complaint relies.").

## DISCUSSION

The Court first discusses the existence of an underlying fiduciary relationship between Jason and Plaintiff, which forms the predicate of much of Plaintiff's argument. Concluding that no fiduciary relationship existed with respect to Rimu's investment in Sponsor and therefore that the Attorney Defendants could not have known of or assisted in breaching a fiduciary duty, the Court dismisses Plaintiff's claim against the Attorney Defendants for aiding and abetting a breach of fiduciary duty. The Court then turns to Rimu's claim that the Attorney Defendants aided and abetted Jason's fraud on Rimu. That claim fails because, for the most part, Rimu does not properly allege a fraud by Jason. Where the Court reaches no conclusion as to the underlying fraud by Jason, the factual allegations do not establish either that the Attorney Defendants knew of a fraud or substantially assisted it. The Court likewise holds that Plaintiff has failed to state a claim against Pamela for fraudulent transfer. Finally, the Ader Defendants do not allege facts sufficient to support their crossclaims against the Attorney Defendants or Pamela.

## I.    Claims Against Attorney Defendants

### A.    Aiding and Abetting Breach of Fiduciary Duty Against Attorney Defendants

Under New York law, "[t]o state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must show: (1) breach of fiduciary obligations to another of which the aider and abettor had actual knowledge; (2) the defendant knowingly induced or participated in the breach; and (3) plaintiff suffered actual damages as a result of the breach." *Convergen Energy LLC v. Brooks*, 2020 WL 5549039, at *9 (S.D.N.Y. Sept. 16, 2020) (citing *In re Sharp Int'l Corp.*, 403 F.3d 43, 49–50 (2d Cir. 2005)).[10]

Plaintiff's claim against the Attorney Defendants for aiding and abetting breach of fiduciary duty fails at the outset.  Plaintiff does not allege facts sufficient to plausibly establish that Jason owed a fiduciary duty to Rimu in connection with Rimu's investment in Sponsor, much less that the Attorney Defendants knew of such a duty and its breach and substantially aided that breach.

"To establish liability for the breach of a fiduciary duty, a plaintiff must demonstrate that the defendant owed her a fiduciary duty and that the defendant breached it." *Est. of Eller v. Bartron*, 31 A.3d 895, 897 (Del. 2011).  "[A] fiduciary relationship arises where one person

---

[10] The parties agree that New York law applies to the claim of aiding and abetting breach of fiduciary duty because the Attorney Defendants are New York lawyers and their conduct allegedly occurred in New York.  *See* Dkt. No. 164 at 14; Dkt. No. 191 at 6.  By contrast, Delaware law applies to the existence, scope, and breach of a state-law fiduciary duty arising from the Subscription Agreement or IMA.  *See* Dkt. No. 191 at 8 n.9; Dkt. No. 164 at 16.  Both the Subscription Agreement and the Playtech IMA contain Delaware choice-of-law provisions. *See* Subscription Agreement § 10; IMA § 11.  In any event, the parties have not identified any actual conflict between the laws of New York and Delaware as to the elements of the claim for aiding and abetting breach of fiduciary duty or of the existence of a fiduciary duty.  *See Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005) (stating that a court need not "embark on a choice-of-law analysis in the absence of an 'actual conflict' between the applicable rules of two relevant jurisdictions"); *accord Perkins Eastman Architects, P.C. v. Thor Eng'rs, P.A.*, 769 F. Supp. 2d 322, 325 (S.D.N.Y. 2011) (Sullivan, J.).

places special trust in another or where one person has a special duty to protect the interests of another. Generally, the fiduciary enjoys a position of superiority in knowledge or expertise upon which the other person relies." *Addy v Piedmonte*, 2009 WL 707641, at *16 (Del. Ch. Mar. 18, 2009). A fiduciary relationship requires "confidence reposed by one side and domination and influence exercised by the other." *BAE Sys. N. Am. Inc. v. Lockheed Martin Corp*., 2004 WL 1739522, at *8 (Del. Ch. Aug.3, 2004).

However, "a bargained-for commercial relationship between sophisticated parties . . . does not give rise to fiduciary duties." *Prestancia Mgmt. Grp., Inc. v. Virginia Heritage Found., II LLC*, 2005 WL 1364616, *5 (Del. Ch. May 27, 2005); *see also Wal-Mart Stores, Inc. v. AIG Life Ins. Co*., 872 A.2d 611, 624–25 (Del. Ch. 2005) ("[I]t is vitally important that the exacting standards of fiduciary duties not be extended to quotidian commercial relationships. This [protects] participants in such normal market activities from unexpected sources of liability against which they were unable to protect themselves . . . ."), *rev'd in part on other grounds*, 901 A.2d 106 (Del. 2006); *Prairie Capital III, L.P. v Double E Holding Corp.*, 132 A.3d 35, 52 (Del. Ch. 2015); *Addy v Piedmonte*, 2009 WL 707641, at *17 (Del. Ch. Mar. 18, 2009) (noting that Delaware "is chary of expanding the scope of fiduciary duty to a broad set of commercial relationships which traditionally has been regulated by normal market conditions, rather than the scrupulous concerns of equity for persons in special relationships of trust and confidence"). Where parties have "bargained for and defined their relationship, including the protection of their particular interests, in . . . a straight forward commercial transaction, with both parties fulfilling their obligations under the contract," and "[n]o special knowledge, element of confidentiality or dependence exists which would lead [the Court] to conclude the parties had a fiduciary relationship," the Court "will not artificially manipulate the parties' commercial relationship to

create fiduciary duties where none exist." *Metro Ambulance, Inc. v. E. Med. Billing, Inc.*, 1995 WL 409015, at *3 (Del. Ch. July 5, 1995).

Further, Delaware law affords sophisticated parties the opportunity to delimit or disclaim a fiduciary relationship through a contract, implicitly or explicitly. *See Addy*, 2009 WL 707641, at *17; *In re Nat'l Collegiate Student Loan Trusts Litig.*, 251 A.3d 116, 187 (Del. Ch. 2020) ("While the Owner Trustee has a general contractual duty to administer the Trusts for the benefit of the Owners, the Trust Agreement whittles down that general duty to a fine point.").[11]  Were it not so, a severe limitation of the freedom of contract would be implied where a common-law fiduciary relationship had arisen or might arise between parties, impeding sophisticated actors from arranging and re-arranging their relationships.  Such a limitation is not tolerated under Delaware law.  As Vice Chancellor Laster observed in the Chancery Court decision in the underlying dispute between the SPAC and the owners of the Okada Manila Resort & Casino, "[t]o say that Delaware prides itself on the contractarian nature of its law risks understatement." *26 Cap. Acquisition Corp.*, 309 A.3d at 473 (quoting *New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 565 (Del. Ch. 2023)).

The agreement between Jason and Rimu with respect to Rimu's investment in Sponsor is defined by the Subscription Agreement, the Operating Agreement, and the Term Sheet & Fee Agreement.  Through those agreements, Rimu disclaimed any duty by Jason with respect to the investment in Sponsor.  In executing the Subscription Agreement, Rimu represented that it was

---

[11] *See also id.* ("[The agreement] thus creates a contractual duty that replaces common law fiduciary duties.  That contractual duty is incongruous with common law fiduciary duties because, at common law, a Delaware fiduciary has an unremitting duty to act in the best interests of the beneficiary, and the scope of that duty could never be reduced to a few express provisions in a contract.  But the Owner Trustee's duties have been reduced to contract, as permitted by our law, and it is that contract (the Trust Agreement) that defines the scope of those duties.").

an "accredited investor" "able to bear the risk of an entire loss of its investment in a Membership Interest of the Company."  Subscription Agreement, sch. 1.  It also represented that it was "knowledgeable with respect to the business and operations of the SPAC and the Company" and that it had "carefully reviewed the information contained in the SPAC's registration statement on Form S-1 and the SPAC's other public filings with the SEC."  *Id.*  Rimu further represented that it "relied exclusively upon his or her own examination of the SPAC, the Founder Shares, the Private Placement Warrants and the terms of the offering of the Founder Shares, the Private Placement Warrants and the Membership Interest offered hereby, including the merits and risks involved, in making an investment decision," and that it had not requested or been provided with information or advice with respect to the Funder Shares or the Private Placement Warrants" by Sponsor or any of its affiliates.  *Id.*  Indeed, Rimu went so far as to acknowledge its understanding that Sponsor and its affiliates had material nonpublic information regarding the SPAC, not known to Rimu, and that Sponsor and its affiliates had no duty to disclose that information to Rimu.  *Id.*  Those agreements and acknowledgments made by an undeniably sophisticated party foreclose any claim that Sponsor or its affiliates owed a fiduciary duty to Rimu.  *See Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1058–1059 (Del. Ch. 2006) ("Contractually binding, written representations of fact ought to be the most reliable of representations, and a law intolerant of fraud should abhor parties that make such representations knowing they are false."); *RAA Mgt., LLC v. Savage Sports Holdings, Inc.*, 45 A.3d 107, 118 (Del. 2012) ("[W]here parties, particularly sophisticated ones . . . have undertaken certain obligations—and at the same time expressly limited those obligations—the courts should not normally interfere with those choices." (*quoting Warner Theatre Assoc. Ltd. Partnership v. Metro. Life Ins. Co.*, 1997 WL 685334, *5 (S.D.N.Y. Nov. 4, 1997))).

Plaintiff alleges no facts suggesting a relationship of trust and confidence outside the Subscription Agreement.  Rimu was represented by its own family office, MGFO.  While Jason described the investment in Sponsor as "very attractive," SASC ¶ 64, he declined to do any diligence for Rimu, referring Rimu instead to the data room for Rimu to review the relevant materials.  *Id.* ¶ 70.[12]

Rimu attempts to avoid this result and to impose a fiduciary duty on SpringOwl by relying on the IMA that it previously entered into with SpringOwl Associates and AFM.  However, the IMA imposed only a limited fiduciary duty on SpringOwl Associates.  SpringOwl Associates was charged with acting as "an investment adviser in connection with making the investment set forth on Schedule A," *i.e.*, an investment "in various types of securities issued by Playtech plc," and with "managing the Investment in the Account, on a discretionary basis, in accordance with the Adviser's best judgment, the investment guidelines set forth in Schedule . . . , and the provisions of this Agreement."  IMA § 2.  It also had the "authority, as agent and attorney-in-fact with respect [to] investing, holding, selling, managing and/or restructuring activities related to the Investment."  *Id.*  As Rimu concedes, SpringOwl Associates "agreed to act as an investment adviser with respect to, and managed for Rimu, an investment in the securities of Playtech plc."  SASC ¶ 27.  But SpringOwl Associates did not have power and did not assume duties beyond those related to the Playtech investment.  Indeed, the IMA states:

> Each of the Adviser Entities [SpringOwl Associates LLC and Ader Fund Management LLC] shall, for all purposes herein, be deemed to be independent contractors. No party shall have the authority to act for or represent any other party,

---

[12] Plaintiff asserts that Jason and SpringOwl made clear that any new investment by Rimu "would, in part, be a continuation of the parties' pre-existing investment-adviser relationship and the existing investment adviser fee agreement."  SASC ¶ 57.  But that is no more than artful pleading.  The fact alleged in support of that conclusion is merely that Jason would forego the fees owed to AFM for the Playtech advice and instead place those fees at risk in the investment in Sponsor.  *Id.*

except as expressly provided herein or as authorized in writing by the other relevant party. Nothing contained herein shall create or constitute the Adviser Entities and [Rimu] as members of any partnership . . . nor shall this Agreement be deemed to confer on any of them any express, implied or apparent authority to incur any obligation or liability on behalf of any such other entity.

IMA § 18.

If Rimu had wanted to expand SpringOwl Associates' (or AFM's) authority and corresponding duty, it would have had to do so by an amendment in writing and agreed to by all parties. *Id.* §§ 2(a), 15.

The fact that two parties enjoy a relationship of trust in some respects does not mean that they enjoy the same relationship in other respects. In Delaware, an agent's fiduciary duty is limited by the "scope of the agency." *Lazard Debt Recovery GP, LLC. v. Weinstock*, 864 A.2d 955, 967 (Del. Ch. 2004); *see also O'Malley v. Boris*, 742 A.2d 845, 849 (Del. 1999). Here, the IMA gave SpringOwl Associates control only over the Playtech investment and thus imposed fiduciary duties only with respect to the management of that investment. *See In re Nat'l Collegiate Student Loan Trusts*, 251 A.3d at 187 ("[F]iduciary duties arise only to the extent that one exercises 'control over the property of another.'"). The IMA did not create fiduciary duties for all purposes and all seasons, going forward into the future. *Lazard*, 864 A.2d 955 at 967; *see also O'Malley,* 742 A.2d 845 at 849.[13]

---

[13] The result would be the same under New York law. "[W]hen sophisticated investors negotiate against a fiduciary and understand that a fiduciary is acting in its own interest, they cannot reasonably rely on the fiduciary to disclose every material fact." *Silver Point Cap. Fund, L.P. v. Riviera Res., Inc.*, 2020 WL 6555114 at *4 (N.Y. Sup. Ct. 2020), *aff'd*, 155 N.Y.S.3d 155 (1st Dep't 2021); *see also Pappas v. Tzolis*, 982 N.E.2d 576, 579 (N.Y. 2012) ("Where a principal and fiduciary are sophisticated entities and their relationship is not one of trust, the principal cannot reasonably rely on the fiduciary without making additional inquiry."). "A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *EBC I, Inc. v. Goldman Sachs & Co.,* 832 N.E.2d 26, 31 (N.Y. 2005) (quotation marks omitted).

Plaintiff also suggests that the mere fact that Spring Owl Associates and SpringOwl AM were registered as investment advisors with the SEC under the Investment Advisers Act of 1940 and held themselves out generally as investment advisors made them investment advisers with respect to the investment in Sponsor. *Id.* ¶¶ 16, 56, 294. But that argument misconstrues the Advisers Act. The IAA regulates who may provide investment advice as a business for compensation and defines the duties and responsibilities within the relationship between client and advisor. *See* Investment Advisers Act of 1940, Pub. L. 76–768, tit. II, 54 Stat. 847 (codified at 15 U.S.C. §§ 80a-1–80a-64); *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 17–18 (1979). It does not create a relationship between two otherwise unrelated parties, nor does it operate to expand the scope of a relationship in an instance where two parties expressly decide to limit their responsibilities to one another. While the Advisers Act "establishes a federal fiduciary duty for investment advisers," "[t]he fiduciary duty follows the contours of the relationship between the adviser and its client, and the adviser and its client may shape that relationship by agreement, provided that there is full and fair disclosure and informed consent." Commission Interpretation Regarding Standard of Conduct for Investment Advisers, Investment Advisers Act Rel. No. 5248 at 6, 9 (June 5, 2019). The fiduciary duty owed by the adviser to a client is "viewed in the context of the agreed-upon scope of the relationship between the adviser and the client [and] depend upon what functions the adviser, as agent, has agreed to assume for the client, its principal." *Id.* at 9–10. The adviser "mandate[d] to manage a fixed income portfolio subject to specified parameters" for a fund does not assume the same obligations as an adviser who "provid[es] comprehensive, discretionary advice in an ongoing relationship with a retail client." *Id.* at 10. While the adviser owes the client a duty of loyalty, that duty applies to "material facts relating to the advisory relationship," *id.* at 21–22, and depends on "the nature of

the client, the scope of the services, and the material fact or conflict," *id.* at 25.  The IAA imposed duties on SpringOwl and AFM with respect to the Playtech investment.  But Plaintiff has not alleged that Jason's decision to offer Rimu an interest in Sponsor conflicted in any way with the duties of SpringOwl to Rimu to manage the Playtech investment.  The IAA did not impose a separate duty on Jason with respect to the investment in Sponsor.

Moreover, even if the IMA agreement with respect to Playtech could be understood to create more general fiduciary duties on the part of AFM and SpringOwl, there would have been no reason for the Attorney Defendants to suspect that those duties were violated.  Section 206(3) of the IAA permits an investment adviser "acting as principal for his own account" to sell a security to a client as long as the adviser discloses "to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction."  15 U.S.C. § 80b-6(3).  There is no particular reason for the Attorney Defendants to have believed that such provision would have applied to AFM and SpringOwl. The provision exists to protect the client from the adviser engaging in a self-interested transaction with the account over which the adviser has responsibility.  *See* Thomas P. Lemke & Gerald T. Lins, *Principal transactions*, Reg. of Investment Advisers § 2:97 ("Section 206(3) generally prohibits principal transactions between an adviser and an advised account unless client consent is obtained beforehand for each principal transaction. This restriction is intended to protect clients from transactions favoring the adviser as well as to minimize the potential for 'dumping' of unwanted securities into a client's account.").  Plaintiff cites no authority to suggest that Section 206(3) exists to protect the client from engaging in a knowing transaction with the adviser with respect to an account over which the adviser has no discretion or responsibility.  In any event, the very terms of the Subscription Agreement disclose and delimit the seller's role.

From the information provided, Rimu would have or should have known that Jason was on the other side of the transaction and that Jason and the Ader Defendants were disclaiming any responsibility to Rimu as to whether to make or not make the investment.[14]

Plaintiff argues that Jason and SpringOwl nonetheless acted as investment advisors in connection with the SPAC Subscription Agreement because they recommended the investment, provided investment advice, and received compensation for that advice. Dkt. No. 191 at 10; *see also* SASC ¶ 30; *id.* at 13 (header to Section G). But the facts alleged in the SASC do not support that claim. While Jason introduced Rimu to the SPAC investment and described it as "very attractive," *id.* ¶ 64, he left it to Rimu to conduct due diligence and to decide whether to make the investment, *id.* ¶¶ 69–70. The communications make it clear that the Ader Defendants were not providing advice but proposing to engage in a transaction. *See id.* ¶¶ 64, 72. Indeed, Plaintiff agreed in the Subscription Agreement that no investment advice had been requested or provided. *See* Subscription Agreement, sch. 1 § 3 ("Neither the Company nor any of its affiliates has been requested to or has provided the Investor with any information or advice with respect to the Founder Shares and the Private Placement Warrants, nor is any such information necessary or desired by Investor."). And, even if Jason had provided advice, he did not do so for a fee. Under the Term Sheet & Fee Agreement, Jason and SpringOwl agreed that they would not directly or indirectly charge any fees as part of the SPAC transaction. *See* Term Sheet & Fee Agreement at 2. To the contrary, SpringOwl agreed to roll over the fees it was owed by Plaintiff from Playtech and co-invest with Rimu in the SPAC transaction. *Id.* This was not a fee paid by

---

[14] The SEC, interpreting this code provision, has clarified that "an adviser may obtain client consent for purposes of Section 206(3) to a principal or agency transaction after execution, but prior to settlement, of the transaction." Interpretation of Section 206(3) of the Investment Advisers Act of 1940, Securities and Exchange Commission, 17 C.F.R. pt. 276 (Release No. IA-1732).

Rimu to SpringOwl; SpringOwl had already earned the fee.  As Plaintiff's counsel ultimately

conceded at oral argument, rolling approximately $800,000 in accrued fees from the Playtech

relationship into the Sponsor agreement meant that SpringOwl was risking the total loss of that

$800,000 in exchange for a potential upside proportionate to the increase in value of the SPAC.

*See* Hearing Transcript 25:4–25:23.

In sum, absent any fiduciary duty between the Ader Defendants and Rimu with respect to

the investment in Sponsor and SPAC, the Attorney Defendants could not have aided and abetted

a breach of fiduciary duty.  Plaintiff's claim against the Attorney Defendants for aiding and

abetting breach of fiduciary duty, SASC ¶¶ 422–430, is accordingly dismissed.

### B.    Aiding and Abetting Fraud Claim Against the Attorney Defendants

"To establish liability for aiding and abetting fraud under New York law, 'the plaintiffs

must show (1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that

the defendant provided substantial assistance to advance the fraud's commission.'"  *Krys v.

Pigott*, 749 F.3d 117, 127 (2d Cir. 2014) (quoting *Lerner,* 459 F.3d 273 at 292).[15]  Allegations

reflecting constructive knowledge, that the defendants should have known, or the defendants

ignored "red flags" are not sufficient.  *Id.* at 125; *see also JP Morgan Chase Bank v. Winnick*,

406 F.Supp.2d 247, 252 (S.D.N.Y.2005).  The requirement of actual knowledge can be met by

---

[15] The parties agree that New York law applies to the elements of aiding and abetting.  Dkt. Nos. 164 at 14; Dkt. No. 191 at 6.  New York "has a paramount interest in regulating the conduct of attorneys licensed to practice within its borders."  *Diversified Grp., Inc. v. Daugerdas*, 139 F. Supp. 2d 445, 453 (S.D.N.Y. 2001).  Because the Attorney Defendants have their principal place of business in New York, maintain an office in New York, and are licensed to practice law in New York, *see* SASC ¶¶ 21–23, New York law applies to their allegedly tortious conduct.  New York law is likewise controlling as to the crossclaim for legal malpractice by Jason against Attorney Defendants.  *See Shaklee Corp. v. Oberman*, 1993 WL 378268, at *1 (S.D.N.Y. Sept. 20, 1990) ("New York has the predominant interest in issues involving legal malpractice allegedly committed by a New York attorney with respect to the performance of his duties in this state.").

"pleading facts sufficient to give rise to a strong inference of conscious avoidance of actual knowledge, such that it can almost be said that the defendant actually knew because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge." *Convergen Energy*, 2020 WL 5549039, at *9 (quoting *In re MF Glob. Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d 157, 182 (S.D.N.Y. 2014), *aff'd sub nom. DeAngelis v. Corzine*, 611 F. App'x 34 (2d Cir. 2015) (citation omitted)).  Finally, Plaintiff must plead facts establishing a strong inference of fraudulent intent on the part of the Attorney Defendants.  *See In re AHT Corp.*, 292 B.R. 734, 746 (S.D.N.Y. 2003), *aff'd*, 123 F. App'x 17 (2d Cir. 2005).  Plaintiff "may raise such an inference in one of two ways: (1) by alleging facts showing a motive for participating in a fraudulent scheme and a clear opportunity to do so; or (2) by identifying circumstances indicative of conscious behavior."  *Id.*

The Court applies Florida law with respect to the substantive elements of the tort of fraud. [16]  In Florida, "[a]n aggrieved party proves common law fraud by establishing that: (1) the

---

[16] Attorney Defendants suggest that Delaware law should apply to the underlying fraud claim, but also cite New York fraud cases in their briefing and point to no difference in the substantive law that would apply from these various jurisdictions.  *See* Dkt. No. 217 ("Hearing Transcript") 10:2–10:25.  Plaintiff suggests that Florida law applies to the underlying common-law fraud claim.  *See* Dkt. No. 191 at 30 n.17; Hearing Transcript 60:21–61:19.  Though Delaware law applies to the existence and scope of a fiduciary duty and corresponding breach, a choice of law provision "indicating that the contract will be governed by a certain body of law does not dispositively determine that law which will govern a claim of fraud arising incident to the contract."  *Cromer Fin. Ltd. v. Berger*, 158 F. Supp. 2d 347, 358 (S.D.N.Y. 2001) (quoting *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996)); *see also SEC v. Credit Bancorp, Ltd*., 147 F.Supp.2d 238, 251–52 (S.D.N.Y. 2001).  Rather, "a contractual choice of law provision governs only a cause of action sounding in contract."  *Krock*, 97 F.3d at 645 (citation omitted).  With respect to Plaintiff's underlying common-law fraud claim, therefore, the Court employs an "interest analysis" to identify "the law of the jurisdiction having the greatest interest in the litigation."  *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir.1998); *see Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, 2022 WL 1997207, at *15 (S.D.N.Y. June 6, 2022); *Toretto v. Donnelley Fin. Solutions, Inc*., 2022 WL 348412, at *5 (Feb. 4, 2022).  Here, the "interest analysis" points to Florida law.  Jason was and is a Florida resident and his alleged acts and

opposing party made a misrepresentation of a material fact, (2) the opposing party knew or

should have known the falsity of the statement, (3) the opposing party intended to induce the

aggrieved party to rely on the false statement and act on it, and (4) the aggrieved party relied on

that statement to his or her detriment." *Jackson v. Shakespeare Found., Inc.*, 108 So. 3d 587,

595 n.2 (Fla. 2013) (citing *Butler v. Yusem*, 44 So.3d 102, 105 (Fla. 2010)).  A claim based on

omission of a material fact, as opposed to an affirmative false statement, is construed as a claim

for fraudulent concealment.  The elements are identical except for the additional requirement of a

duty to speak.  The requisite elements are "(1) the defendant concealed or failed to disclose a

material fact; (2) the defendant knew or should have known the fact should be disclosed; (3) the

defendant knew her concealment or failure to disclose would induce the plaintiff to act; (4) the

defendant had a duty to disclose the fact; and (5) the plaintiff detrimentally relied on the

misinformation." *Dunkel v. Hamilton*, 2016 WL 4844662, at *11 (M.D. Fla. Aug. 8, 2016)

(quoting *R.J. Reynolds Tobacco Co. v. Martin*, 53 So. 3d 1060, 1068 (Fla. Dist. Ct. App. 2010)),

*report and recommendation adopted*, 2016 WL 4765740 (M.D. Fla. Sept. 13, 2016).  A duty to

disclose arises if "one party has information which the other party has a right to know because

there is a fiduciary or other relation of trust or confidence between the two parties." *Friedman v.

Am. Guardian Warranty Servs., Inc.*, 837 So. 2d 1165, 1166 (Fla. Dist. Ct. App. 2003).  The law

of New York and Delaware is to the same effect.  *See May v. Barclays PLC*, 2025 WL 887300,

at *28 (S.D.N.Y. Mar. 21, 2025) (reciting New York common law fraud elements); *Lateral

Recovery, LLC v. Cap. Merch. Servs., LLC*, 632 F. Supp. 3d 402, 467 (S.D.N.Y. 2022) (same);

---

omissions occurred in Florida.  *See* SASC ¶ 14.  Sponsor, SPAC, SpringOwl Associates,
SpringOwl AM, SSOF, and HAC all have their principal places of business in Florida.  *See id.* ¶¶
13–19, 25.  The Court concludes that Florida law should apply to the elements of the underlying
common-law fraud claim but considers cases from Delaware and New York to the extent that the
common-law fraud regimes are similar.

*Nissan Motor Acceptance Corp. v. Scialpi*, 944 N.Y.S.2d 160, 161 (2d Dep't 2012) ("Where the fraud claim at issue is based on an omission or concealment of a material fact, the plaintiff must demonstrate that the defendant had a duty to disclose material information and failed to do so"); *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 143 (Del. Ch. 2004) ("In order to state a claim of common law fraud against any particular defendant, [plaintiff] must allege . . . that defendant either 1) represented false statements as true, 2) actively concealed facts which prevented [plaintiff] from discovering them, or 3) remained silent in the face of a duty to speak." (citing *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del.1983))).

"The particularity requirements of Federal Rule of Civil Procedure 9(b) apply to claims of aiding and abetting fraud no less than to direct fraud claims." *Green Star Energy*, 2022 WL 16540835, at *14; *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 759 F. Supp. 2d 363, 383 (S.D.N.Y. 2010); *cf. Chambers v. Weinstein*, 2014 WL 4276910 at *4 (N.Y. Sup. Ct. 2014), *aff'd*, 21 N.Y.S.3d 892 (1st Dep't 2016) (applying the requirement of pleading with particularity under New York law "strictly" to aiding and abetting allegations because secondary actors "should not be called to account for the intentional tort of another unless the circumstances of his connection therewith can be alleged in detail from the outset"). The plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)). Particularity "means the who, what, where, when and how: the first paragraph of any newspaper story." *Antigenics Inc. v. U.S. Bancorp Piper Jaffray, Inc.*, 2004 WL 51224, at *3 (S.D.N.Y. Jan. 9, 2004) (quoting *In re Initial Pub. Offering Sec. Litig.*,

42

241 F. Supp. 2d 281, 327 (S.D.N.Y. 2003)). "Rule 9(b) also requires a plaintiff to 'allege facts that give rise to a strong inference of fraudulent intent.'" *Budhani v. Monster Energy Co.*, 527 F. Supp. 3d 667, 687 (S.D.N.Y. 2021) (quoting *Lerner,* 459 F.3d 273 at 290).

The rigorous requirement of 9(b) applies with special force with respect to fraud allegations against attorneys. *See F.D.I.C. v. U.S. Mortg. Corp.*, 132 F. Supp. 3d 369, 387 (E.D.N.Y. 2015) ("[T]he Court takes special note of the fact that Ezratty is an attorney and, therefore, the standard to which USMC's allegations are held is necessarily higher than it might be with respect to a layperson."); *cf. Quintel Corp., N.V. v. Citibank, N.A.*, 589 F. Supp. 1235, 1243–44 (S.D.N.Y. 1984) (noting that the Second Circuit has "vigorously enforced Rule 9(b)" in cases involving fraud allegations against professionals); *DiVittorio v. Equidyne Extractive Indus.*, 822 F.2d 1242, 1247 (2d Cir. 1987) (noting that a pleading under Rule 9(b) must be sufficient, inter alia, to protect a defendant from harm to its reputation or goodwill by unfounded allegations of fraud).

### 1.    Alleged Omissions

The first set of Plaintiff's claims center on what are properly viewed as omissions. These consist of the following:

- Omission of the fact that the membership interests purchased by Rimu in Sponsor were sold by Jason and resulted in Jason divesting himself of most of his then-remaining economic interests in Founder Shares and Private Placement Warrants. *Id.* ¶¶ 136–37, 169–79.

- Omission of the fact that Rimu's investment would not be used by Sponsor for its own business purposes but would go to SpringOwl, leaving Sponsor without capital. *Id.* ¶¶ 2, 176–77, 196, 298(b).

- Omission of the fact that before Rimu executed the transaction, Zama purchased a majority of Jason's interest in Founder Shares and Private Placement Warrants at a more favorable price than Jason and SpringOwl recommended to Rimu and on which the Rimu Transaction ultimately closed. *Id.* ¶¶141, 148, 204–06.

- Omission of the fact that, with respect to the SPAC transaction, Alan Leibman was entitled to 50% of Jason's returns on any Rimu investment, in a context in which Rimu understood Leibman to be a neutral outside advisor to Rimu. *Id*. ¶¶ 58, 63–64, 69, 152–160, 209.

- Omission of the existence and nature of the SPAC Shares Option as an encumbrance on the Founder Shares, and the potential dilution that would occur if the SPAC Shares Option was not cancelled. *Id*. ¶¶ 260, 264, 277.

Plaintiff does not allege that any affirmative misrepresentations were made to it with respect to any of the foregoing. Plaintiff states that Jason and SpringOwl did not disclose to Rimu that its investment was not going to fund the merger or to fund Sponsor but rather would compensate Jason for selling his own interest in Sponsor to Rimu. SASC ¶ 2. But Jason and SpringOwl did not represent anything other than that Rimu was purchasing an interest in Sponsor, which had already invested in the SPAC, and that the shares that Rimu was purchasing would be sold by Jason. Plaintiff was provided the Operating Agreement before it signed the Subscription Agreement and agreed to the Term Sheet & Fee Agreement. *Id.* ¶ 97. The Term Sheet & Fee Agreement itself made crystal clear that the Membership Interest Plaintiff would be acquiring consisted of Founder Shares and Private Placement Warrants that Sponsor had already purchased from SPAC in return for initial at-risk capital for SPAC to utilize in connection with the IPO and the de-SPAC transaction. *See* Terms and Conditions at ECF 2. It did not withhold but expressly indicated that Sponsor had already provided to SPAC its at-risk capital. *Id.* That was the purpose of the purchase by Sponsor of the Founder Shares and Private Placement Warrants. The Term Sheet & Fee Agreement and Subscription Agreement make clear that Rimu's investment would effectively reimburse Sponsor for the contribution Sponsor had already made to the SPAC through the purchase of those Founder Shares and Private Placement Warrants. The Prospectus, which Rimu acknowledged having read, made clear that all of the Founder Shares and Private Placement Warrants issued by SPAC were issued beneficially to

Jason and the Operating Agreement made clear that the interests in the Founder Shares and Private Placement Warrants Rimu was acquiring were being transferred from current members of the SPAC.  *See* Prospectus at ECF 5; Operating Agreement § 8.04.  Although the Operating Agreement did not specify precisely which members of the SPAC were being diluted through the transfer of interests to Rimu and Jason may not have verbally stated to Rimu that it was his interests that were being sold, Rimu had no reason to suspect that the member who was being diluted was anyone other than Jason.  Jason did not provide Rimu documents showing "the total capital contribution of all members," SASC ¶ 119, but there was no reason for the Attorney Defendants to think that Rimu had a right to such information.  In fact, Rimu contractually gave up the right to know that anyone else was either invested in Sponsor or being diluted by the transfer.  While the Prospectus did not disclose the Zama transaction, the Operating Agreement states that Rimu would not be entitled to that information.  *See* Operating Agreement § 2.05(a).[17] There is no allegation that an affirmative misrepresentation was made with respect to the interest that Leibman would receive on Jason's returns or of the existence of the SPAC Shares Option or its Cancellation.  Though Plaintiff suggests that the Cancellation, if not satisfied, could have encumbered the shares Rimu acquired through Sponsor and "potential[ly]" diluted them, SASC ¶¶ 258, 260, it does not allege that the Cancellation was unsatisfied at the time that Rimu took ownership of its Membership Interest.  Indeed, Rimu suggests that it *was* satisfied—that $9,966,669.39 of the $25 million from the Rimu transaction was used to retire the debt to SSOF, thereby cancelling the SPAC Shares Option.  *Id.* ¶ 278.

---

[17] Likewise there is no allegations that Rimu was entitled to a Schedule A with the "Option/Conversion Dilution Footnote."  SASC ¶ 269.

Accordingly, all of the above are properly viewed as omissions rather than affirmative misrepresentations. However, Plaintiff does not allege facts that would support a claim of fraudulent concealment or actionable omission in connection with any of these statements, much less facts that would support that the Attorney Defendants had actual knowledge of a fraud. There would have been no reason for the Attorney Defendants to suspect that any more should be disclosed to Rimu than Sponsor in fact disclosed. Plaintiff alleges no facts from which the Attorney Defendants would have believed that Jason and SpringOwl owed a fiduciary duty to Rimu. The Subscription Agreement, Term Sheet & Fee Agreement, and Operating Agreement described an arms-length transaction. Rimu represented that it "relied exclusively upon his or her own examination of the SPAC, the Founder Shares, the Private Placement Warrants and the terms of the offering of the Founder Shares, the Private Placement Warrants and the Membership Interest offered hereby, including the merits and risks involved, in making an investment decision," and that it had not requested or been provided with information or advice with respect to the Founder Shares or the Private Placement Warrants" by Sponsor or any of its affiliates. Subscription Agreement sch. 1.

There also would have been no reason for the Attorney Defendants to have believed that Rimu would have been confused or misled with respect to any of the allegedly omitted facts it now claims, or that Rimu relied upon them. Rimu admitted to the Attorney Defendants it was a sophisticated investor. It was an accredited investor, capable of losing an investment of $25 million. It represented that it had read carefully and fully understood the Operating Agreement, the Risk Factors, and the Prospectus. Those documents would have put Rimu on notice that the Units that Rimu was purchasing were Units that were being transferred from Jason—the Operating Agreement itself stated that the Preferred Shares and Private Placement Warrants were

being transferred from existing members and the Prospectus indicated that it was Jason who held the 100% beneficial interest in Sponsor. They also would have put Rimu on notice that the capital it was contributing might not stay in Sponsor. The Subscription Agreement and Operating Agreement made clear that, in exchange for its contribution, Rimu was purchasing the Preferred Shares and Private Placement Warrants with their contribution. Its sole interest was in the Preferred Shares and the Private Placement Warrants. It was also made clear to Rimu in the documents that the Attorney Defendants would have seen that if those securities lost their value, Rimu might have lost their whole investment. There would have been no reason for the Attorney Defendants to have suspect that Rimu would have believed it was in a "heads I win, tails you lose position"—able to reap the profits if those securities appreciated in value because of a successful de-SPAC transaction but protected from loss and entitled to recoup their contribution if there was no transaction. As to the Zama investment and the effect of the Rimu investment on Jason's remaining interest, there also would have been no reason for the Attorney Defendants to have believed that Rimu was entitled to such information when the Operating Agreement to which Rimu agreed stated precisely the opposite.[18]

And finally, per the Subscription Agreement, the Plaintiff expressly "represent[ed] and warrant[ed]" that:

> The Investor acknowledges and understands that the Company and its affiliates possess material nonpublic information regarding the SPAC not known to the Investor that may impact the value of the Founder Shares and the Private Placement Warrants (the "Information") and that the Company is unable to disclose the Information to the Investor. The Investor understands, based on its experience, the disadvantage to which the Investor is subject due to the disparity of information between the Company and the Investor. Notwithstanding such disparity, the Investor has deemed it appropriate to enter into this Agreement and to make the

---

[18] The claim with respect to Liebman's alleged interest, *see* SASC ¶¶ 152–60, 208–211, also fails because Plaintiff does not allege the Attorney Defendants knew the facts of the relationship between Liebman and Jason.

> Capital Contribution. The Investor agrees that none of the Company, its affiliates, principals, managers, members, employees and agents shall have any liability to the Investor, its affiliates, principals, managers, members, employees, agents, granters or beneficiaries whatsoever due to or in connection with the Company's use or non-disclosure of the Information or otherwise as a result of the Investor's Capital Contribution, and *the Investor hereby irrevocably waives any claim that it might have based on the failure of the Company to disclose the Information*.

Subscription Agreement sch. 1 § 4 (emphasis added).  Though Florida law admits some ambiguity on the preclusive effect of general non-reliance clauses on fraud claims, *see e.g., Asokan v. Am. Gen. Life Ins. Co.*, 302 F. Supp. 3d 1303, 1315 (M.D. Fla. 2017), a clear, unambiguous waiver of claims arising from the non-disclosure of material nonpublic information, such as that contained in Schedule 1, precludes such claims as a matter of law, *see Billington v. Ginn-La Pine Island, Ltd.*, LLLP, 192 So. 3d 77, 79, 84 (Fla. Dist. Ct. App. 2016) (finding that "express waiver of the right to maintain a fraud claim is all that is required to avoid liability for fraud," where such a waiver stipulated that "Buyer acknowledges that Buyer has not relied upon such statements, promises or representations, if any, and waives any rights or claims arising from any such statements, promises or representations"); *NM Residential, LLC v. Prospect Park Dev., LLC*, 336 So. 3d 807, 810 (Fla. Dist. Ct. App. 2022) (finding fraud claim would be precluded only where there is "language expressly absolving the seller from any responsibility for such statements or expressly releasing the seller from liability for such statements by expressly stipulating that the buyer . . . waives the right to bring a claim based upon such statements.").[19]

---

[19] Plaintiff also takes issue with the redacted Schedule A provided to Rimu in January 2022 and Jason's refusal in June 2022 to provide information concerning the members of Sponsor and financial information for Sponsor.  SASC ¶¶ 117–122, 125-26, 128-30, 272-76.  However, the SASC does not explain how Rimu could have detrimentally relied on those alleged omissions when its investment was complete by December 2021.  *See N. Fork Partners Inv. Holdings, LLC v. Bracken*, 2023 WL 3871903, at *11 (S.D.N.Y. June 7, 2023) ("[The allegedly false statement] was not provided until approximately one year after Plaintiff closed on the loan . . . It therefore

2. **Alleged Misstatements**

The remaining alleged misstatements boil down to the following:

- Jason's representations on November 6, 18, and 24 of 2021 that Sponsor was "targeting" a closing date of 11/30 [November 30, 2021], *see* SASC ¶¶ 64, 72, 87, whereas Plaintiff alleges on information and belief that there was no intent or ability to close an "Okada transaction" on that date, nor any legitimate business purpose or deadline that required anyone to close funding Sponsor by that date, but rather Ader fabricated the deadline to rush Rimu's investment, *see id.* ¶¶ 88–90.

- Jason's November 6, 2021, statement that there was "strong demand from our investors," *id.* ¶ 64, and his November 26, 2021, statement that "[w]e have a pool of other investors who are buying, the less valuable $100 units with 10/1 shares/units," *id.* ¶ 92, whereas, upon information and belief, at the time the statement was made, there was no "pool of investors" buying "less valuable $100 units with 10/1 shares/units," *id.* ¶¶ 93, 199.

- Jason's November 28, 2021, email to Rimu's Investment Analyst, Drew Colaiezzi. Colaiezzi had emailed Jason a question regarding Schedule 2 of the Subscription Agreement: "If a business combination is not completed within 24 months of the IPO, the underlying securities will become worthless and all investors will lose their entire investments. Why would the capital not be returned to investors in a liquidation process?" *Id.* ¶ 99. Jason responded by forwarding back to Colaiezzi an email from Attorney Defendant Cromwell in which Cromwell had responded in-line to Colaiezzi's question that "Any remaining capital would be returned in a liquidation process. The risk disclosure text was perhaps overstating the risk in order to make the point that the entire investment may be lost in that event. We have revised the risk disclosure language by inserting 'may' in place of 'will.'" *Id.* ¶ 100. Jason's forwarding email thanked Colaiezzi for his "thoughtful questions," noting that "we have done our best to answer all of them for you in the email below." *Id.* ¶ 102.

The SASC contains no allegations that Attorney Defendants were copied on or otherwise

aware of the email exchanges containing the alleged misstatements regarding the "target" closing

date of 11/30, *see* SASC ¶¶ 64, 72, 87, Jason's representation that there was "strong demand

from our investors," *id.* ¶ 64, or Jason's statement that "[w]e have a pool of other investors who

---

could not have been relied upon by Plaintiff when it decided whether or not to invest in Patriot one year earlier."); *DH Cattle Holdings Co. v. Smith*, 607 N.Y.S.2d 227, 231 (1st Dep't 1994) ("The documents provided to defendant were received after he made the investment, and thus the required element of reliance is absent."). As to the claim that in November 2021, Jason sent Rimu a Schedule A with an effective date of July 12, 2021, SASC ¶¶ 265–71, the only information Rimu alleges was omitted from that schedule was the Option/Conversion Dilution Footnote, to which Rimu has not alleged an entitlement.

are buying, the less valuable $100 units with 10/1 shares/units," *id.* ¶ 92.  Though Plaintiff

attempts to imply the Attorney Defendants' knowledge by splicing into the factual narrative

excerpts from the Attorney Defendants' billing records during the key dates, such allegations do

not suffice for pleading with particularity their actual knowledge of the specific

misrepresentations.  *See DiVittorio*, 822 F.2d at 1249 (affirming district court's dismissal of a

complaint under Rule 9(b) where there were no allegations linking attorneys "in any specific way

to any fraudulent misrepresentation or omission").[20]

Plaintiff has pleaded facts sufficient to suggest that the Attorney Defendants were aware

of the third communication—that the prior risk disclosures were overstated and that it was

possible that Rimu would not lose its entire investment in the event of a liquidation.  SASC ¶

101.  Jason had emailed Cromwell a question Jason had received from Rimu, and it is plausible

to presume from the Jason-Cromwell correspondence that Jason intended to forward Cromwell's

---

[20] Apart from the deficiency in pleading the Attorney Defendants' knowledge of the above
affirmative misstatements, the statements regarding the intended closing date and "strong
demand from our investors" cannot support a claim for aiding and abetting fraud because they
cannot support a claim for fraud in the first place.  The first is an intention of future action,
which is generally is not actionable unless the defendant had no intent to perform the promise
when the defendant made it.  *See Mejia v. Jurich*, 781 So.2d 1175, 1177 (Fla. 3d Dist. Ct. App.
2001); *Prieto v. Smook, Inc*., 97 So. 3d 916, 917–18 (Fla. 4th Dist. Ct. App. 2012)).  Jason
expressed a target for a closing date; there is no factual allegation that he made a promise, much
less one that he did not expect to keep.  At best, Plaintiff alleges that the only "Okada
transaction" Jason was looking to close and fund was the transaction with Rimu.  SASC ¶ 88.
The second is mere puffery.  *See Tung v. Dycom Indus., Inc.*, 454 F. Supp. 3d 1244, 1257 (S.D.
Fla. 2020) ("[G]eneralized, non-verifiable, vaguely optimistic statements" are inactionable
because "[r]easonable investors do not base their investing decisions on corporate puffery."
(internal citations and quotations omitted)); *Carlucci v. Han*, 886 F. Supp. 2d 497, 523–24 (E.D.
Va. 2012) (holding "vague and general representations about investor interest to be puffery, and
hence non-actionable" where defendants "allegedly misrepresented that certain high-profile
investors, including Warren Buffet, Bill Gates, Dow Chemical, Morgan Stanley, and Goldman
Sachs, were 'interested in' investing."); *Kleban v. S.Y.S. Rest. Mgmt.*, Inc., 994 F.Supp. 932, 938
(N.D. Ill. 1998) (representation that specifically named "big" investor was going to invest in
restaurants was mere puffery and not actionable).  There is also no allegation that it is false.

response to Rimu.  *See Mutual Life Ins. Co. of N.Y. v. Hillmon*, 145 U.S. 285, 295–96 (1892);

Fed. R. Evid. 803(3).  But this claim fails for other reasons.

First, Plaintiff has not pleaded facts that would establish that Jason's statement to Rimu

was false.  Cromwell stated to Jason, and Jason relayed to Rimu, that the prior draft of the

Subscription Agreement had overstated the risk that if there was no business combination within

24 months of the IPO, Rimu's entire investment would be lost.  SASC ¶ 100.  He stated that it

would be more accurate to say that the entire investment "might" be lost.  *Id.*  As reflected in

Schedule 2 of the executed Subscription Agreement, Rimu was advised that:

> [T]he Founder Shares and Private Placement Warrants (the "Underlying
> Securities") held by the Company provide the entire basis for any return on your
> investment that you might receive, and . . . if a business combination is not
> completed within 24 months following the closing of the SPAC's initial public
> offering, the Underlying Securities may become worthless, and you **may** lose your
> entire investment.

Subscription Agreement, sch. 2 (emphasis added).

The statement that the entire investment might be lost was accurate.  A statement that the

entire investment would, with certainty, be lost if there was no de-SPAC transaction within 24

months of the IPO would have been inaccurate.  As the Subscription Agreement stated, the

Founder Shares and Private Placement Warrants held by Sponsor provided the entire basis for

any return on Rimu's investment.  It also is accurate that the funds generated by the IPO were to

be placed in a trust available only to the purchasers of the Class A common stock in the event

that a de-SPAC transaction did not take place.  *See* Prospectus at ECF 3.  It does not follow,

however, that in the event that there was no de-SPAC transaction completed in 24 months, the

Founder Shares and the Private Placement Warrants, and correspondingly, the value of a

membership interest in Sponsor, would be worthless.  While under the terms of the offering, the

Founder Shares did not have a claim on the $240 million that would be deposited into a trust

account, the $2 million left aside to pay fees and expenses in connection with the closing of the offering and for working capital following the closing of the offering were not so encumbered. *Id*. More importantly, the investors in Sponsor still had an interest in the Founder Shares, and it does not necessarily follow that, even if the transaction was not accomplished in time that, the rights that those Shares carried were worthless. There might not have been a de-SPAC transaction for which Sponsor would have had to expend funds. Or if there was a de-SPAC transaction, it might have been completed after the 24-month period. Or the SPAC might have had a good lawsuit against its merger partners or others which could have returned value to the SPAC. Tellingly, Plaintiff does not actually allege that the Founder Shares are currently worthless. Indeed, the Operating Agreement itself contemplates that the shares would have value even if there was no timely de-SPAC. The Operating Agreement states: "Upon dissolution of the Company, the Liquidator shall satisfy liabilities owing to creditors . . . After paying such liabilities and providing for such reserves, and to the extent the following have not been previously distributed, the Liquidator shall cause the Founder Shares, the Private Placement Warrants, the Loan Warrants, or any proceeds attributable thereto (if any) to be distributed to the Members in accordance with the provisions of Section 4.01(a)." Operating Agreement § 9.02. There would be little reason to provide for the distribution of the Founder Shares and the Private Placement Warrants if it was believed that they would under no circumstances have any value. [21]

---

[21] Plaintiff also alleges that the Term Sheet & Fee Agreement falsely stated that a member may not withdraw any amount from the Company. SASC ¶ 195. The Operating Agreement does provide that a member of Sponsor may not withdraw its capital contribution. *See* Operating Agreement § 3.02. But the SASC does not allege that Jason withdrew money from Sponsor. He acquired an option from Sponsor with respect to his own economic interest, which then was used to retire a pre-existing debt that Sponsor owed to SSOF for funds that SSOF contributed to Sponsor. *Id.* ¶¶ 223–36, 238, 242.

Second, even if there was a misstatement in connection with the Risk Disclosure, Plaintiff does not allege that the Attorney Defendants knew that the statement was untrue at the time. The only basis upon which Plaintiff suggests that the Founder Shares and the Private Placement Warrants would have no value is from the transaction documents themselves. If a de-SPAC transaction was not consummated within the 24-month period, the holders of the Class A shares would be entitled to the return of the proceeds invested through the IPO. The Founder Shares and Private Placement Warrants would be entitled to only what value was left in the SPAC but such value in a shell with no IPO proceeds would, as discussed below, be very little. It might only be an interest in a lawsuit. But if that was the information that the Attorney Defendants had and allegedly withheld, it was also precisely the same information that Rimu had. It thus cannot give rise to a claim for aiding and abetting fraud against the Attorney Defendants.

Finally, and importantly, Plaintiff does not allege that the Attorney Defendants provided substantial assistance to the Ader Defendants' alleged fraud. Under New York law, attorneys may only be held liable for aiding and abetting fraud where they step outside their role as attorneys, not where they are "merely performing work within the scope of [their] duties." *Nuntnarumit v. Lyceum Partners LLC*, 87 N.Y.S.3d 10, 12 (1st Dep't 2018); *see also Mendoza v. Akerman Senterfitt LLP*, 10 N.Y.S.3d 18, 21 (1st Dep't 2015) ("The claim of aiding and abetting [counsel's] breach of its fiduciary duty to plaintiff fails because defendants' actions (e.g. conducting an investigation and drafting amendments to a partnership agreement) were 'completely within the scope of [their] duties as . . . attorney[s].'" (internal citations omitted)); *Gregor v. Rossi*, 992 N.Y.S.2d 17, 19 (1st Dep't 2014); *Lumen at White Plains, LLC v. Stern*, 24 N.Y.S.3d 46, 47 (1st Dep't 2016). "[P]ublic policy demands that attorneys, in the exercise of

their proper functions as such, shall not be civilly liable for their acts when performed in good faith and for the honest purpose of protecting the interests of their clients." *Art Cap. Grp., LLC v. Neuhaus*, 896 N.Y.S.2d 35, 37 (1st Dep't 2010); *see also id.* ("[P]laintiffs' causes of action are not viable because all of the aforementioned acts fall completely within the scope of defendant's duties as an attorney.").  Respect for the autonomy of the client demands no less.

Plaintiff alleges only activities that the Attorney Defendants performed as attorneys. They allegedly (1) "draft[ed] the transaction documents to swap the HAC Note for the SPAC Option, and to transfer that SPAC Option to SSOF for allocation to Pamela's 'special memorandum account,'" *id.* ¶¶ 414–15; (2) drafted the Rimu Subscription Agreement, Term Sheet & Fee Agreement, the Schedule A to be provided to Rimu, the SPAC Option Agreement, and the SPAC Option Cancellation; [22] (3) advised with respect to the SPAC Option Agreement and SPAC Option Cancellation and provided wire instructions for the transfer of $25 million from MGFO to Sponsor, *id.* ¶ 416; and (4) advised with respect to the strategy to swap the HAC Note for the SPAC Option, *id.* ¶ 417.  The Attorney Defendants also advised on the Risk Disclosures and with respect to Pamela's redemption of her interest in SSOF.  *Id.* ¶ 96.  Each of these activities, however, is the paradigmatic conduct of counsel advising a client in the course of a transaction.  The deal lawyers prepared documents and gave legal advice.  Each allegation of the Attorney Defendants' wrongful conduct is simply preparing documents or giving legal advice.

In *Nat'l Westminster Bank USA v. Weksel*, the First Department expounded on Plaintiff's heavy burden in pleading substantial assistance against a law firm as follows:

---

[22] The SASC also alleges that the Attorney Defendants drafted a document entitled Confirmation of Full Payment of Obligations.  *Id.* ¶ 416.

Assuming, arguendo, that the firm knew that the sale and lease transactions were misrepresented in the company reports and that those reports were to be used and indeed relied upon by plaintiff in deciding whether to extend credit to IDI, this does not amount to substantial assistance. Acceptance of these assumptions only warrants the conclusion that defendant law firm, upon learning that the sale and lease transactions were to be misrepresented to plaintiff, did nothing. We know of no case where mere inaction by a defendant has been held sufficient to support aider and abettor liability for fraud.

511 N.Y.S.2d 626, 629 (1st Dep't 1987).

The cases cited by Plaintiff are each inapposite. In *Oster v. Kirschner*, the law firm defendants acted not only as attorneys, but also served as escrow agents for the Ponzi scheme. 905 N.Y.S.2d 69, 70 (1st Dep't 2010). In *Joel v. Weber*, the court held that a law firm could be liable as an aider and abettor to the fraudulent diversion of the plaintiff's partnership distributions, where the law firm itself had been the knowing recipient of the fraudulently conveyed funds. 602 N.Y.S.2d 383, 383–84 (1st Dep't 1993). In *Fid. Nat. Title Ins. Co. v. Smith Buss & Jacobs, LLP*, the defendant law firm not only made misrepresentations in the condominium offering document but also deviated from normal practice in a number of respects, including directing payment of funds outside of typical channels. 2014 WL 3739192, at *6 (N.Y. Sup. Ct. June 27, 2014), *aff'd*, 6 N.Y.S.3d 29, 31 (1st Dep't 2015). There is no such allegation here that Attorney Defendants stepped outside their role as counsel, engaging in transactions atypical of the attorney-client relationship.[23]

Plaintiff's claim is akin to a negligent misrepresentation claim based on attorney advice or comments on a filing that the client later provides to a third party. *See F.D.I.C. v. U.S. Mortg. Corp.*, 132 F. Supp. 3d 369, 388 (E.D.N.Y. 2015) (analyzing fraud by omission and negligent misrepresentation together); *Beach v. Citigroup Alternative Invs. LLC*, 2014 WL 904650, at *21

---

[23] For those same reasons, Plaintiff's claim of aiding and abetting a breach of fiduciary duty would fail against the Attorney Defendants even if there was a well pleaded allegation of fiduciary duty.

(S.D.N.Y. Mar. 7, 2014) (observing that "the relationship that must be alleged to sustain a negligent misrepresentation claim is the same as the relationship that must be alleged to sustain a claim of fraudulent concealment," and where, as here, the plaintiff "failed to allege the existence of a relationship . . . that would give rise to a duty of disclosure," the negligent misrepresentation claim warranted dismissal).[24]   Here, Plaintiff alleges merely that Cromwell provided legal advice to Jason which he "knew" Jason would provide to Rimu, advice that was purportedly false and misleading.  SASC ¶ 101.  Similar allegations could be made in virtually every other case in which an issuer of securities is alleged to have made a false statement and the document in which the false statement is contained was drafted by a lawyer.  In those cases, as here, plaintiffs could allege that the attorneys provided advice or drafted disclosures "knowing" that they would be provided to an investor if the advice was accepted.  *See* SASC ¶ 101.  The courts have never held that a lawyer may be held liable for the statement made by a client merely by alleging that the lawyer knew or should have known that the client's statement was false.  Courts respect client autonomy.  Although the client may have a claim against his own lawyer for negligent advice, for a third party to intrude on the attorney-client relationship and go behind the client statement to reach the lawyer, the plaintiff must allege "a special relationship with the third-party that 'approaches that of privity.'"  *Doehla v. Wathne Ltd., Inc.*, 1999 WL 566311, at *19 (S.D.N.Y.

---

[24] Of course, negligent misrepresentation, unlike fraud, does not require scienter.  *See S.E.C. v. Lee*, 720 F. Supp. 2d 305, 328 (S.D.N.Y. 2010) ("Negligent misrepresentation involves most of the same elements as fraud, with a negligence standard substituted for the scienter requirement." (internal quotations omitted)).  But tellingly here, Plaintiff makes no allegations that would establish the necessary strong inference of scienter that would distinguish fraud from negligent misrepresentation.  *See* SASC ¶¶ 281–92 (alleging scienter by Jason and SpringOwl but not by Attorney Defendants); *see also Weksel*, 511 N.Y.S.2d at 630 ("Doubtless, in the course of representing a client, a lawyer gains access to information about his client's affairs, but the fact of legal representation, even as to transactions allegedly the subject of subsequent misrepresentation, does not itself support the inference of the high degree of scienter necessary to extend fraud liability on an aiding and abetting theory.").

Aug. 3, 1999) (quoting *Prudential Ins. Co. of America v. Dewey, Ballantine,* 605 N.E.2d 318,

320 (N.Y. 1992) (alterations adopted))); *see also Ossining Union Free School District v.*

*Anderson LaRocca,* 539 N.E.2d 91, 94 (N.Y. 1989) ("The long-standing rule is that recovery

may be had for pecuniary loss arising from negligent representations where there is actual privity

of contract between the parties or a relationship so close as to approach that of privity.").  "The

circumstances under which this 'special relationship' exception to the rule requiring the

existence of a contractual relationship to hold professionals liable for negligent misrepresentation

has been construed narrowly." *Doehla,* 1999 WL 566311, at *19; *Ossining,* 539 N.E.2d at 95

(recognizing that "[w]e have defined this duty narrowly").  The plaintiff must plead "(1) an

awareness by the maker of the statement that it is to be used for a particular purpose; (2) reliance

by a known party on the statement in furtherance of that purpose; and (3) some conduct by the

maker of the statement linking it to the relying party and evincing its understanding of that

reliance." *Prudential Ins. Co.,* 605 N.E.2d at 321–22 (citing *Credit Alliance Corp. v. Andersen*

*& Co.,* 483 N.E.2d 110, 118 (N.Y. 1985)).  Those conditions have generally been found satisfied

only when the attorney makes a direct representation to the third party or, in the case of an

opinion letter, delivers an opinion to the client that is addressed to and intended to be relied upon

by the third party.  *See Am. Med. Distributors v. Macdonald Tuskey*, 2018 WL 1478301, at *4

(S.D.N.Y. Mar. 23, 2018) (quoting *Doehla,* 1999 WL 566311, at *20); *Prudential Ins. Co.,* 605

N.E.2d at 322; *Vereins-Und Westbank, AG v. Carter*, 691 F. Supp. 704, 709 (S.D.N.Y. 1988);

*see also Crossland Sav. FSB v. Rockwood Ins. Co.*, 700 F. Supp. 1274, 1282 (S.D.N.Y. 1988)

(Leval, J.) ("When a lawyer at the direction of her client prepares an opinion letter which is

addressed to the third party or which expressly invites the third party's reliance she engages in a

form of limited representation. . . . Although the attorney is paid by and represents her client, in

the opinion letter she expressly states (with her client's consent) that she is rendering a legal service to the third party." (citing *See* 1 G. Hazard & W. Hodes, The Law of Lawyering 320 (1987))).  "If it were otherwise, every non-client would have a claim against every law firm who failed to exercise due care in the context of representing a long-standing client in a financial transaction."  *Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP*, 612 F. Supp. 2d 267, 286 (S.D.N.Y. 2009).

Plaintiff here alleges no more than that the Attorney Defendants provided advice to Jason that Jason then provided to Rimu.  Plaintiff's claim against Attorney Defendants for aiding and abetting fraud, SASC ¶¶ 405–421, is accordingly dismissed.

### C.    Malpractice Crossclaim Against the Attorney Defendants

The Ader Defendants crossclaim against the Attorney Defendants for legal malpractice. *See* Dkt. No. 148 ¶¶ 519–525.  In a seven-paragraph crossclaim, they allege that the Attorney Defendants represented them in the de-SPAC transaction and failed "to properly effectuate the necessary documents for the de-SPAC transactions and advise accordingly," and that the Attorney Defendants' legal malpractice was the proximate cause of the damage suffered by the Ader Defendants from the numerous lawsuits those defendants have faced.  *Id.* ¶¶ 519–525.  The Attorney Defendants argue that the crossclaim should be dismissed for three independent reasons: (1) the Attorney Defendants were not counsel for the de-SPAC transaction; (2) the failure to effectuate documents was not the cause of the Ader Defendants' damages; and (3) the allegations of the crossclaim are conclusory.  Dkt. No. 196.

To state a claim for legal malpractice in New York, a party must allege "(1) an attorney-client relationship at the time of the alleged malpractice; (2) attorney negligence; (3) proximate causation and (4) actual damage to the client."  *Kirk v. Heppt*, 532 F. Supp. 2d 586, 591 (S.D.N.Y. 2008) (citing *Nordwind v. Rowland*, 2007 WL 2962350, at \*22 (S.D.N.Y. Oct. 10,

2007)).  "The New York Court of Appeals has made it clear that 'a cause of action for legal

malpractice pose[s] a question of law which [can] be determined on a motion to dismiss.'"

*Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (quoting *Rosner*

*v. Paley*, 481 N.E.2d 553, 554 (N.Y. 1985)).

The crossclaim must be dismissed because it is entirely conclusory.  It offers solely

"labels and conclusions," "a formulaic recitation of the elements of a cause of action," and

"naked assertion[s]" devoid of "further factual enhancement."  *Twombly*, 550 U.S. at 555, 557.

The Ader Defendants fail to allege what services the Attorney Defendants were engaged to

provide them and fail to indicate which documents were not effectuated, in what respect the

Attorney Defendants' conduct fell below the ordinary and reasonable skill and knowledge

expected of the Attorney Defendants, or how any "proper performance would have led to a

different result."  *Collins v. Felder*, 785 F. App'x 8, 10 (2d Cir. 2019); *see Ghouneim v. 352-354*

*H.D.F.C.*, 2019 WL 1523326, at *4 (S.D.N.Y. Mar. 29, 2019) ("[T]he sparse allegations relating

to [attorney defendants] do not contain sufficient factual matter to state any plausible claim for

relief.").

## II.    Claims Against Pamela Ader

### A.    Fraudulent Transfer Claim

Plaintiff brings one claim against Pamela for fraudulent transfer.  SASC ¶¶ 405–421.

Both Florida Law and New York law provide that:

> [a] transfer made . . . by a debtor is fraudulent as to a creditor . . . if the debtor made
> the transfer . . . [w]ith actual intent to hinder, delay, or defraud any creditor of the
> debtor; or [w]ithout receiving a reasonably equivalent value in exchange for the
> transfer . . . and the debtor: (1) [w]as engaged or was about to engage in
> a . . . transaction for which the remaining assets of the debtor were unreasonably
> small . . . or (2) [i]ntended to incur, or believed or reasonably should have believed
> that he or she would incur, debts beyond his or her ability to pay as they became
> due.

Fla. Stat. § 726.105.[25]  "To prevail on a fraudulent transfer claim, a creditor must demonstrate (1) there was a creditor to be defrauded, (2) a debtor intending fraud, and (3) a conveyance—i.e., a 'transfer'—of property which could have been applicable to the payment of the debt due." *Isaiah v. JPMorgan Chase Bank*, 960 F.3d 1296, 1302 (11th Cir. 2020) (citing *Wiand v. Lee*, 753 F.3d 1194, 1199–1200 (11th Cir. 2014)).

Accepting the well-pleaded allegations of the SASC as true, Jason solicited the funds from Rimu in order to satisfy pre-existing obligations that both Sponsor and HAC had to SSOF and, in turn, to satisfy SSOF's pre-existing obligations to Pamela.  Even assuming the SASC properly alleged that Jason defrauded Rimu into making his $25 million investment in Sponsor to obtain the economic interests in SPAC, Pamela would not be liable on those facts for fraudulent transfer.  The claim fails for numerous reasons.

First, Rimu can recover for a fraudulent transfer to Pamela only if Rimu is deemed to be a creditor of SSOF, for the transfer that Rimu is seeking to recover as fraudulent was made by SSOF to Pamela.  But, in turn, Rimu can be a creditor of SSOF only if SSOF is liable to Rimu for aiding and abetting the Ader Defendants' fraud on Rimu.  *See* SASC ¶¶ 381–86.  A properly pleaded tort claim would make plaintiff a creditor for the purposes of fraudulent transfer law, even before the underlying tort is reduced to judgment.  *See Wiand*, 753 F.3d at 1202 (defrauded

---

[25] The parties agree that, though the claim arises under Florida law, there is no conflict between the laws of Florida and New York regarding fraudulent transfer.  The New York statute, N.Y. Debt. & Cred. Law § 273, is substantially identical to the Florida statute, Fla. Stat. § 726.105, as both are modeled on the Uniform Fraudulent Transfer Act.  *See In re Bumshteyn*, 2022 WL 126612, at *5 (Bankr. S.D. Fla. Jan. 13, 2022) (noting that New York's and Florida's fraudulent transfer laws "are nearly, if not entirely, substantively identical"); Fla. Stat. § 726.112 (stating that Florida's fraudulent transfer law, the enactment of a model statute, "shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of the law among states enacting it").  Accordingly, the Court draws on cases interpreting New York's statute as well as Florida's.

investors in Ponzi scheme were creditors within the meaning of the Florida Uniform Fraudulent Transfer Act because they were tort creditors); *Friedman v. Heart Inst. of Port St. Lucie, Inc.*, 863 So. 2d 189, 193 (Fla. 2003) ("[A] creditor is merely a person who 'has a claim,'" and a 'claim' may be 'unliquidated, . . . contingent, [or] unmatured."); *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 428 (S.D.N.Y. 2006) (holding that "Plaintiffs here are tort creditors of the Partnership by virtue of their claims against the defrauding defendants in the pending action, and therefore have standing within the meaning of the New York Debtor and Creditor Law to avoid fraudulent transfers made by the Partnership," as "one who has a right to maintain a tort action but has not recovered judgment at the time of the transfer is a creditor").   A transfer made by SSOF to Pamela would be fraudulent as to Rimu if and only if SSOF has secondary liability for the underlying fraud.

However, Plaintiff has not alleged facts from which it can plausibly be inferred that SSOF aided and abetted the Ader Defendants' fraud of Rimu.  As discussed above, an aiding-and-abetting-fraud claim requires "(1) a primary wrong, (2) defendant's knowledge that the wrong existed and (3) substantial assistance by the defendant in carrying out the wrong." *Krys*, 749 F.3d at 125 (applying New York law) (internal citation omitted); *Platinum Ests., Inc. v. TD Bank, N.A.*, 2012 WL 760791, at *3 (S.D. Fla. Mar. 8, 2012) (same elements under Florida law). Rimu alleges that Jason needed to arrange for HAC to repay the HAC Note and for Sponsor to repay the loan to SSOF in order to satisfy Pamela's redemption demand and that Jason needed to sell Rimu his interests in the Founder Shares and Private Placement Warrants to discharge SSOF's remaining interests in the SPAC and to satisfy the SPAC Option Cancellation. However, even assuming that SSOF (and, in turn, Pamela) benefitted from Jason's alleged fraud on Rimu, Plaintiff does not allege any acts that SSOF committed to substantially aid that fraud.

Its only allegations are purely conclusory.  Dkt. No. 191 at 34 ("Rimu has alleged that SSOF provided substantial assistance to the fraud by, among other things, actively participating in the fraudulent SPAC Option transaction." (citing SASC ¶¶ 212–280)).  The aiding-and-abetting claim against SSOF falls flat without a non-conclusory allegation of substantial assistance.

Second, to assert a claim against Pamela, Rimu would have to allege that there was a transfer to Pamela that worked as a fraud against Rimu.  But Plaintiff alleges no such facts.  Plaintiff does not allege that the transfer from SSOF to Pamela occurred *after* Rimu executed its transaction with Sponsor.[26]  Instead, as Plaintiff acknowledges, Pamela demanded redemption of her investment in SSOF months before Rimu invested in Sponsor.  SASC ¶ 212 ("In the summer of 2021 Pamela, through counsel, demanded that SSOF redeem her interest in SSOF.").  There is no allegation that the transfer from SSOF to Pamela occurred after Rimu invested in Sponsor.  Therefore, Plaintiff has not properly alleged that any creditor to SSOF (whether Rimu or another entity) existed at the time of the transfer to Pamela, as is required under Florida law to make out a claim for fraudulent transfer.  "In order to establish a fraudulent transfer claim . . . 'a creditor must have at least one claim in existence when the transfers were made.'"  *In re Ormond Beach Assocs. Ltd. P'ship*, 184 F.3d 143, 156 (2d Cir. 1999) (quoting *Harper v. United States*, 769 F. Supp. 362, 366–67 (M.D. Fla. 1991) (citing *Whetstone v. Coslick*, 157 So. 666, 667 (Fla. 1934))).

Finally, even assuming for the sake of argument that the aiding-and-abetting-fraud claim was properly made against SSOF, and that Rimu was properly considered a creditor to SSOF at the time of the transfer to Pamela, the most that Plaintiff would have pleaded would be a preference and not a fraudulent conveyance.  The Second Circuit has held that the transfer of

---

[26] Though the Court may not make a contrary factual finding on a motion to dismiss, the Court notes the absence of precision in the complaint where other relevant transaction dates are set out with clarity and consistency.  *See* SASC ¶¶ 455–483.

funds to one creditor that have been fraudulently obtained from a second creditor does not
constitute a fraudulent transfer even if the first creditor is aware of the fraud. *See In re Sharp
Int'l Corp.*, 403 F.3d 43, 55 (2d Cir. 2005). Plaintiff makes no allegation that Pamela's demand
was anything less than earnest—in fact, Plaintiff goes to great lengths to emphasize that the
demand created a "personal problem" for Jason. *Id.* ¶¶ 134–35, 149, 221, 396. "A conveyance
which satisfies an antecedent debt made while the debtor is insolvent is neither fraudulent nor
otherwise improper, even if its effect is to prefer one creditor over another." *Sharp*, 403 F.3d
54–55 (quoting *Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.*, 599 N.Y.S.2d 816, 819
(1st Dep't 1993)). It does not matter whether the first creditor knew that the funds used to repay
it were fraudulently obtained. "[W]here the transferee does not participate in, but only knows
that the debtor created the other debt through some form of [] dishonesty" there is a preference,
"concededly a most undesirable kind of preference, one in which the claims of alternative
creditors differ considerably in their moral worth, but a kind of preference nonetheless." *Id.*
(quoting *Boston Trading Group, Inc. v. Burnazos*, 835 F.2d 1504, 1512 (1st Cir. 1987) (Breyer,
J.)).

    That holding applies squarely here. Rimu alleges that SSOF redeemed Pamela's
membership interest in SSOF with funds that Jason obtained by way of fraud and then
transferred to SSOF. SASC ¶485–495. There is no allegation that, at the time Pamela invested
her funds with SSOF, she had any knowledge that the funds would not be used for legitimate
corporate purposes or that the investment was anything other than legitimate. *See id.* at 55. Nor
is there any allegation that her decision to pull her funds out of SSOF was anything other than a
legitimate business decision on her part. Without allegations of Pamela's participation in the

alleged dishonesty, *Sharp* applies and the payment to Pamela constitutes merely a preference between creditors, not a fraudulent transfer.

Plaintiff argues that *Sharp* is distinguishable because the payment at issue here did not discharge an antecedent debt. Dkt. No. 191 at 41–44. It was critical in *Sharp* "that the payment at issue discharged an antecedent debt and was made for a 'fair equivalent.'" 403 F.3d at 54. However, SSOF is a Delaware limited partnership, and the applicable Delaware statute provides that a "partnership interest is personal property." 6 Del. C. § 17-701 ("A partnership interest is personal property"). Thus, even if Plaintiff's argument that paying out the redemption of Pamela's equity was not paying an antecedent debt is correct, the payment was still in exchange for property (her personal property interest). *Sharp* would still apply.

Plaintiff has failed to plead with particularity that the specific transfer made to Pamela was made with fraudulent intent. "Just because a debtor is involved in a fraudulent scheme does not mean that every transfer made by that debtor is made with fraudulent intent. In order to prosecute a claim based on actual intent to hinder, delay, or defraud a creditor, the plaintiff must show that the alleged fraudulent intent is related to the transfers sought to be avoided." *In re Rollaguard Sec., LLC*, 591 B.R. 895, 918 (Bankr. S.D. Fla. 2018). SSOF's ordinary course transfer to Pamela, in redemption of her undisputedly valid interest in SSOF, cannot give rise to a claim for fraudulent transfer in the absence of a plausible allegation that SSOF's intent *in this transfer* was to defraud Rimu. *In re D.I.T., Inc.*, 561 B.R. 793, 803 (Bankr. S.D. Fla. 2016) (dismissing complaint where the challenged transfers "were regular payments on the Debtor's commercial debt obligations" notwithstanding an allegation that they "were somehow in furtherance of the Debtor's bank fraud scheme"); *In re Bal Harbour Quarzo, LLC*, 623 B.R. 903, 918 (Bankr. S.D. Fla. 2020) (dismissing actual fraudulent transfer claim where "nothing

plausibly alleges [transfer] was made for any reason other than that [debtor] owed [transferee] this money.  It is not fraudulent to pay some but not all creditors, even though the effect might be to injure or prejudice an existing creditor who was not chosen to receive the debtor's largesse" (footnotes, quotation marks, and citations omitted)).

For these reasons, the claim for fraudulent transfer against Pamela is dismissed with prejudice.

### B.    Crossclaim for Contribution and Indemnification

The Ader Defendants bring two crossclaims against Pamela: (1) contribution or indemnification, Dkt. No. 148 ¶¶ 510–511, and (2) breach of fiduciary duty, *id*. at ¶¶ 512–518.

The laws of New York, Delaware, and Florida are substantially identical with respect to the elements of a claim for contribution and indemnification.  A claim for contribution lies when (1) two or more people are (2) subject to liability for the same injury.  *See* Del. Code tit. 10, § 6302(a); Fla. Stat. Ann. § 768.31(2)(a); N.Y. C.P.L.R. 1401.  In that instance, the liability of each is to be determined based upon the relative fault or culpability of the parties.  *See* Del. Code tit. 10, § 6302(d); Fla. Stat. Ann. § 768.31(3)(a); N.Y. C.P.L.R. 1402.

Pamela was impleaded to the case based solely on a claim of fraudulent transfer seeking, in substance, to avoid a transfer to her by SSOF.  SASC ¶¶ 485–495.  As the Court determines that no fraudulent transfer was made to Pamela, the sole underlying tort giving rise to a cognizable injury is eliminated.  Without a surviving claim to which both parties are liable, neither a claim for contribution nor a claim for indemnification may be sustained in any of the potential jurisdictions.  *See* Del. Code tit. 10, § 6302(a); Fla. Stat. Ann. § 768.31(2)(a); N.Y. C.P.L.R. 1401.

The Ader Defendants allege that Pamela was an investor in SSOF, owed them a fiduciary duty by way of her investment, and breached her fiduciary duty by leaving SSOF with no assets

when she redeemed her interest.  Dkt. No. 148 ¶¶ 512–518.  However, Pamela's limited

partnership interest in SSOF does not give rise to a fiduciary duty.  In Delaware, "[g]eneral

partners owe default fiduciary duties.  Passive limited partners do not owe default fiduciary

duties, but under certain circumstances, they can assume fiduciary duties if they take on an active

role in the management of the entity."  *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 662 (Del. Ch.

2012).  Pamela is a limited partner of SSOF and was not alleged to have taken part in managing

or controlling the affairs of SSOF.[27]  The Ader Defendants allege no facts showing that Pamela

takes "an active role in the management of the entity."  *Feeley*, 62 A.3d 649 at 662.  Therefore,

the Ader Defendants have failed to plausibly allege the existence of a fiduciary duty and the

claim for breach of fiduciary duty must accordingly be dismissed.  *See Estate of Eller v. Bartron*,

31 A.3d 895, 897 (Del. 2011); *In re Our Alchemy, LLC*, 2019 WL 4447519, at *6–9 (Bankr. D.

Del. Sept. 16, 2019) (no breach of fiduciary duty claim absent allegation of control of LLC);

*Brinckerhoff v. Enbridge Energy Co., Inc.*, 2011 WL 4599654, at *7–8 (Del. Ch. Sept. 30, 2011)

(dismissing claim for breach of fiduciary duty in the absence of an allegation of control over the

limited partnership); *Kuroda v. SPJS Holdings, L.L.C.*, 2010 WL 925853, at *7–8 (Del. Ch. Mar.

16, 2010) (dismissing counterclaim for breach of fiduciary duty because plaintiff was neither a

manager or a controlling member of LLC).

    For that reason, the Ader Defendants' crossclaim for breach of fiduciary duty is

dismissed.

---

[27] SSOF's Limited Partnership Agreement provides that "[t]he business and affairs of the Partnership shall be managed exclusively by the General Partner [SpringOwl Special Opportunities GP LLC]. The Limited Partners shall take no part in the management or control of the Partnership's business and shall have no authority to act for or bind the Partnership."  Dkt. No. 194-1 § 3.01(a).

### III.    All Claims Dismissed With Prejudice

Plaintiff has already amended its complaint twice.  *See* Dkt. No. 1, 43.  Plaintiff has given the Court no reason to believe that it possesses facts which could cure the defects the Court has identified in the SASC with respect to Attorney Defendants or Pamela.  *See Wolet Capital Corp. v. Walmart Inc.*, 2021 WL 2383213, at *1 (S.D.N.Y. Jun. 10, 2021) (granting motion to dismiss with prejudice because plaintiff "has had numerous opportunities to amend, and any further amendment would be futile"); *see also McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) ("[I]t is within the sound discretion of the district court to grant or deny leave to amend.  A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." (internal citations omitted)); *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (finding that repleading would be futile when the "problem with [the pleader's] causes of action is substantive").  Plaintiff's failure to identify facts suggestive of the Attorney Defendants' actual knowledge and conduct outside of their role as counsel makes repleading futile at this stage.  Likewise, no facts have been identified which would make claims of fraudulent transfer against Pamela viable.

The Ader Defendants' crossclaims against Attorney Defendants and Pamela are threadbare and conclusory in the extreme.  *See* Dkt. No. 148 ¶¶ 510–525.  Amendment would be futile.  *See Ivey v. Cnty. of Albany*, 2024 WL 1306910, at *3 (N.D.N.Y. Mar. 27, 2024) (noting that the court "has discretion to dismiss with prejudice if it believes that amendment would be futile or would unnecessarily expend judicial resources." (quoting *Nwaokocha v. Sadowski*, 369 F. Supp. 2d 362, 372 (E.D.N.Y. 2005)).

The Court accordingly dismisses all claims and crossclaims against the Attorney Defendants and Pamela with prejudice.

## CONCLUSION

For the foregoing reasons, the motion to dismiss Rimu's claims against Attorney Defendants for aiding and abetting fraud and aiding and abetting breach of fiduciary duty is GRANTED with prejudice. Additionally, the motion to dismiss Rimu's claim for fraudulent transfer against Pamela is GRANTED with prejudice.

Attorney Defendants' motion to dismiss the Ader Defendants' crossclaim for legal malpractice is also GRANTED with prejudice. Pamela's motion to dismiss the Ader Defendants' crossclaims is also GRANTED with prejudice.

The Clerk of Court is respectfully directed to close Dkt. Nos. 160, 163, 192, 195.

SO ORDERED.

Dated: May 1, 2025
     New York, New York

_____
               LEWIS J. LIMAN
           United States District Judge