UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| RIMU CAPITAL, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| and | ) | |
| | ) | |
| 26 CAPITAL HOLDINGS, LLC, | ) | |
| | ) | |
| Nominal Plaintiff, | ) | Civil Docket Case #: 1:23-cv-05065-LJL |
| | ) | |
| v. | ) | |
| | ) | |
| JASON ADER, SPRINGOWL ASSET | ) | |
| MANAGEMENT LLC, SPRINGOWL | ) | |
| ASSOCIATES LLC, ADER FUND | ) | |
| MANAGEMENT LLC, SPRINGOWL | ) | |
| SPECIAL OPPORTUNITIES, LP, | ) | |
| 826 CAPITAL HOLDINGS LLC, | ) | |
| SADIS & GOLDBERG, LLP, ROBERT | ) | |
| D. CROMWELL, RON S. GEFFNER, | ) | |
| and PAMELA ADER, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT
## OF DEFENDANTS' MOTION TO DISMISS

Defendants JASON ADER, SPRINGOWL ASSET MANAGEMENT LLC,

SPRINGOWL ASSOCIATES LLC, ADER FUND MANAGEMENT LLC, SPRINGOWL

SPECIAL OPPORTUNITIES, LP, and 826 CAPITAL HOLDINGS LLC (collectively, the

"Ader Defendants"), by and through their undersigned counsel, respectively submit this

Memorandum of Law in Support of their Motion to Dismiss the Second Amended and

Supplemental Complaint ("SASC") pursuant to Federal Rules of Civil Procedure 9(b) and

12(b)(6).

PRELIMINARY STATEMENT

This Court has already dismissed similar claims against the Co-Defendants, recognizing the fundamental defects in Plaintiff's legal theory.   Now, the Ader Defendants seek dismissal of the remaining claims, which suffer from the same fatal flaws.   This case represents a sophisticated billionaire investor's attempt to extract additional recovery through litigation after:

1.      Expressly disclaiming reliance on any representations through clear non-reliance provisions;

2.      Achieving a 100% return across his investments with the Ader Defendants; and

3.      Choosing not to pursue legitimate recovery options that were fully within his control after the Ader Defendants voluntarily transferred complete control of the Sponsor entity to him.

Plaintiff RIMU CAPITAL LTD. ("RIMU"), controlled by Harald McPike, a billionaire investor with a documented history of high-stakes investments and litigation, made approximately $50 million in profits from two prior investments with the Ader Defendants before the transaction at issue.   While the SPAC investment at issue did not yield similar returns due to market conditions and factors beyond the Ader Defendants' control, Mr. Ader demonstrated remarkable good faith by:

- Co-investing $800,000.00 of his own legitimately earned fees alongside RIMU, subjecting these fees to the same risks;

- Providing exceptional transparency in public disclosures that exceeded SEC requirements; and

2

- Voluntarily transferring complete control of the Sponsor entity to RIMU after difficulties arose, giving RIMU full authority to pursue recovery against Universal through litigation.

Despite these good faith actions, RIMU made the calculated business decision not to pursue recovery beyond the $11 million settlement, only to now turn around and seek recovery from the Ader Defendants instead.

This Court should dismiss RIMU's claims for three independently sufficient reasons: (1) the unambiguous non-reliance provisions in the Subscription Agreement create a complete legal bar to RIMU's fraud claims; (2) RIMU fails to plead fraud with particularity required by Rule 9(b); and (3) the Ader Defendants' good faith co-investment and subsequent transfer of control to RIMU conclusively negate any plausible inference of fraudulent intent.

## FACTUAL BACKGROUND

1.     The Parties' Successful Prior Investment Relationship

Mr. McPike, through RIMU, had successfully invested with the Ader Defendants on two prior occasions, earning approximately $50 million in profits on an investment of approximately $25 million. The second investment involved Playtech PLC, where the Ader Defendants served as investment advisors and earned approximately $1 million in advisory fees. These successful transactions established a pattern of profitable dealings between sophisticated parties.

3

C.      The SPAC Transaction and Co-Investment Structure

In late 2021, the Ader Defendants presented RIMU with an opportunity to invest in 26 Capital Holdings LLC ("Sponsor"), which sponsored a Special Purpose Acquisition Company ("SPAC") that was pursuing a business combination with owners of the Okada Manila Resort & Casino.  Unlike the previous Playtech investment, the Ader Defendants did not serve as investment advisors on this transaction, but rather, explicitly co-invested alongside RIMU in a carefully structured arrangement.

Specifically, RIMU contributed $24.2 million in new capital, while Mr. Ader and SpringOwl rolled over $800,000.00 in legitimately earned advisory fees from the prior Playtech transaction—fees that RIMU already owed to the Ader Defendants.  This co-investment structure was documented in the Term Sheet & Fee Agreement, which expressly provided that SpringOwl would place "the entire $800,000.00 at risk."  If the investment succeeded, SpringOwl would share in the profits; if it failed, SpringOwl would lose its $800,000.00 fee entirely.

While the proposed business combination ultimately did not succeed due to factors outside the Ader Defendants control, Mr. Ader took the extraordinary step of transferring complete control of the Sponsor entity to RIMU.  On January 12, 2024, pursuant to a Settlement Agreement, Mr. Ader resigned as Managing Member and acknowledged RIMU's authority to appoint a replacement Managing Member.  SASC ¶ 168.  RIMU appointed itself as Managing Member, giving it full control over the Sponsor's affairs, including litigation and recovery strategies.

4

Critically, RIMU's investment was governed by a comprehensive Subscription Agreement that contained explicit non-reliance provisions. RIMU expressly represented and warranted that:

1. It was an "accredited investor" able to "bear the risk of an entire loss" of its investment;

2. It was "knowledgeable with respect to the business and operations of the SPAC and the Company;"

3. It "relied exclusively upon his or her own examination of the SPAC, the Founder Shares, the Private Placement Warrants, and the terms of the offering…;"

4. "Neither the Company nor any of its affiliates has been requested to or has provided the Investor with an information or advice with respect to the Founder Shares and the Private Placement Warrants, nor is any such information necessary or desired by Investor;"

5. It "acknowledges and understands that the Company and its affiliates possess material nonpublic information regarding the SPAC not known to the Investor that may impact the value of the Founder Shares and the Private Placement Warrants… and that the Company is unable to disclose the Information to the Investor;" and

6. It "irrevocably waives any claim that it might have based on the failure of the Company to disclose the Information."

Despite the significant risks disclosed in the transaction documents, the investment proved highly successful. RIMU received a 100% return, doubling its $25 million investment.

## JUDGMENT

I.     THE CLEAR NON-RELIANCE PROVISIONS IN THE SUBSCRIPTION AGREEMENT CREATE A COMPLETE LEGAL BAR TO RIMU'S FRAUD CLAIM.

Under both Delaware and Florida law, sophisticated parties may contractually define the boundaries of their relationship, including through non-reliance provisions that preclude future fraud claims based on extra-contractual representations or omissions. The Court has already recognized in its May 1, 2025 Opinion & Order that "a clear, unambiguous waiver of claims arising from the non-disclosure of material nonpublic information, such as that contained in Schedule 1, precludes such claims as a matter of law." Op. at 47-48.

The Subscription Agreement contains precisely such clear, unambiguous waivers. RIMU expressly acknowledged that the Ader Defendants possessed material non-public information that they could not disclose, and RIMU "irrevocably waive[d] any claim that it might have based on the failure of the Company to disclose the Information." This provision is fatal to RIMU's claims based on alleged omissions.

Moreover, RIMU represented that it "relied exclusively upon his or her own examination" of the relevant securities and investment opportunity. This representation forecloses RIMU's claims of reliance on any alleged misrepresentations by the Ader Defendants.

Courts in this District have repeatedly dismissed fraud claims in similar circumstances. In Barron v. Helbiz, Inc., 639 F. Supp. 3 483. 15-16 (S.D.N.Y. 2022), Judge Rakoff dismissed fraud claims brought by sophisticated cryptocurrency investors based on non-reliance provisions, holding that the Plaintiffs "unreservedly agreed in the [agreement] that they had 'sufficient knowledge, sophistication, and experience in business'" and "expressly disclaimed all reliance." Similarly, in Quail Cruises Ship

Mgmt. Ltd. v. Agencia de Viagens CVC tur Limitada, 2011 WL 5928295, at *5 (S.D.N.Y. Nov. 29, 2011), the court held that "where a party specifically disclaims reliance upon a representation in a contract, that party cannot, in a subsequent action, claim that it was fraudulently induced to enter into the contract by the very representation it has disclaimed."

Most recently, in KKR Credit Advisors (US) LLC v. Nuss Glob, Sols., Inc., 637 F. Supp. 3d 453, 489-90 (S.D.N.Y. 2022), Judge Oetken dismissed fraud claims in a failed investment context, holding that the plaintiff's "express non-reliance clauses…pose an insurmountable barrier to its fraud claims." The court emphasized that "[w]hen parties have negotiated and agreed on specific, detailed disclaimers, the presumption is that they meant what they said. Courts will not lightly discard such provisions." Id.

Delaware and Florida courts consistently enforce such provisions between sophisticated commercial parties. See Abry Partners V, L.P. v. F & W Acquisition LLC, 891 A.2d 1032, 1058-59 (Del. Ch. 2006); Billington v. Ginn-La Pine Island, Ltd., LLLP, 192 So. 3d 77, 79-84 (Fla. Dist. Ct. App. 2016). This Court should do likewise and dismiss RIMU's claims.

## II.     RIMU'S FRAUD ALLEGATIONS FAIL TO MEET RULE 9(b)'S HEIGHTENED PLEADING STANDARD

Rule 9(b) requires that fraud be pled with particularity, specifying "the who, what, where, when, and how" of the alleged fraud. In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d 281, 327 (S.D.N.Y. 2003). RIMU's complaint falls short of this standard for three distinct reasons.

First, many of RIMU's allegations are made "upon information and belief" without stating the facts upon which that belief was formed.  As this Court has recognized, such allegations "cannot support a claim of fraud in the absence of a statement of the facts upon which the belief was formed." Op. at 3 n.1.  The Second Circuit has consistently enforced this requirement, holding that "even where fraud is alleged, Rule 9(b) allows plaintiffs to make such allegations on information and belief concerning facts that are 'peculiarly within the opposing party's knowledge,' but this exception to Rule 9(b)'s general particularity requirement must not be mistaken for a 'license to base claims of fraud on speculation and conclusory allegations.'" Acito v. IMCERA Grp., Inc., 47 F. 3d 47, 53 (2d Cir. 1995) (citations omitted).

Second, RIMU's alleged misrepresentations are either:

1.     <u>Non-actionable statements about future events</u> – such as Jason's representations about "targeting" a closing date, which are not actionable under Florida law absent allegations that "the defendant had no intent to perform the promise when the defendant made it." Mejia v. Jurich, 781 So. 2d, 1175, 1177 (Fla. 3d Dist. Ct. App. 2001);

2.     <u>Mere puffery</u> – such as references to "strong  demand from our investors," which courts consistently hold are "inactionable because reasonable investors do not base their investing decisions on corporate puffery." Tung v. Dycom Indus., Inc., 454 F. Supp. 3d 1244, 1257 (S.D. Fla. 2020); or

3.     <u>Statements that were not false</u> – such as the revised risk disclosure that securities "may" (rather than "will") become worthless, which accurately reflected the potential range of outcomes.

Third, RIMU fails to adequately allege scienter, a required element of fraud claims. The fact that Mr. Ader and SpringOwl deliberately placed $800,000.00 of their own legitimately earned fees at risk in the same transaction is perhaps the strongest possible

evidence negating fraudulent intent. This was not merely a nominal co-investment—it represented substantial compensation that the Ader Defendants had legitimately earned and were contractually entitled to receive without condition. Instead of collecting these fees outright, the Ader Defendants voluntarily subjected them to the exact same risks as RIMU's capital, creating perfect alignment of interests.

The Second Circuit has repeatedly held that such aligned economic interests negate fraudulent intent. In Shields v. Citytrust Bancorp, Inc., 25 F. 3d 1124, 1130 (2d Cir. 1994), the court noted that "allegations that one or more of the defendants stood to benefit from wrongdoing" are important, and conversely, the absence of such benefit undermines scienter. More recently, in Nguyen v. MaxPoint Interactive, Inc., 889 F. 3d 61, 71 (2d Cir. 2018), the court emphasized that when defendants maintain significant economic interests with the plaintiff, "the [fraud] inference is undermined."

As Judge Cote held in In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 425 (S.D.N.Y. 2001), "the alleged fraud must make economic sense" to survive dismissal. Here, no rational actor would forfeit guaranteed compensation of $800,000.00 to participate in a fraudulent scheme of their own creation. This arrangement is fundamentally incompatible with fraudulent intent and represents the epitome of good faith dealing between sophisticated commercial parties.

III.    RIMU'S CLAIMS FAIL BECAUSE THE ADER DEFENDANTS DEMONSTRATED GOOD FAITH AND RIMU CONTROLLED ITS OWN RECOVERY OPTIONS.

Even setting aside the dispositive effect of the non-reliance provisions, RIMU's claims fail for three additional reasons that negate any plausible inference of fraud.

9

1. <u>The Ader Defendants Demonstrated Good Faith Through Co-Investment</u>

The Ader Defendants demonstrated their good faith and honest belief in the investment by co-investing $800,000.00 of their own legitimately earned advisory fees alongside RIMU's $24.2 million. This was not merely a nominal co-investment—it represented substantial compensation that the Ader Defendants had legitimately earned and were contractually entitled to receive without condition.

Instead of collecting these fees outright, the Ader Defendants voluntarily subjected them to the exact same risks as RIMU's capital, creating alignment of interest. No rational actor would forfeit guaranteed compensation of $800,000.00 to participate in a fraudulent scheme of their own creation. This arrangement is fundamentally incompatible with fraudulent intent and represents the epitome of good faith dealing with sophisticated commercial parties.

2. <u>The Ader Defendants Transferred Complete Control to RIMU</u>

Perhaps the most compelling evidence of the Ai der Defendants' good faith—and the absence of any fraudulent intent—is their voluntary transfer of complete managerial control of the Sponsor entity directly to RIMU. Specifically, as the SASC itself acknowledges, on January 12, 2024, pursuant to a Settlement Agreement, Jason Ader resigned as Managing Member and expressly recognized RIMU's authority to appoint a successor. SASC ¶ 168. RIMU subsequently appointed itself as Managing Member, thereby assuming exclusive control over all aspects of Sponsor's operations and assets, including the unfettered authority to direct litigation strategy and pursue further recovery against Universal beyond the existing $11 million settlement.

Critically, this deliberate relinquishment of control is fundamentally inconsistent with any alleged fraudulent scheme. If, as Plaintiff speculatively asserts, the Ader Defendants had any fraudulent or concealed strategic motives, voluntarily transferring full managerial authority—including complete decision-making power over potential additional recovery—would be entirely counterintuitive. Rather, this explicit transfer clearly demonstrates genuine transparency, good faith, and an intent to empower RIMU fully and unconditionally to protect and maximize its own investment interests.

That RIMU subsequently chose not to pursue additional remedies against Universal—and instead initiated litigation against the Ader Defendants—strongly indicates an attempt at opportunistic litigation, rather than a sincere claim grounded in fraud. Such conduct reinforces the conclusion that Plaintiff's claims are not genuinely predicated upon actionable wrongdoing, but rather, represent a strategic effort to extract additional financial gain through litigation after deliberately abandoning legitimate avenues of recovery within its exclusive control.

3. RIMU's Litigation History Suggests a Pattern of Opportunistic Claims

Mr. McPike, the billionaire investor controlling RIMU, has a documented history of high-stakes investments and litigation. Public records indicate his involvement in other controversial legal disputes, including matters related to COVID loan programs and litigation against a space tourism provider. This pattern of litigation by an ultra-wealthy investor with a sophisticated understanding of financial markets undermine the

plausibility of RIMU's claim that it was somehow defrauded in this arms-length transaction between sophisticated parties.

## IV.    NO FIDUCIARY RELATIONSHIP EXISTED BETWEEN THE PARTIES WITH RESPECT TO THIS TRANSACTION

The Court has already correctly determined that "Plaintiff does not allege facts sufficient to plausibly establish that Jason Ader owed a fiduciary duty to RIMU in connection with RIMU's investment in Sponsor." Op. at 30. This holding is equally applicable to all Ader Defendants.

The co-investment structure of the transaction conclusively establishes that this was not a fiduciary relationship. Unlike the previous Playtech investment where SpringOwl Assocates served as an investment advisor and charged fees for their services, the SPAC transaction involved a fundamentally different relationship. Here, the Ader Defendants expressly and contractually:

1.    Rolled over $800,000.00 in fees they had legitimately earned and were entitled to receive;

2.    Placed those fees at risk alongside RIMU's capital;

3.    Agreed that if the investment declined in value, their $800,000.00 would be proportionally reduced or even eliminated entirely; and

4.    Explicitly documented that they "would not charge any fees under the agreement, directly or indirectly."

This arrangement transformed what had previously been an advisory relationship into a true partnership of co-investors with perfectly aligned interests. The Subscription Agreement further confirmed this non-fiduciary relationship, with RIMU representing

that "[n]either the Company nor any of its affiliates has been requested to or has provided the Investor with any information or advice."

Delaware law does not impose fiduciary duties in "quotidian commercial relationships." WalMart Stores, Inc. v. AIG Life Ins. Co., 872 A.2d 611, 624-25 (Del. Ch. 2005). This was precisely such a relationship between sophisticated commercial parties, and RIMU's attempt to retroactively impose fiduciary duties fails as a matter of law.

### CONCLUSION

For the foregoing reasons, the Ader Defendants respectfully request that the Court grant their Motion and dismiss the SASC in its entirety with prejudice. At minimum, the Court should take judicial notice of Mr. McPike's litigation history, including his involvement in disputes related to COVID loan programs and space tourism providers, as part of evaluating the plausibility of RIMU's fraud claims against the backdrop of what appears to be a pattern of opportunistic litigation by an ultra-sophisticated billionaire investor.

Dated:     October 14, 2025
           New York, New York

Respectfully submitted,

HOWARD BENJAMIN, ESQ.
Attorney for Defendants
260 Madison Avenue, 15th Floor
New York, NY 10016
(212) 832-3006
Benjesq@aol.com

13